**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

March 29, 2019

**BY ECF**
The Honorable Vincent Briccetti
United States Courthouse
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

    Re:    <u>**United States v. Tyrone Felder**</u>,
             14 Cr. 604 (VB)

Dear Judge Briccetti:

    The Government respectfully submits this letter in connection with the sentencing of defendant Tyrone Felder, scheduled for April 3, 2019 at 2:15 p.m. Consistent with the extreme depravity of Felder's conduct, the United States Sentencing Guidelines (the "Guidelines") and the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), the Court should sentence Felder to life imprisonment—that is, a sentence without the possibility of release during his lifetime.

## Background

    Having presided over Felder's trial, the Court is undoubtedly familiar with the horrific facts of this case. During a single week in August 2014, Felder, Kareem Martin, Takiem Ewing, and Tommy Smalls carjacked two livery cab drivers—Maodo Kane and Aboubacar Bah—intending to use their cars to commit a series of armed robberies. During those carjackings, Felder shot and killed both Mr. Kane and Mr. Bah.

    On August 5, 2014, Mr. Kane was directed to drive Felder, Martin, Ewing, and Smalls to an area of the Bronx notable only for its unusual isolation. On a dead-end dirt road, in the dark, Felder pulled out a gun and directed Mr. Kane out of the car. When Mr. Kane was too terrified to move,

Smalls pulled him out of the car.  Mr. Kane stood frozen in fear.  Although the men could easily have driven off in Mr. Kane's car right then, Felder got out of the car, came behind Mr. Kane, and executed him with a single gunshot to the back of the head.  After killing Mr. Kane, Felder drove his crew to a McDonalds in the Bronx that they intended to rob; however, the robbery plan was aborted when they realized the McDonalds was adjacent to a police precinct and a police vehicle pulled up alongside them.  Undeterred, Felder drove them all to Yonkers, and Martin, Ewing, and Smalls—using guns provided by Felder—robbed a convenience store and a Dunkin' Donuts.  The four men then ditched Mr. Kane's car under the Deegan Expressway, attempting to cover their tracks by soaking the car in bleach stolen from the convenience store.

Exactly one week later, on August 12, 2014, Felder chose to do the same thing all over again.  Felder, Martin, Ewing, and Smalls hailed Mr. Bah's livery cab in the early morning hours and, just as they had done one week earlier, attempted to direct him to a quiet neighborhood.  But this time they struggled to find a good place to take Mr. Bah's car by force.  As they continued to direct him here and there, Mr. Bah became concerned and ordered them out of the car.  Just as Felder had done a week earlier, he pulled out a gun and pointed it at Mr. Bah's head.  When the car moved forward, Felder fired once, killing Mr. Bah.  The Court no doubt recalls the chilling video of the car rolling aimlessly down the street, Mr. Bah dead behind the wheel, as Felder and the others gave chase.  The car came to a stop only when it hit parked cars.  Felder's crew pulled Mr. Bah's body from the car and threw it into the street before speeding off, Felder again behind the wheel, only to decide that the car had to be abandoned a short distance away.

All told, Felder's crimes netted only a few hundred dollars.  The true cost of his actions, however, was the inexplicable, brutal killing of Mr. Kane and Mr. Bah, livery cab drivers simply trying to earn a living, and the trauma that the five surviving robbery victims endured.

For these acts, Felder was tried and convicted of two carjackings resulting in death (Counts One and Seven); discharge of a firearm in furtherance of each of the carjackings (Counts Two and Eight); robbery of the convenience store and the Dunkin' Donuts (Counts Three and Five); aiding and abetting the brandishing of firearms during and in relation to these robberies (Counts Four and Six); and robbery conspiracy (Count Eleven).

As correctly calculated in the PSR, the sentence recommended by the Guidelines is life imprisonment on the carjacking and robbery counts, followed by a mandatory 34-year term of imprisonment on the firearms counts. This is also the sentence recommended by Probation. The Government agrees with defense counsel that the 34-year term must run consecutively to the entirety of the sentence imposed in 14 Cr. 546 (VEC). The defense asks that the Court impose only the 34-year mandatory minimum.

## Discussion

In light of the nature and circumstances of Felder's crimes, as well as Felder's history and characteristics, the Government respectfully submits that a sentence of life imprisonment is necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

In many respects, the seriousness of Felder's crimes is self-evident—it is hard to conceive of a crime more serious than the taking of innocent life. But in particular, it is both Felder's personal role in these crimes and the fact that he chose to commit them not once but twice, just one week apart, which make a sentence of anything less than life wholly inadequate.

*First*, Felder actively participated in the planning of these violent crimes. As Smalls explained, the robbery plan was first presented to him by Felder, and Felder helped devise the specific plan to carjack a cab driver and use the car to commit gunpoint robberies. (Tr. 860:17-25, 863:5-2.) Felder's role is not surprising given that both Nenobia Washington and Jorge Figueroa testified that Felder was the leader of the group. (Tr. 528:8-16, 546:5-10, 845:5-16.) Indeed, the video of the convenience

store robbery makes clear that when Felder gave an order—in this case, that it was time to finish the robbery and leave—the others followed. (GX 309.) Moreover, from the beginning, the plan that Felder helped devise involved a significant risk of violence: not only do both carjackings and robberies of commercial establishments open for business contemplate the use of force by their very nature, but Felder also specifically directed that they would use guns as part of this plan—guns that he personally provided. (Tr. 864:5-10, 877:1, 899:15-17.)

*Second*, Felder personally fired each of the shots that killed Mr. Kane and Mr. Bah. As Smalls described, on August 5, 2014, after luring Mr. Kane to a desolate block in the Bronx, "Felder put the gun out on his [Mr. Kane's] head. . . . [T]he driver did not move. So I got out and opened the driver's door and pulled him out by his shirt . . . he looked scared." (Tr. 871:2-9; 872:8.) At that point, "Felder came out the opposite side. And I was going through the cab driver's pocket. Felder came around. He asked me what I'm doing. I said, 'I'm trying to rob him.' He told me, 'go in the car.' Then, when I was getting in the car, halfway in the car, I heard a shot." (Tr. 871:4-9.) Smalls "saw the body on the floor. [Felder] jumped in the car and [they] drove away." (Tr. 874:9-12.) On August 12, 2014, after giving Mr. Bah various directions in search of a quiet place to carjack him, "Felder pulled his gun out on him, [and] told him to get out. [But h]e refused to get out." (Tr. 905:2-25.) Smalls, Ewing, and Martin got out of the car, arguing with Mr. Bah. (Tr. 905:25—906:1-3.) But Felder was still in the car—"[h]e had the gun pointed at him [Mr. Bah]." (Tr. 906:3-5.) When the car started to move, Smalls "heard a shot." (Tr. 906:5-8.) When they chased down the car and opened the door, they "saw the cab driver leaning in front dead, and [Smalls] and Felder pulled him out [of] the car, then jumped in the car and drove away." (Tr. 910:4-6.) Once again, Felder was the driver. (Tr. 910:14-15.)

*Third*, the manner in which Mr. Kane was killed—akin to an execution—was especially abhorrent. Once Mr. Kane was standing outside of the car, frozen in fear, there was no impediment to Felder and the others simply driving away with the car as planned. Mr. Kane was not resisting, there

was not, for example, a struggle over the gun.  Mr. Kane stood in shock while Smalls ran through his pockets.  Felder chose to get out of the car.  Felder chose to send Smalls back inside.  And Felder chose to shoot Mr. Kane at close range, in the back of the head.  (*See* Tr. 1093:2—1094:21 (concluding the bullet traveled back to front, right to left, and that the muzzle of the gun was within two feet of Mr. Kane's head when it was fired).)

*Fourth*, while either killing standing alone would merit a life sentence, Felder's decision to commit these violent crimes in aid of armed robbery not once but twice, just one week apart, demonstrates a particularly astonishing disregard for human life.  Despite having taken Mr. Kane's life and participated in two armed robberies in which victims were terrorized with guns on August 5, Felder did not hesitate to do it all again on August 12—in Smalls' words, "the same way we did last time."  (Tr. 896:1.)  Once again the plan was to carjack a car and then, this time, to rob a jewelry store.  (Tr. 897:13-14.)  This was not going to be a nighttime burglary but rather a morning robbery, after the store had opened.  (*Id.*)  That this meant they would again terrorize store employees was apparently of no concern.  After all, just one week earlier they had robbed the convenience store and the Dunkin' Donuts by using three guns to subdue customers and employees.  Moreover, Felder agreed to the second carjacking—and provided the guns for it—having shot and killed their last carjacking victim.  Under these circumstances, it would be absurd to think that Felder did not, at a minimum, know and accept the risk that the next driver would be killed too.  To have so clearly made the calculus that a getaway car and a robbery were worth an innocent life is astounding.

These factors not only demonstrate the extreme seriousness of Felder's crimes, but they also evidence an indifference to human life that speaks to the deep and real need to incapacitate Felder in order to protect the public.  The need for incapacitation is further supported by Felder's criminal history.  His interactions with the criminal justice system date back at least as early as age 16.  Neither steadily escalating sentences, nor court supervision deterred Felder from continuing to commit assaults

and robberies or from becoming the leader of a gang that used guns and violence to control the drug market at River Park Towers in the Bronx. Furthermore, even while incarcerated on federal charges, Felder has been disciplined eleven separate times. Felder's lack of respect for the law, the apparently low deterrent value of criminal justice supervision, and the apathy for human life that he has shown underscore the need for a life sentence.

In asking that the Court impose only the 34-year mandatory minimum sentence, the defense focuses on the circumstances of Felder's childhood and on the 26-year sentence Felder received in 14 Cr. 546 (VEC). The Government respectfully submits that neither of these factors justifies a sentence less than life.

The Government fully acknowledges the damage done to children raised in abusive, neglectful, and drug-ridden environments like the one detailed in the defense submission. No child should have to endure that. And as the Court is certainly all too aware, many of these children sadly join gangs to replace missing families and turn to crimes like selling drugs because those are the easiest jobs available. But what this kind of childhood does not explain is the decision to execute a cab driver who has already ceded control of his car. What this kind of childhood does not explain is the decision, exactly one week later, to commit another carjacking armed with a gun for the purpose of committing another armed daytime robbery. Felder did not find himself in a sudden shootout. He did not agree to a robbery that unexpectedly went bad. Felder is before this Court for sentencing because he made the decision to commit armed robberies and to take innocent lives in the process. These crimes require a sentence of life imprisonment.

For essentially the same reasons, the mandatory minimum sentence of 34 years is insufficient even in light of the sentence imposed in 14 Cr. 546 (VEC). As the defense acknowledges, such a sentence contemplates Felder's release during his lifetime, even if at the age of 77. The defense suggests that by that time, there is not much risk to the public, so why not give Felder that chance?

Because while deterrence and incapacitation are important purposes of sentencing, they are not the only purposes. The sentence imposed must reflect the seriousness of Felder's crimes, and not just their generic seriousness, but the seriousness of Felder's personal conduct. Mr. Kane will not see his 77th birthday because of Felder. Mr. Bah will not see his 77th birthday because of Felder. For the rest of their lives, the robbery victims will suffer the effects of being pistol whipped and chased with guns that Felder provided. Under the particular facts of this case, only a sentence without the possibility of release during Felder's lifetime is sufficient to satisfy all the purposes of sentencing.

## Conclusion

For all the forgoing reasons, the Government respectfully submits that consistent with the sentence recommended by the Guidelines and the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), a sentence of lifetime imprisonment is necessary.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: ___/s/_____
Celia V. Cohen
Hagan Scotten
Anden Chow
Assistant United States Attorney
(212) 637-2466