```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,
 4
                            Case No. 7:14-cr-00604-VB
 5      -vs-
 6  TYRONE FELDER,
 7                          Defendant.
 8  ------------------------------------x
 9                          United States Courthouse
                            White Plains, New York
10
                            August 29, 2018
11
12  Before:
                THE HONORABLE VINCENT L. BRICCETTI
13              UNITED STATES DISTRICT JUDGE
                AND A JURY
14
    APPEARANCES
15
    GEOFFREY S. BERMAN
16      United States Attorney for the
        Southern District of New York
17  CELIA V. COHEN
    HAGAN CORDELL SCOTTEN
18  ANDEN F. CHOW
    Assistant United States Attorneys
19  Attorneys for the Plaintiff
20  ANDREW G. PATEL
    DAVID A. RUHNKE
21  BENJAMIN A. SILVERMAN
    Attorneys for the Defendant, Tyrone Felder
22
    ALSO PRESENT:
23
    BRENDAN KENNEY, FBI
24  KARMA SMITH, FBI
    JAMES McLAUGHLIN, Paralegal
25
```

1          (In open court; jury not present)

2          THE COURT:  Have a seat, please.

3          Okay.  Let me, before we bring the jury in, let me

4    tell you that I have given additional thought to this DNA expert

5    issue that we addressed briefly yesterday, and here is we are

6    going to do, okay?  I don't need any further argument on this.

7          I am inclined to agree with the government.  Inclined

8    doesn't mean I have ruled, but I am inclined to agree with the

9    government that the report and the corresponding testimony is

10   admissible.  Again, we are referring to Mr. Silverman's letter

11   of August 27th and the government's response also August 27th,

12   Documents 158 and 159 in the ECF docket.

13         It's not apparent to me that the jury will be

14   confused.  The essence of the testimony, as I understand it,

15   because I haven't heard the testimony.  All I have seen is one

16   little two-page report, but from what I understand from reading

17   that and from hearing from counsel, is:  Number one, that

18   Martin's DNA was found on the glove, and that's what the witness

19   will testify.

20         Secondly, that there is other DNA on the glove, in

21   other words, belonging to someone other than Martin, but the

22   witness cannot say that it's Felder's DNA.  By the same token,

23   she can't exclude the possibility that it is Felder's DNA.

24         Number three, Felder's DNA definitively is not found

25   on the other samples that were tested.  In other words, he is

1   excluded as a contributor.

2         So the significance of the middle of those three

3   things, the second of those three things, is that it prevents

4   Felder from arguing that the fact that Martin's DNA was found in

5   the glove means that Felder never touched the glove since there

6   is other evidence, other DNA on the glove, it's not fair to

7   infer that Felder is definitively excluded; and this evidence is

8   probative because, while it doesn't prove any connection to

9   Felder, neither does it exclude Felder from the connection to

10  the glove.

11        Under the circumstances, especially since defense

12  counsel will have a full opportunity to elicit from the witness

13  that she -- I believe it's a she; is that right?

14        MR. CHOW:  Yes, Your Honor.

15        THE COURT:  From the witness that she did not find

16  Felder's DNA in the glove, I don't think there is a risk of

17  juror confusion.  In other words, the witness is going to say, I

18  didn't find his DNA on the glove.  It's just that she can't

19  exclude that possibility.  It doesn't mean that she still going

20  to -- she's still going to say I didn't find his DNA in the

21  glove based on whatever scientific standards apply.  Correct?

22        MR. CHOW:  Correct, Your Honor.  Although at this

23  time, if it would be permissible, I don't think this affects the

24  Court's ruling at all, but I did misspeak yesterday.  I went

25  back and took a look at Ms. Perez's laboratory reports, and

 1    yesterday I said that the same two samples that had the biggest
 2    hit from Mr. Martin were the same two samples that she concluded
 3    she could not exclude the defendant or could not determine
 4    whether the defendant would be included.
 5           Those are actually the outsides of the same glove, but
 6    technically are two different samples than the samples that she
 7    concluded had been major donor of Kareem Martin.  That's kind of
 8    convoluted.
 9           THE COURT:  Yes, it is.
10           MR. CHOW:  I will try to break it down.
11           THE COURT:  Hold that thought because that actually
12    leads to my final point, and this is important.  Remember I said
13    that I didn't rule yet, right?
14           MR. CHOW:  Right.
15           THE COURT:  What I am going to do is I am going to --
16    I want to hear from the witness first before she testifies about
17    this specific part of her testimony.  You know, the language in
18    the report is both technical and somewhat awkward, awkwardly
19    phrased, you might say.  Sorry.
20           I am just reading into the record, quote, and this is
21    attached to Mr. Silverman's letter, this is the report dated
22    November 13, 2014, prepared by the Medical -- the Office of
23    Chief Medical Examiner in New York City.
24           It says, "Based on the number of DNA alleles," I think
25    that's how you pronounce it.  I could be wrong, A-L-L-E-L-E-S,

1  "seen in the DNA profile of Tyrone Felder that are seen in the

2  mixtures of DNA found in the samples listed below, it cannot be

3  determined whether he can be included as a possible contributor

4  to the mixtures."

5          Now, I am not trying to be mean about it, but that is

6  rather awkwardly phrased, at a minimum, and plus, there are some

7  technical words in there like the word alleles.  That's not a

8  word that anybody in the jury is likely to know.

9          And then the two samples, the two items are then

10  referenced below that, and then it says, "Tyrone Felder is

11  excluded as a contributor to all other samples where comparisons

12  could be made."

13         This is -- usually when it comes to assessing the

14  admissibility of some particular piece of evidence, you know, a

15  proffer from one side or the other is sufficient, and I get the

16  idea of what the person is going to say, and then I can make a

17  decision about whether it's probative and relevant and not

18  unduly prejudicial, et cetera, et cetera.

19         I just feel like this seems a little both technical

20  and a little awkward, and I would like to hear it from her

21  personally myself, and that doesn't mean that I am going to want

22  to do a rerun or do a complete testimony, her complete testimony

23  and then do it again in front of the jury.  The notion that I

24  have is that she could -- she could -- I am not sure where this

25  fits into her testimony, but that she could testify about her

```
1    experience, testify about DNA sampling.  You know, exactly what
2    her -- the whole sort of scope of her testimony is, I am not
3    really sure, but what I am hoping is that this could be
4    something that we can simply interrupt her testimony on and then
5    hear from.  Maybe I am wrong about that.  I don't know.  I don't
6    have your outline in front of me.  I don't know how you are
7    going to do this.  I am guessing.
8                 MR. CHOW:  I think if the Court has any particular
9    preference with regard to this, perhaps I could suggest during
10   -- so during one of the breaks she won't be the first witness
11   called tomorrow.  We have several witnesses before her.  During
12   one of the breaks, we could -- she could just come into the
13   courtroom and we could have her explain just this limited
14   portion of the DNA report to the Court.  We wouldn't need to go
15   through her entire, you know, professional background and
16   qualifications in order to be qualified as an expert.  Since the
17   Court is very interested in just this small portion of her
18   testimony, we could just have her walk the Court through this
19   particular conclusion, and then based on that, the Court could
20   make a determination whether or not --
21                THE COURT:  I am just trying to do it as efficiently
22   as possible, and if that's what you think would work, then I am
23   willing to do that.
24                MR. CHOW:  She will be here first thing in the
25   morning, and so at any point in the break in the court session
```

 1    we could have her just come in.

 2              MR. RUHNKE:  That makes sense.

 3              THE COURT:  I am fine with that.  Mr. Silverman you

 4    look like -- somebody looked like they were standing up.  Did

 5    you want to say anything?

 6              MR. SILVERMAN:  We agree with the government.

 7              MR. RUHNKE:  And, Your Honor, I was going to say

 8    practically it would make sense to do this first thing in the

 9    morning.  Maybe tell the jury to come in a little bit later.

10              THE COURT:  That's not crazy.  We could do that, too.

11    Does that sound all right to you?

12              MR. CHOW:  Whichever one the Court prefers.

13              THE COURT:  I just don't -- it's a little -- see, here

14    is the thing:  It's interesting.  On the one hand, as long as

15    this is explained to the jury and clearly defense counsel will

16    have an opportunity to cross-examine, I just don't see

17    ultimately any likelihood of confusion.  I don't think the jury

18    -- it's hard to me to imagine that the jury is going to go in

19    the jury room and say, well, you know, she didn't exclude Felder

20    so, and there was other DNA, so it must have been Felder's DNA.

21    I don't see how they could possibly draw that conclusion from

22    the little snippet that I have in front of me on this report.

23              But, on the other hand, the snippet itself is

24    inherently technical and awkward, and I would like to just hear

25    it in live, kind of dynamic conversation.

1              Anyway, that's what I want to do, and that's the way I

2     am going to do it.  Okay?  All right.  We will put that to the

3     side for the moment.

4              Hold on just one second.  I guess I had that.  Is

5     there anything else we need to do before the jury comes in?

6              MR. SCOTTEN:  Not before the jury comes in.  I think

7     we sent up last night, Your Honor, an application for immunity.

8              THE COURT:  Oh.

9              MR. SCOTTEN:  But it doesn't need to be done now.

10    This witness will not go on any earlier than this afternoon.  We

11    would like to do it sometime --

12             THE COURT:  I did see that, and for some reason I

13    don't seem to have it in front of me, but I did get it.  So it

14    must be sitting on my desk.  So it's okay.  We don't need to do

15    that now is what you are saying?

16             MR. SCOTTEN:  No.  Her attorney is only available

17    today.  I think the usual practice is the attorney should at

18    least be present for the invocation and the Court's giving the

19    order of the immunity if the Court is inclined to do that.

20             THE COURT:  Do you want to do that outside the

21    presence of the jury?

22             MR. SCOTTEN:  I think the courts would prefer to do it

23    that way.  That's the way I've always seen, so yes.

24             THE COURT:  So just tell me exactly how you want to do

25    this.

1              MR. SCOTTEN:  I think probably right after lunch

2    before the jury comes out, assuming the attorney gets here on

3    time, we can put the witness on, and I could ask her some

4    questions, and she will invoke, and then the Court could

5    inquire, you know, give the order as the Court prefers.

6              MR. RUHNKE:  Your Honor, just one piece of breaking

7    news a little bit.  We were advised by the government this

8    morning --

9              THE COURT:  Wait a minute.  Is this on the same point?

10             MR. RUHNKE:  No.  This is --

11             THE COURT:  Let's keep one point at a time.  Are you

12   okay with that procedure?

13             MR. RUHNKE:  We are fine, Your Honor.

14             THE COURT:  Next.

15             MR. RUHNKE:  All right.  We were advised by the

16   government this morning, and I don't know if Mr. Kennedy should

17   remain in court while we discuss this, but that he will --

18             THE COURT:  He is the case agent.

19             MR. RUHNKE:  The case agent --

20             THE COURT:  He can stay in court.

21             MR. RUHNKE:  -- will opine that on one of the videos

22   Mr. Felder appears to be carrying a firearm.  Now, that is

23   certainly expert testimony.  That's opinion testimony.  We have

24   never been apprised that a --

25             THE COURT:  Why is it expert testimony?  What if he

1    said that he appears to be wearing white and black sneakers?

2            MR. RUHNKE:  That does not call for expert

3    qualifications.

4            THE COURT:  See, isn't this something that's subject

5    to cross?  If he says, this little thing over here, this dark

6    shadowy thing, you know, based on my experience, looks like a

7    gun to me.  And then you say on cross whatever you are going to

8    do to sort of impeach that statement.  I don't that's expert

9    testimony.  It's testimony.  It's based on his long experience

10   as an -- I will take out the word "long" -- based on his

11   experience as a law enforcement officer.

12           MR. RUHNKE:  Your Honor, cross-examining --

13           THE COURT:  And his very careful review of the video.

14           MR. RUHNKE:  Cross-examining on that issue would

15   probably not be a profitable exercise for the defendant in this

16   circumstance.

17           The best I believe the witness is going to be able to

18   say is that it looks like a firearm, and I think that is

19   unfairly prejudicial, minimally probative, and we object to it.

20           MS. COHEN:  Your Honor, the government agrees with

21   your point that it's clearly not expert testimony.  Special

22   Agent Kenney will be testifying on the basis of his personal

23   experience, both observing individuals carrying firearms and

24   personally carrying a firearm.

25           He -- in addition, that testimony is extremely

1  relevant, and while it's prejudicial in the sense the defense

2  doesn't like it, it's not prejudicial in the sense of it being

3  unfair.  Absolutely he can be cross-examined on that point.

4  Should they choose not to do so, that's a defense decision.  But

5  it's highly relevant given the amount of video that the jury has

6  seen.  The special agent's very careful review of that video

7  will assist the jury in their review of that video.

8          THE COURT:  Well, I mean, again, again, it seems to me

9  that the Devil is in the details.  Let's say the -- the agent

10  came in and said, based on my experience and my personal use and

11  possession of firearms, you know, this little shadow here inside

12  his sweatshirt is a bump that indicates that he is carrying a

13  firearm, but it kind of really boils down to a guess as opposed

14  to some meaningful observation.  That would be different than

15  if, you know, there was something in Felder's hand that was in

16  the -- was not concealed, but he was holding it, and it clearly

17  was in the appearance of a firearm, and it's the same testimony

18  as, you know, much more probative in that situation than it

19  would be in the former situation.  I don't know what it is.  So

20  maybe I should see it first.

21          MS. COHEN:  That's fine, Your Honor.

22          MR. RUHNKE:  Maybe we should have an 104 hearing on

23  this issue.

24          THE COURT:  A 104 hearing?  What does that mean, 104?

25          MR. RUHNKE:  Preliminary, put the agent on to explain

PROCEEDINGS

1    what he's going to testify to.

2            THE COURT:  Oh, essentially what I talked about before

3    with the other witness, sort of a preview of the evidence.

4            MS. COHEN:  Your Honor, I would be happy to proffer

5    what the testimony will be.

6            MR. RUHNKE:  If we are going --

7            THE COURT:  Just wait one second, please.

8            (Pause)

9            THE COURT:  When is this going to come up?  Is this

10   like the first thing?

11           MS. COHEN:  Yes, Your Honor.

12           THE COURT:  Why don't you give me -- and we will have

13   a preview?

14           MS. COHEN:  So in Government Exhibit 338, why don't we

15   just pull that up?  This is the video where the defendant and

16   Ewing, Martin and Smalls are chasing a car.

17           (Video played)

18           THE COURT:  Okay.

19           MS. COHEN:  And --

20           THE COURT:  Let me just, again, we only had one day of

21   trial, so there is obviously a lot more to come, but stop the

22   video, please, or actually go back to the beginning.

23           As I recall, the video shows four men getting into the

24   vehicle, into a black vehicle, and there might be some other

25   video in there, but then ultimately, we get here where it shows

1    four men, four men running after the vehicle, and then they get

2    back in the vehicle, and then it pulls away, right?  And then

3    there is a body on the ground.

4         MS. COHEN:  Correct.

5         THE COURT:  Is there going to be some explanation of

6    how they got out of the vehicle and how they got back in and the

7    car is rolling down the road?  How do you fill that gap?

8         I mean, what you showed before is that they were in

9    the vehicle, and all of a sudden they are out of the vehicle;

10   assuming it's the same four guys in the same vehicle.  How does

11   the government's -- what's the government's theory of what

12   happened here and --

13        MS. COHEN:  The theory is that the driver in this

14   video has already been shot and killed.  The defendant and the

15   others are now already out of the vehicle.  The driver, because

16   he is dead, is not able to control the car.

17        THE COURT:  That part I get, but how did they happen

18   to be out of the vehicle?  They were in the vehicle.

19        MS. COHEN:  In the effort to carjack the driver, they

20   exited the vehicle, and the driver's shot while one person is in

21   the vehicle, and then they get out.  They are sort of half in,

22   half out; and at that point because the driver has been shot, he

23   is not controlling gas or brake.  The car starts to roll

24   aimlessly down the street.  That's when they are chasing it.

25   The car stops because it hits another vehicle.  They pull the

1    driver out, Mr. Bah.  Dump his body, jump in, and drive away.

2              THE COURT:  Was the -- was the car in gear or was it

3    rolling down hill in neutral?  In other words, was it in gear,

4    but he was -- he was not controlling it?  I mean, if it's an

5    automatic car, and you have the car in drive, and you put your

6    foot on the brake, the car is not going to move.  If you take

7    your foot off the brake, the car is going to move.  Slowly, but

8    it will move.

9              Is that what appears?

10             MS. COHEN:  That's our understanding, yes.

11             THE COURT:  All right.  Roll it back to the beginning,

12   please, or whatever the segment is.  So this is the segment you

13   are talking about, right?

14             MS. COHEN:  This is the first.

15             THE COURT:  All right.

16             MS. COHEN:  There is two pieces to the testimony.

17             (Video played)

18             MS. COHEN:  So Mr. Felder now in the front, and his

19   testimony is that he is holding something in front of him.  He

20   is not running with two hands.  He is running with his hands

21   clasped in front of him.  There won't be a conclusion as to what

22   that is, merely the observation that he is running with his

23   hands clasped in front of him.

24             THE COURT:  Does it really require testimony?  You

25   just said it yourself.  Can't you just show this to the jury and

PROCEEDINGS

```
1    show it to the jury in summation ten times if you want to.  You
2    can slow it down even, but why can't you just make that argument
3    to the jury?
4            MS. COHEN:  Because I think that's important for when
5    we go to 342.
6            THE COURT:  I am not saying it's not important.  I am
7    just trying to figure out why we need a witness to testify to
8    that.  You can see it.
9            MS. COHEN:  Right.  We need a witness to testify as to
10   the next exhibit, Your Honor.
11           THE COURT:  All right.
12           (Video played)
13           MS. COHEN:  So this is a clip out of Government
14   Exhibit 342.  This is just before we play it just to orient
15   everyone.  The car has now been dumped at Underhill.  They have
16   taken a left into the alleyway on the way to Bolton.  Mr. Felder
17   is in the front.  Can we go ahead and play the video?  And if
18   you look in his left hand, which is on our right, there.  You
19   can see.  Yes.
20           THE COURT:  I have to go back.
21           MS. COHEN:  We have a still of that, 342-C.
22           THE COURT:  This is a still from the same video?
23           MS. COHEN:  Yes.  So if you're looking at his left
24   hand on our right, that's not a hand.
25           THE COURT:  So you are saying that that sort of
```

PROCEEDINGS

```
1    elongated object, almost an extension of his left hand --
2              MS. COHEN:  Exactly.
3              THE COURT:  -- in 342-C, in the view of the agent is a
4    firearm?
5              MS. COHEN:  Yes.  Is consistent with a firearm.
6              MR. RUHNKE:  Your Honor, respectfully, nobody can look
7    at that and say, I think that's a firearm.
8              THE COURT:  Sure, they can.
9              MR. RUHNKE:  Somebody could -- somebody could look at
10   that and say, I think maybe that's a firearm.  I am not sure
11   what that is.
12             Certainly the government could make that argument to
13   the jury if they want to say, look at this.  We argue that that
14   is a firearm he is carrying, but to put an agent on the witness
15   stand to say he looks at that, and in his expert opinion as a
16   law enforcement agent for X number of years, that's a firearm he
17   is carrying is just usurping the fact-finding responsibility of
18   the jury, and we object to it.
19             And I know the line of cases say all evidence that the
20   government offers is prejudicial.  It is unfairly prejudicial to
21   take from this ambiguous photograph, series of photographs and
22   say, we are therefore allowed to put a witness on who will offer
23   the opinion that that is a firearm based on what we are looking
24   at here, and we object to it.
25             MS. COHEN:  Your Honor, again, Special Agent Kenney is
```

```
 1    not going to offer an opinion.  He is going to say it's
 2    consistent with the firearm based on his personal experience of
 3    running carrying a firearm.
 4         The way that the defendant is holding that object is
 5    consistent with a firearm because you don't hold a bottle of
 6    water this way.  You don't hold a cell phone this way.  I don't
 7    think that it's --
 8         THE COURT:  Well, there are other things besides a
 9    firearm that you could hold that way.  I mean, you could be
10    holding --
11         MR. RUHNKE:  A handkerchief.
12         THE COURT:  A stick or a club or a brick or a golf
13    club or I don't even know what it could be, but --
14         MR. PATEL:  A handkerchief.
15         THE COURT:  Well, I am not adopting Mr. Patel's
16    suggestion.  I have seen Mr. Patel.
17         MR. SCOTTEN:  To be fair, Your Honor --
18         THE COURT:  Have a seat Mr. Patel, please.
19         MR. SCOTTEN:  I saw this 20 minutes ago, which is why
20    this is coming up so late.  I think the Court knows from my
21    prior life I have carried firearms.  That's a gun.  I am not
22    testifying.  I am not saying that I would testify to it.  I am
23    saying it is not an irrational leap.  Somebody who has
24    experience with firearms I think can readily explain why there
25    is almost nothing you hold that has a handle in the hand and
```

1    then elongates in the same direction.

2             THE COURT:  Yes, but if what you are saying is true,

3    and I do understand your -- you previously served -- you have

4    served in the Army, I guess, right?  So you do have experience

5    with firearms.  I get that.

6             Mr. Kenney, obviously, has experience with firearms

7    because of his job, but if that's so clear that that's a

8    firearm, I am not saying it's not a firearm.  Don't get me

9    wrong.  I am not making a finding that it isn't.  But if it's so

10   clear, then why is this coming up now?  In other words, did

11   Mr. Kenney prior to this morning say in the enormous amount of

12   time that was put in -- and, by the way, excellent police work;

13   I don't think the defense even would object to that statement --

14   that was put into this case, did he say until this morning, you

15   know, that's a firearm based on my experience.  I have seen this

16   video now 50 times.  That's a firearm.  Did he say that or is it

17   coming from counsel?

18             MS. COHEN:  Your Honor, we reviewed the video together

19   with Special Agent Kenney this morning.  He did not observe the

20   firearm prior to today.  We observed it together and certainly

21   did not suggest to him that he should testify to something that

22   he did not see himself on the video and feel comfortable, and

23   that's why he is not going to get up there and say definitively,

24   that's a firearm.  He is going to say it's consistent with and

25   provide a basis for that observation.

 1                THE COURT:  Of course one of the things that could be
 2    done on cross is to say, when did you first tell your -- the
 3    prosecutors in this case that you believed that was a firearm?
 4    And if his answer to that is, this morning, that is relevant
 5    cross in my opinion; not because it's showing that he is making
 6    it up exactly, but because it suggests that it's not so clear;
 7    that it's -- if it was all that clear, then it wouldn't have
 8    come up for the first time this morning.  I am not saying the
 9    government did anything wrong.  You didn't do anything wrong,
10    but the fact is, and you just confirmed it to me, that this
11    notion that this is a firearm that he's carrying in
12    Exhibit 342-C occurred, broadly-speaking, to the prosecution and
13    its witness this morning for the first time.  Is that a fair
14    statement?
15                MS. COHEN:  That's --
16                THE COURT:  Maybe not, but --
17                MS. COHEN:  That's fair, Your Honor.  I just -- to
18    contextualize as Your Honor has said, there are hours and hours
19    of video, much of which we actually haven't put into evidence.
20                THE COURT:  Of course.
21                MS. COHEN:  And so the amount of time spent by the
22    agents working on this case reviewing video is extensive.  The
23    fact that this, although important detail, wasn't identified
24    until this morning I don't think reflects on failure to
25    carefully reviewed video or --

PROCEEDINGS                                                  280

1          THE COURT:  Ms. Cohen, you are misunderstanding me.
2    It does not reflect on that at all.  The police work in this
3    case was amazing.  That's the opposite of careless, right?  But
4    that's sort of the point, right?  That's -- I think that's the
5    jumping off point.  It was amazing police work.  It was
6    detailed, thoughtful, careful.
7          Yet notwithstanding that, and notwithstanding not just
8    Mr. Kenney's review of the video, but other agents' review of
9    the video and prosecutors' review of the video, which has been
10   in their -- your/their possession for some number of years, I
11   assume, it wasn't until this morning that someone made the
12   observation, you know what, I think that's a gun.
13         MS. COHEN:  That's fair, Your Honor.  That's true.
14         THE COURT:  So see, that's -- that's -- to me, that
15   supports the notion that while it may be a gun, and it's fair
16   argument for the government to argument to the jury that it's a
17   gun, it suggests that it's not so clear that it warrants
18   testimony by the agent that it's a gun.
19         MS. COHEN:  But, Your Honor, I think, in fact, because
20   of that, that's exactly why it is helpful to the jury to hear
21   from someone who is familiar with carrying and running with a
22   firearm.  If it were clear as day --
23         THE COURT:  What is it about carrying and running with
24   a firearm that means that this is a gun?  It's either it looks
25   like a gun or it doesn't look like a gun.  Even if you have

 1   never run with a firearm.

 2              MS. COHEN:  So, Your Honor, combining 342 with the

 3   prior exhibit we watched, 338 --

 4              THE COURT:  Which was several minutes earlier, right,

 5   in time?

 6              MS. COHEN:  Right.  But so Felder is running like

 7   this, which most law enforcement --

 8              THE COURT:  For the record, you are crossing your

 9   arms.

10              MS. COHEN:  Crossing my arms across my torso, not

11   running with two hands as they are chasing a car, right?  Very

12   unusual way to be running.  Law enforcement observing someone

13   running that way would conclude that that person is carrying

14   something that they are attempting to control and conceal, and

15   then we get --

16              THE COURT:  Again, was that concept, did that come up

17   prior to this morning or was that discussed earlier?

18              MS. COHEN:  Yes.  We have discussed the manner in

19   which Felder and the other three are running in that video.

20              THE COURT:  But specifically, the manner and the

21   conclusion that Felder's -- maybe you should go back to that --

22   but Felder's manner of running suggests that he is concealing

23   something?

24              MS. COHEN:  We didn't --

25              THE COURT:  If you didn't bring it out yesterday, so I

```
1    am guessing you didn't have it in your outline to ask about.

2              MS. COHEN:  It was discussed, but we did not identify

3    it as something that we were going to offer to the jury during

4    Special Agent Kenney's testimony.

5              THE COURT:  Can I see the other video again, please?

6    I don't remember what the exhibit number was.

7              MS. COHEN:  338.

8              (Video played)

9              THE COURT:  Okay.  By the way, is it possible to stop

10   it, please?  Just pause for a second.

11             Is it possible to slow it down?  Maybe not.  I don't

12   know.  This is in realtime?  Right?  This is --

13             MS. COHEN:  Yeah.  I don't know that we have the

14   capacity to do that.  We would have to -- we could -- let's

15   scroll it instead of playing.

16             THE COURT:  Just hit "play."  Let me just see it play

17   again.

18             (Video played)

19             MS. COHEN:  Pause it here.  So now Mr. Felder is in

20   front.  Just play.

21             THE COURT:  Stop right there.  He definitely has left

22   -- this is in again Exhibit 330, is it?

23             MS. COHEN:  338.

24             THE COURT:  330?

25             MS. COHEN:  Eight.
```

1          THE COURT:  338, and it's I guess 17 seconds into this

2    clip, and the person in front who is wearing what appears to be

3    a light-colored hoodie in that you brought out that yesterday

4    that that could be a function of color distortion, I am kind of

5    assuming that that's also going to be part of cross in this

6    case, but we are not there yet.

7          But in any event, that person, whoever it may be,

8    certainly has his left arm crossed in front of him.  It's not at

9    his side.  Hard for me to see his right arm.

10         MS. COHEN:  If we play just slightly forward to the

11   next couple of frames, you can see it's still 17 seconds, but

12   it's about two frames forward from that, that Mr. Felder has

13   both hands clutched, you know, approximately at his navel.

14         THE COURT:  That does appear to be -- what's happening

15   here?  Continue.

16         (Video played)

17         THE COURT:  And the other three people, not the first

18   one, but the other three, appear to be running swinging their

19   arms back and forth, which -- which I guess would be a more

20   typical way to run.

21         MS. COHEN:  Yes, with the exception, Your Honor, of

22   Mr. Smalls --

23         THE COURT:  Okay.

24         MS. COHEN:  -- who we believe also has a firearm.  If

25   we could play to clip again, I will point out who he is.

1          MR. RUHNKE:  Your Honor, just so you know what is

2  coming, it appears that one of the people running drops

3  something and goes back to that tree in the background to pick

4  it up.

5          THE COURT:  Stop.  Which tree?  Which tree?

6          MS. COHEN:  So the person right here in the front of

7  the screen wearing the white top and dark pants --

8          THE COURT:  Right.

9          MS. COHEN:  -- that is Tommy Smalls.  If we play

10  forward and pause it here at 12 seconds for the record,

11  Mr. Smalls turns back towards that tree.  You will notice that

12  his left hand stays out.  His right hand stays at his torso as

13  he turns.  So go ahead and play.

14          (Video played)

15          MS. COHEN:  Sixteen seconds he is reaching down.  Go

16  ahead.

17          (Video played)

18          MS. COHEN:  Unfortunately, the video is just choppy,

19  but --

20          THE COURT:  And he runs out into the street.

21          MS. COHEN:  Right.

22          THE COURT:  He is swinging his left hand, but you are

23  saying that he is not swinging his right arm?

24          MS. COHEN:  Right.

25          THE COURT:  And what do you believe is that he picked

1    up a firearm off the ground?

2            MS. COHEN:  We actually think he dropped a cell phone

3    and went back and picked it up, but he had a firearm in his

4    sweatshirt pocket on the right-hand side, and he is holding that

5    with his right hand so it doesn't fall out as he goes back to

6    the cell phone and reaches down.

7            THE COURT:  Oh, boy.  Well, again, are you proposing

8    that Agent Kenney basically testify to all of the things that

9    you just proffered?  In other words --

10           MS. COHEN:  No, Your Honor.  I just wanted to clarify

11   the record on our view on how many people run the way that

12   Felder runs that video.

13           THE COURT:  What exactly would Agent Kenney say?

14           MS. COHEN:  He would testify that in 338,

15   Mr. Felder -- he observed Mr. Felder running with his hands

16   clasped about his torso, and then he would testify that that,

17   based on his experience, is significant bought because it's

18   consistent with someone holding an object close to their body

19   and attempting to conceal it; and then when we move to 342, he

20   will testify that he observes an object in Mr. Felder's left

21   hand, and that based on his experience both observing people

22   moving with guns and personally running with a gun in his hands,

23   that object is consistent with a firearm.

24           MR. RUHNKE:  I am a little confused, Your Honor,

25   whether -- apparently he is not going to say that that is a

1    firearm that he sees?  He says it's consistent.

2              THE COURT:  Consistent with.

3              MR. RUHNKE:  Yeah.  We object to the testimony.  We

4    think it's argument.  If the government wants to argue from

5    this, but we don't think it's the subject of opinion testimony

6    or experiential testimony that's properly before the jury.

7              The fact that it -- that we are now more than four

8    years into the case; that the agent has viewed this video who

9    knows how many times, and it never came up until the second day

10   of his testimony.  You know, it's almost like a sideshow on the

11   cross-examination.  We think the whole thing should being

12   excluded, Your Honor.

13             THE COURT:  Well, you didn't finish your thought.

14   What is the -- that's the same thought I had, by the way that

15   it's -- it doesn't mean it's wrong.  It's important.  I don't

16   mean, I am not casting aspersions on anybody.  That's not the

17   point.

18             The point is if no one noticed it until now, it may

19   not be so clear.  It may not really be -- it's just hard to

20   imagine that if it really was based on prior law enforcement

21   experience consistent with carrying a gun, that all the law

22   enforcement officers who have had -- not just Agent Kenney --

23   but everybody else that's been involved in this case who also

24   have experience with firearms and running with firearms, you

25   would think that somebody would have mentioned that up until

1   now, up until this morning or prior to this morning.

2           And the fact that they didn't doesn't mean they are

3   not doing their job.  It just means it's -- it's not as,

4   frankly, probative as it might otherwise be.  Just that's really

5   what it boils down to.

6           MR. RUHNKE:  That's basically a 403 argument, Your

7   Honor, that it's minimally probative.  The danger of unfair

8   prejudice is manifest, and we ask that it be excluded.

9           THE COURT:  Well, I don't think it's an expert

10  testimony issue.  I think it's a 403.  It's a 401, which is just

11  an old-fashioned relevance and unfair prejudice issue.  That's

12  all it is, and those are tough calls sometimes.

13          I want to think about it.  So here is what we are

14  going to do:  We are going to -- sometimes I feel like I make a

15  mistake of asking, does anybody want to bring up something up?

16  You didn't bring it up.  It only came up when I asked.

17          But anyway, it's obvious, so we have to deal with it.

18  I need to just scratch my head for a few minutes.  So if you

19  don't mind, I am going to take a few minutes, and I am going to

20  come back in a minute.

21          THE DEPUTY CLERK:  All rise.

22          THE COURT:  I am sorry.  The stills, the one with the

23  object or the apparent object, does someone have that I can look

24  at?

25          MR. PATEL:  This is 342-C.

```
 1                THE COURT:  Right.  Thank you.  And I will give it
 2   back of course.
 3                (Break taken.)
 4                THE COURT:  Okay.  Have a seat, everybody.  Okay.
 5                Before I talk about what we were talking about a
 6   moment ago, let me just report that first when I came out to see
 7   the lawyers before the jury was brought in, simultaneously
 8   Ms. Hilbert went into the jury room to make sure they are all
 9   ready to go, and Juror Number 15, which is Ms. Williams, I
10   believe, the alternate.  It's not juror.  It's alternate Number
11   3, Ms. Williams told Ms. Hilbert that yesterday when she was in
12   the library parking lot, which I guess is where she parks her
13   car.  There is parking under the library on Martine Avenue.
14   There also parking on the Galleria on Martine Avenue, but
15   anyway, she was in the parking lot, and she thinks she may have
16   asked for directions the EMT witness, the FDNY, the Fire
17   Department of New York, the FDNY EMT witness who testified
18   yesterday.  She thinks she may have asked him for directions,
19   and so in an abundance of caution she was telling Ms. Hilbert.
20   Was that her words?  She said in an abundance of caution.  She's
21   been around lawyers.
22                I am inclined to do nothing about it.  I just don't
23   think it's -- obviously, it probably wasn't even him, although
24   might have been.  I don't know, but there is uniformed people
25   around.  It's not that unusual.  It might have been him, but I
```

 1  don't think there is any issue there.  Do you agree with me on

 2  that, counsel?

 3          MR. PATEL:  I do, Your Honor.

 4          THE COURT:  All right.  You agree with that?

 5          MR. SCOTTEN:  Yes, Your Honor.

 6          THE COURT:  So I am just not going to do anything.

 7          To me, it's actually a good thing because what it

 8  shows is that they are paying attention.

 9          Okay.  Moving on to the more significant point.  I

10  have given this a lot of thought, and it's a close call, like a

11  lot of things, but I am going to -- I am not going to allow

12  Agent Kenney to testify the way you want him to testify.

13          I just think that even saying that this image, in

14  context with the other video and all that, that this image is

15  consistent with someone running with a gun that they are holding

16  in their hand is really going to be treated by the jury as, this

17  is a gun.  You could -- you could lawyer it up a little bit by

18  saying, this is consistent with a gun, but it's going to be

19  heard as -- and by the way, I am not criticizing.  I don't know

20  why I have to keep saying this over and over again.  I don't

21  think anybody is overstepping their bounds here, but it's going

22  to be heard as, Trust me.  I am an agent.  I carry guns as part

23  of my job.  I have run with guns.  It's a gun.  That's the way

24  it's going to be heard.

25          The fact that notwithstanding the numerous times in

1    which, not only Agent Kenney, but certainly other agents and

2    prosecutors for that matter have reviewed these various videos,

3    including this particular video, in both investigating the case

4    and prosecuting the case and preparing for trial, and that it

5    wasn't until this morning that the agent said -- and I don't

6    think he was improperly prompted by the government, but

7    nonetheless -- prompted by the government because the government

8    said to him so, in effect, gee, what do you think this is?  What

9    exactly did you say?  I want to make sure I get this exactly

10   right as best you can recall.  I don't know if it was you or

11   Ms. Cohen, but somebody spoke to Agent Kenney, right?

12            MR. SCOTTEN:  I said that I would like to show you

13   something, and I played just that small snippet and --

14            THE COURT:  Did you ask him did you -- what do you

15   see?

16            MR. SCOTTEN:  Do you see anything?  And to which he

17   said, looks like a gun.

18            THE COURT:  Right.  Okay.  And I don't think the

19   government did anything wrong.  In fact, the government is doing

20   exactly what they should be doing.  But the point of that is,

21   the point of that is, it shows how relatively weak the probative

22   value is of this evidence because it -- I think to we have to

23   agree, the government has to agree that this is kind of

24   remarkable that this did not come up ever before.  At no other

25   time apparently did the agent or an agent say, listen, can't be

1    sure of course because it's not crystal clear, but this looks
2    like a gun to me.  The fact that that hasn't happened, that
3    didn't happen until this morning, is an indication of the
4    relative lack of probative value; and as I said earlier, it
5    would be viewed as, this is a gun, and I think that this is a
6    classic 401, 403 situation, and my conclusion is that the
7    potential for unfair prejudice -- let me use the language of the
8    statute, so we get it exactly right.
9         It says, "The Court may exclude relevant evidence if
10   its probative value is substantially outweighed by a danger of
11   unfair prejudice."
12        And I believe under these very unique circumstances,
13   to say the least, that the evidence is arguably probative --
14   arguably relevant, but its probative value is substantially
15   outweighed by a danger of unfair prejudice.
16        Now, let's change the testimony for a minute.  Okay?
17   What if he were to say, he appears to be carrying something in
18   his hand.  Not a -- not that he says he appears to be carrying a
19   gun, but he appears to be carrying something in his hand, which
20   is certainly consistent with he appears to be carrying a gun.
21   So I presume that the agent would be prepared to say that.
22        If I were to limit his testimony to that, especially
23   in light of the other video where he is running like someone --
24   I think it's fair to say like someone who is carrying something.
25   You would normally be swinging your arms as you are running, and

1   he definitely is not swinging his arms, either of them, this

2   person.  What about that testimony?

3          I am asking Mr. Ruhnke.  Would you object to that?

4          MR. RUHNKE:  We do object to that for basically the

5   same reasons that --

6          THE COURT:  Well, wait a minute.  It can't be the same

7   reason.  He is not saying it's a gun.

8          MR. RUHNKE:  But the jury will infer that the only

9   reason that could possibly be relevant is if it was a gun or

10  some forbidden object and, otherwise, what difference would it

11  make that he appeared to be carrying something other than to

12  allow the government to make the argument that you heard the

13  agent say he is carrying something.  We suggest to you it was a

14  gun, and there would be no evidence really supporting that --

15  that statement in summation.  It's not a crime to carry

16  something.

17         And we do object to it, too, for that reason.  It's

18  even less probative than as originally proposed, and the danger

19  that the jury could take it wrong is still clear and present

20  because why else would anyone care that he is carrying

21  something?

22         THE COURT:  But I don't think it's inappropriate to

23  argue to the jury that, you know, and show, zoom in, and draw a

24  circle around, do whatever you want, to say, look, you know, you

25  can see in this video, this still image that Mr. Felder is

1    carrying something, but you are not objecting to the argument?
2    Am I right about that?
3             MR. RUHNKE:  Yeah, I don't think under the present
4    circumstances we would object to an argument that the government
5    looks at this and says, you know, we suggest this is a gun,
6    ladies and gentlemen, draw your own conclusion, without
7    buttressing it with evidence from the agent.
8             THE COURT:  Well, it's not exactly draw your own
9    conclusion.  It's, I suggest to you that this is a gun, and
10   that's the conclusion you should draw.
11            MS. COHEN:  That's right, Your Honor.  And I think the
12   government is entitled to develop a record that would support
13   the conclusion we are asking --
14            THE COURT:  You have a record.  It's right here.
15            MS. COHEN:  Right.  So I agree -- I agree with Your
16   Honor, I am concerned about the direction that Mr. Ruhnke is
17   going.  We should be entitled to have Special Agent Kenney
18   testify that in 338 Mr. Felder is running with his arms crossed
19   over his torso as if he is carrying something.  We should be
20   permitted to put up that still, and for him, as you say, just to
21   identify that there is something in Mr. Felder's left hand; and
22   I would suggest that we should be permitted to allow Special
23   Agent Kenney just to testify about how -- excuse me -- the shape
24   of a firearm, and how it's carried, and he will not draw a
25   conclusion.  That is for argument, as I understand what Your

 1    Honor's ruling, but we are certainly entitled to put facts into
 2    the record that support that argument at closing.
 3           THE COURT:  You see, the problem with that is, you
 4    already have the basic facts in the record, which is the video
 5    evidence itself and the still images from the video evidence.
 6    That's already in the record.
 7           This additional piece that we have been talking about
 8    this morning only came up this morning, and almost by definition
 9    it makes it -- it's sort of common sense, my common sense anyway
10    tells me that it must not be that; that the image must not so
11    probatively show the things that you just talked about because
12    it never was discussed before.  No one was prepared until this
13    morning to say, he appears to be carrying something, and the
14    something that he appears to be carrying is in the shape of a
15    gun.  That's the problem.
16           MS. COHEN:  Well, Your Honor, to be clear, the second
17    thing you said, the thing he is carrying appears to be in the
18    shape of a gun, I understand Your Honor's ruling to be that
19    Special Agent Kenney cannot testify to that, and the government
20    is prepared to adhere to that ruling.
21           THE COURT:  But you just said something different than
22    what you were saying to me a moment ago.
23           MS. COHEN:  What I am suggesting is --
24           THE COURT:  Let's be clear about what you are
25    suggesting.

 1            MS. COHEN:  Three pieces of testimony:  338 when they
 2    are chasing the car that he has his arms clutched about him as
 3    if he is carrying something.  No conclusion as to what that is.
 4            Secondly --
 5            THE COURT:  Would you object to any -- I mean, you can
 6    object to anything you want -- but would you object do that?
 7            MR. RUHNKE:  It's predicate to what will follow, Your
 8    Honor, and why should an agent on the witness stand be able to
 9    look at the same video that the jury is looking at and say, in
10    my opinion, he appears to be carrying something rather than the
11    government making the argument to the jury at the close of the
12    case, you saw this video, look at this still.  Mr. Felder
13    certainly appears to be carrying something in front of him.  Now
14    look at this next video.  You see his left hand.  The video of
15    the walk down the alleyway.  We suggest, ladies and gentlemen,
16    that that is a weapon.  They have all of that now without the
17    agent adding the impermissible inference that the only reason he
18    is saying he is carrying something is, hey, what he is really
19    telling you, ladies and gentlemen, is it's a gun.
20            THE COURT:  Finished?  I am sorry.  I interrupted
21    Ms. Cohen, and I apologize for that.
22            Just so that was the first piece.  You said there were
23    three pieces.
24            MS. COHEN:  Yes, Your Honor.  The second piece of the
25    testimony would be that as Felder and the others run through the

 1  alley, he appears to have something in his left hand, and then
 2  we would propose to separately ask him to describe the shape of
 3  a gun and the manner in which a gun is carried.
 4          THE COURT:  Let me ask another question.  Do you know
 5  whether Mr. Felder is left-handed or right-handed?
 6          MS. COHEN:  I don't know, Your Honor.
 7          THE COURT:  There is no evidence that you are -- not
 8  necessarily in the record -- but just information about which
 9  you are aware --
10          MS. COHEN:  No, Your Honor.
11          THE COURT:  -- that would suggest that one way or the
12  other?
13          MS. COHEN:  That's correct.  I would -- I would make
14  clear to the Court that he moves items between his left hand and
15  right hand both in the video that we have watched to date
16  relating to August 12th, and that the Court will see when we go
17  through the video from August 5th.
18          So there is not video of him, for example, firing a
19  gun where it might be relevant which, here is your dominant
20  hand.
21          But when you are running carrying things, right-
22  handed, left-handed, I would submit it's not a relevant.
23          THE COURT:  It's not as relevant if you are carrying a
24  hoodie.  I am not sure I agree with you if you are carrying a
25  loaded firearm.  I happen to be right-handed, and I am pretty

1    sure that if I was running with a dangerous instrumentality, I
2    would be damn sure to carry it in my right hand, my dominant
3    hand.  I wouldn't even think about it.  I would just do it.  It
4    would be an unconscious thing to do.  That's why I am asking
5    whether he is left-handed or right-handed because it could
6    potentially be relevant or if you don't know, you don't know.
7    We can't do anything about it.

8              MS. COHEN:  I don't know, Your Honor.

9              And I think the other point is in the context of a
10   video, Mr. Felder is doing several things at once, including
11   trying to hold a weapon while he takes a hoodie off and run.  So
12   I hear what Your Honor is saying about how sort of in quote/
13   unquote normal circumstances one would carry a gun, but I think
14   being in flight, taking off a sweatshirt, carrying multiple
15   items while running, he could be using either hand for that
16   purpose, but certainly that's an argument that defense counsel
17   can make.

18             THE COURT:  Well, there would have to be evidence to
19   support it.  I don't know how they present evidence to
20   whether -- there is one way to do it, of course, which would be
21   to call Mr. Felder as a witness, but obviously, the defense
22   doesn't have to do that.

23             However, the defense can't make an argument about
24   left-handedness or dominant hand without some evidence in the
25   record one way or the other.  There has to be some basis for it.

1   It's not fair to say, trust me, he is right-handed.

2              MS. COHEN:  You meant more to question on the point of

3   whether we know what his dominant hand is, but --

4              THE COURT:  Yes.

5              MS. COHEN:  -- those are the --

6              THE COURT:  Look, I am -- this is a close call, and I

7   am going to -- I am ruling that it's not admissible.  What's not

8   admissible, just so we are clear, is testimony from Agent Kenney

9   that -- well, certainly what's not admissible is testimony from

10  Agent Kenney that this appears to be a gun or that it's

11  consistent with a gun or even that it's the shape of a gun or

12  how one would carry a gun when they were running.  That's -- I

13  am not allowing that.  I am just not.

14             I am waffling, and I hate to be a waffler, I am still

15  thinking it through carefully.  Waffling a little bit on the

16  previous piece, which is, when he is running -- when, again,

17  this person is running down the street and appears to have his

18  arms crossed in front of him, whether he should be permitted to

19  testify, I think what you said was that he appears to be

20  carrying something.  That was -- that would explain why his arms

21  are crossed in front of him.

22             MS. COHEN:  Correct.

23             THE COURT:  And Mr. Ruhnke's point is, well, yeah,

24  that is correct; that is an explanation but it's an explanation

25  that the government could make an argument about based on the

1    evidence which is in the record, including the video itself.

2              It's a fair argument, but it's not really appropriate

3    testimony because it suggests that the thing that's being

4    carried is a gun, and hearing it from the witness as opposed to

5    hearing it from the government just arguing it from the evidence

6    is a meaningfully different thing and arguably prejudicial,

7    unfairly prejudicial.  That's, I think, the gist of what you are

8    saying.

9              MR. RUHNKE:  That's exactly correct.

10             MS. COHEN:  Especially Agent Kenney yesterday spent

11   time testifying about Smalls carrying a sweatshirt.  Smalls --

12   excuse me -- Felder carrying a sweatshirt.

13             THE COURT:  Sweatshirt is different than a gun,

14   though.

15             MS. COHEN:  Sure.  But he is not -- I hear Your

16   Honor's ruling, and we will absolutely comply with that, that he

17   will not say it's consistent with a gun, but certainly him to

18   say that the way that Felder is running is consistent with

19   carrying something.

20             THE COURT:  What's the -- what else is there?  He is

21   not carrying his hoodie at that point.  He is wearing his

22   hoodie.  All right?

23             MS. COHEN:  True.

24             THE COURT:  In that, but not in this image 342-C, but

25   in the other one, 338?

PROCEEDINGS                                300

```
1              MS. COHEN:  Yes.  That's correct.

2              THE COURT:  Can I see 338 one last time, please?

3              (Video played)

4              THE COURT:  Okay.  338.

5              (Video played)

6              THE COURT:  Keep going.  Or is that the end of it?

7              MS. COHEN:  No.

8              MR. RUHNKE:  It's choppy.

9              THE COURT:  Can you run it one more time, please?

10  Wait a minute.  Hold on one second.  Stop right there.  Stop.

11             (Video played)

12             THE COURT:  Adidas, the hue of his sweatshirt changed

13  from dark to light in an instant, and I bet you if it keeps

14  running, it's going to change back to dark again.  Keep going.

15             MS. COHEN:  That's accurate, Your Honor.

16             MR. SCOTTEN:  The same thing --

17             THE COURT:  Just a second.  Let me just watch this,

18  please.  Yes.  And start it from the beginning again and show me

19  the whole thing.

20             (Video played)

21             THE COURT:  This is a different point of course, but

22  -- that's it.  That's a nuance that I just noticed; that the hue

23  is -- in an instant it appears to be lighter, but it's dark, and

24  then it's light, and then it's dark immediately thereafter, but

25  that's a different question altogether.
```

1              And again, that's certainly an area which the parties

2    are permitted to argue and cross-examine.

3              I am going to -- I am going to keep it out, meaning

4    keep it out that the testimony that he appears to be carrying

5    something.  That's my ruling.  All right.

6              Are we ready to go?

7              MS. COHEN:  We are, Your Honor.

8              THE COURT:  Okay.  Let's bring the jury in.

9              THE DEPUTY CLERK:  Can the agent resume the stand?

10             (Trial resumed; jury present)

11             THE COURT:  Good morning, everybody.  Have a seat.

12             I feel like I sound like a broken record here.  Do you

13   know what a record is?  I know these young people on the right

14   don't know what a record is, but -- because I feel like this is

15   now the second time that I am apologizing to you for starting

16   later than I anticipated.

17             You simply have to trust me that we didn't really

18   start later.  We have the trial and important matters regarding

19   the trial started at 9:30, in fact, maybe shortly before 9:30,

20   but certainly by 9:30.

21             Both lawyers have said this, so I am not -- you are

22   not hearing something from me for the first time.  This is a

23   matter of great importance to everybody, including you; and

24   accordingly, the lawyers are proceeding in a perfectly ethical

25   and appropriate way, and they are raising issues with me from

 1    time to time that need to get resolved, and I am proceeding in a

 2    deliberate way and cautious way to ensure, at least to the best

 3    of my ability, and I am only human, so there is only so much I

 4    can do, but to the best of my ability that this trial proceed in

 5    as fair a way as possible, also as expeditiously as possible,

 6    but fair and expeditious.

 7            So I just -- I hope you will forgive me, but I hope

 8    you will accept my explanation that we are not starting late

 9    because we are goofing off or one of the lawyers was late or I

10    was late.  None of that is true.  We are starting late because

11    there were important matters that had to be discussed and

12    deliberated about.

13            Okay.  Agent Kenney, you are still under oath.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  Ms. Cohen, you may proceed.

16    SPECIAL AGENT BRENDAN KENNEY,

17        called as a witness by the Government, having been duly

18        sworn, testified as follows:

19    DIRECT EXAMINATION

20    BY MS. COHEN:

21        Q.   Special Agent Kenney, I want to go back to Government

22    Exhibit 151, the summary chart that we ended with yesterday.

23            MS. COHEN:  And while we are setting that up,

24    Mr. McLaughlin, can you put up Government Exhibit 100 on the

25    screen, please?

1    BY MS. COHEN:

2        Q.   So before I move to the summary board, Special Agent

3    Kenney, looking at Government Exhibit 100 that Mr. Chow is

4    showing you, and looking at Government Exhibit 100 on the

5    screen, can you tell us whether the 2, 8 and 9 on the screen are

6    approximately the same location that they are on the physical

7    board?

8        A.   Yes, it's accurate.

9        Q.   Thank you.  So looking at the summary chart, can you

10   tell us the significance of the -- not the times, but the

11   numbers above the numbers running down the left-hand side?

12       A.   The numbers correspond to the locations on the map.

13   So --

14            THE COURT:  You have to speak up a little.

15            THE WITNESS:  Sorry.  The numbers above the timestamps

16   correspond to locations where that video was recorded, as the

17   numbers are shown on the map.

18   BY MS. COHEN:

19       Q.   And what is the relationship between the times running

20   down the left-hand side of the summary chart and the times of

21   the stills on the chart?

22       A.   The times on the left side is when the stills are

23   captured, the timeframe when the stills were captured.

24            MS. COHEN:  Mr. McLaughlin, can we put up the first

25   row next to number two on the summary chart, which we will put

1  up on the screen for everyone's convenience?  That's 331-A,

2  331-C, and 331-D?

3  BY MS. COHEN:

4     Q.   Special Agent Kenney, can you remind us the location

5  of these stills?

6     A.   This is from 3480 Third Avenue, which is Takiem

7  Ewing's apartment building, the lobby area of this building.

8     Q.   And approximately what time are these stills taken?

9     A.   Approximately 4:19 into 4:20 a.m.

10    Q.   Can you identify each of the four individuals, please?

11        MR. PATEL:  Objection, Your Honor.  Asked and answered

12  several times.

13        THE COURT:  I will allow it.

14        THE WITNESS:  Top left -- sorry.  Judge.

15        THE COURT:  Yes, let's not over do that, but you know,

16  we are starting the day, so you can -- you can identify them or

17  at least you can tell us who you believe these people are based

18  on your interactions with them.

19        THE WITNESS:  Top left is Takiem Ewing.  Top right is

20  Tommy Smalls on the right, Kareem Martin on the left, and bottom

21  photo, that's the defendant, Tyrone Felder.

22        THE COURT:  Okay.

23  BY MS. COHEN:

24    Q.   Moving to the second row on the summary chart, which

25  is 333-A, 334-B, and 336-A?  Can you remind us what this

KENNEY - DIRECT - COHEN                    305

```
 1   location is?
 2              MR. PATEL:  Your Honor?
 3              THE COURT:  What?  Do you have an objection?
 4              MR. PATEL:  I do.  I object.  We have gone through
 5   this before.  This is just repetition.
 6              THE COURT:  Why are we doing this again?
 7              MS. COHEN:  Your Honor, I am simply trying to walk
 8   through the chart of locations and timestamps so that when the
 9   jury looks at the exhibit, they are able to compare and
10   understand where these things come from.  We are not going to do
11   a detailed recitation of the sequence of events from the 12th.
12              MR. PATEL:  Your Honor, there was a time and place for
13   the government to do that.
14              THE COURT:  Thank you, Mr. Patel.  Have a seat.
15              Look, I want to get going here.  We have already gone
16   through this.  All right?  Let's try to move on.  I mean, of
17   course the exhibit is in evidence.  I allowed it in evidence.
18   Meaning this, you know, the board with all the photos on it, and
19   you can make whatever arguments you want to make about it.
20   So --
21              MS. COHEN:  That's fine, Your Honor.
22              THE COURT:  What was -- I don't know if you even
23   finished the question.  What was the question?
24              MS. COHEN:  To remind us of the location from which
25   these stills were taken.
```

```
1                THE COURT:  This is 3480 Third Avenue, right?

2                THE WITNESS:  That's correct, Your Honor.

3                THE COURT:  Next question.

4    BY MS. COHEN:

5        Q.   To expedite things, Special Agent Kenney, can you

6    summarize for us how the board flows, what the -- how to read

7    the board?

8                THE WITNESS:  Can I step down for a second?

9                THE COURT:  Yes, you can.

10               THE WITNESS:  So the stills correlate to the number 2.

11   That's 3480 Third Avenue.  These stills form the lobby area of

12   3480 Third Avenue between 4:19 and 5:19 a.m. on August 12th.

13   Number 8, that correlates to Bryant Avenue between 6:00 and 6:03

14   a.m.  These three stills.  Number 9, this is area around

15   Underhill and Bolton Avenue at 6:06 a.m. and 6:08 a.m. on

16   August 12th, the stills.

17               Number 2, we are back now at 3480 Third Avenue between

18   6:17 and 6:38 a.m.  Number 9, we have now returned to the

19   dumpsters on Bolton Avenue, and in the area of Bolton Avenue and

20   Stevenson Commons from Number 9 between 6:57 and 7:01 a.m., and

21   finally we are back now between 7:17 a.m. at 3480 Third Avenue,

22   the final stills.

23               THE COURT:  Could you maybe turn that so I can look at

24   it?

25               THE WITNESS:  Sure.
```

KENNEY - DIRECT - COHEN

1           THE COURT:  Or I might have to step down myself.

2           May I have permission to step down, Ms. Cohen?

3           MS. COHEN:  Absolutely, Your Honor.

4           THE COURT:  I just ask the question:  Mr. Kenney,

5   338-A and 338-B, locate those two still images?  338-A and

6   338-B?  Do you see those?

7           THE WITNESS:  I do.

8           THE COURT:  That's -- I think you said that's Bryant

9   Avenue?

10          THE WITNESS:  That's correct.

11          THE COURT:  Are they in the right order

12  chronologically?  Is A -- just time-wise, am I missing something

13  there?  338-A and 338-B, the way they are on the chart --

14          THE WITNESS:  You are correct.  B --

15          THE COURT:  I am not a witness.  I am asking you if

16  they are in the right order chronologically?

17          THE WITNESS:  No.  B is -- happens first.  That's at

18  6:00 a.m. and 46 seconds, and A happens next at 6:00 a.m. and

19  49 seconds, so B happens -- 338-B occurs before A.

20          THE COURT:  So those two images are out of order on

21  the chart?

22          THE WITNESS:  Yes.

23          THE COURT:  Can they be re-placed or is that going to

24  require some --

25          MS. COHEN:  They can be redone, Your Honor.

```
1              THE WITNESS:  We can redo it.

2              THE COURT:  Okay.  Just it's important for me not to

3    be confused, and if it's important for me not to be confused I

4    am just assuming it's also important for the jury.

5              So 338-B actually precedes 338-A, time-wise in just in

6    the chronology of events?

7              THE WITNESS:  Correct.

8              THE COURT:  Well, can you correct that at some point?

9              MS. COHEN:  Yes, Your Honor.  That's not a problem.

10             THE COURT:  Okay.  Sorry about that.  You may proceed.

11             MS. COHEN:  Thank you, Your Honor.

12             Can we please play Government Exhibit 342?

13             (Video played)

14   BY MS. COHEN:

15       Q.   Special Agent Kenney, I am showing you what's been

16   marked for Identification as Government Exhibit 342-C.  Do you

17   recognize that?

18       A.   Yes.

19       Q.   What is it?

20       A.   It's a still image which was captured off that video

21   we just watched.

22             MS. COHEN:  Please publish 342-C.  First -- sorry,

23   Your Honor.  Government offers 342-C.

24             THE COURT:  I thought it was in already.  It's not?

25             MS. COHEN:  It's not.
```

```
 1                    THE COURT:  Okay.  It's a still image off of 342,
 2        which is in evidence.
 3                    MS. COHEN:  Correct.
 4                    MR. RUHNKE:  We have no objection, Your Honor.
 5                    THE COURT:  342-C is received.
 6                    (Government Exhibit 342-C received in Evidence)
 7                    MS. COHEN:  No further questions.
 8                    THE COURT:  Okay.  Any cross-examination?
 9                    MR. PATEL:  Thank you, Your Honor.  We have no
10        questions for Agent Kenney.
11                    THE COURT:  I didn't hear you.
12                    MR. PATEL:  I am sorry, Your Honor.  We have no
13        questions for Agent Kenney.
14                    THE COURT:  Agent.  Thank you very much.  You may step
15        down.  You might want to move that.
16                    THE WITNESS:  Move this.
17                    (Witness excused)
18                    THE COURT:  Okay.  Thank you for doing that.
19                    It's funny, we have a pretty big courtroom here, but
20        it seems small sometimes when there is lots of physical things
21        lying around.  Although for those of us -- I don't know whether
22        Mr. Ruhnke or Mr. Patel remember the original White Plains
23        courthouse, the courtrooms were, I don't know, about one quarter
24        the size of this room.  So you think it's crowded here, imagine
25        what that was like.  All right.
```

```
 1              Call your next witness.
 2              MS. COHEN:  Government calls Alhagie Bahaga.
 3              THE COURT:  Is this witness going to require an
 4    interpreter?
 5              MS. COHEN:  An interpreter, yes, Your Honor.
 6              THE COURT:  Sir, have a seat.  This is just addressed
 7    to the -- have a seat, please.  No, no.  You stand there.  The
 8    gentleman should sit.  Sit down.  Okay.  Thank you very much.
 9              (Interpreter sworn)
10              THE DEPUTY CLERK:  What is your name for the record?
11              THE INTERPRETER:  Marianne Lansseni.
12              THE DEPUTY CLERK:  Please spell your last name.
13              THE INTERPRETER:  Lansseni, L-A-N-S-S-E-N-I.
14              THE DEPUTY CLERK:  Mary was your first name?
15              THE INTERPRETER:  Marianne.
16              THE COURT:  What language are you interpreting?
17              THE INTERPRETER:  Mandinka.
18              THE COURT:  I am sorry.  Speak loudly.
19              THE INTERPRETER:  Mandinka.
20              THE DEPUTY CLERK:  Now the witness.
21    ALHAGIE BAHAGA,
22         called as a witness by the Government, having been duly
23         sworn, testified as follows:
24              THE WITNESS:  (Through interpreter) Yes.
25              THE DEPUTY CLERK:  Please state your full name for the
```

```
1    record, spelling your first and last name slowly.

2              THE WITNESS:  (Through interpreter.) Alhagie Bahaga.

3              THE DEPUTY CLERK:  Please spell both.

4              THE WITNESS:  (Through interpreter) A-L-H-A-G-I-E.

5              THE DEPUTY CLERK:  And last name, please?

6              THE WITNESS:  (Through interpreter.) Bahaga,

7    B-A-H-A-G-A.

8              THE DEPUTY CLERK:  Thank you.

9              THE COURT:  Okay.  Can we give the interpreter a

10   microphone?

11             THE DEPUTY CLERK:  Oh, yes.

12             THE COURT:  So we can hear her.  You can stand if it's

13   easier for you.  Whatever is easiest for you, that's fine, but I

14   want to give you a microphone so we can hear.  It's what you say

15   that's going to be in English that we need to all hear.

16             All right.  You know what, Ms. Lansseni, is that how

17   you pronounce it?  I need you to speak up, and I need you to

18   speak clearly because I have to hear it; the court reporter has

19   to hear it; the parties and the lawyers have to hear it, and all

20   of those people over there have to hear it.  So I am going to

21   rely upon you to speak clearly and quite loudly.  Okay?

22             THE INTERPRETER:  Yes judge.

23             THE COURT:  Thank you, ma'am.

24             All right.  Ms. Cohen?

25   DIRECT EXAMINATION
```

```
1   BY MS. COHEN:
2        Q.   Mr. Bahaga, are you employed?
3        A.   (Through interpreter) Yes.
4        Q.   Where?
5        A.   In the Bronx.
6        Q.   Specifically, what work do you do?
7        A.   I work at a gas station.
8        Q.   What do you do at the gas station?
9        A.   I pump gas for people.
10       Q.   Were you working at that gas station in August of
11  2014?
12       A.   Yes.
13       Q.   Showing you Government Exhibit 6, do you recognize
14  that person?
15       A.   Yes, I do.
16       Q.   How do you know that person?
17       A.   It's my friend.
18       Q.   Who do you recognize that photo as?
19       A.   Maodo.
20            MS. COHEN:  Government offers Government Exhibit 6.
21            MR. PATEL:  No objection, Your Honor.
22            THE COURT:  Government Exhibit 6 is received.
23            (Government Exhibit 6 received in Evidence)
24  BY MS. COHEN:
25       Q.   Mr. Bahaga, how long did you know Maodo?
```

```
 1          A.    A year and a half.

 2          Q.    How did you come to know him?

 3          A.    He used to come and buy gas at the station.

 4          Q.    Do you know whether he had a job in August of 2014?

 5          A.    The only job I know of him is that driving taxi.

 6          Q.    How do you know he was a taxi driver?

 7          A.    I knew because he was coming in to buy gas from our

 8    station.

 9                MR. RUHNKE:  Your Honor, I am having a little bit of

10    difficulty.

11                THE COURT:  Ma'am, you really have to speak up.  Just

12    do the best you can, okay, because everybody has to hear.  What

13    she just said was --

14                THE WITNESS:  (Through interpreter) He usually come to

15    the station to buy gas.

16    BY MS. COHEN:

17          Q.    What kind of car did he drive?

18          A.    I saw him with a Lincoln.

19          Q.    What color was the Lincoln?

20          A.    Black.

21          Q.    I would like to ask you about the last time you saw

22    Maodo.  Okay?  Do you recall when that was, approximately?

23          A.    Yes, I do.

24          Q.    Approximately when was it?

25          A.    It was in the month of Ramadan.
```

1        Q.    What year?

2        A.    It's -- I think now it's like four years.

3        Q.    Can you describe the last time you saw Maodo?  What

4   were you doing?

5        A.    We used to eat together during the month of Ramadan.

6        Q.    Approximately what time would you eat together?

7        A.    We eat twice.  We ate twice in the evening and also

8   between 3:00 and 4:00 a.m.

9        Q.    Why do you eat twice?

10       A.    In the evening we break the fasting, and in the

11  morning we eat dinner for the fasting.

12       Q.    I want to talk to you specifically about the second

13  meal between 3:00 and 4:00 a.m.  Okay?

14       A.    Okay.

15       Q.    What did you and Maodo do when he first arrived for

16  dinner?

17       A.    Around the time of that dinner, he asked me if I have

18  already eaten, and I said no.  Then he told me that he was going

19  to buy some food and bring it.

20       Q.    Where did you meet for dinner?

21       A.    At the same gas station.

22       Q.    What did Maodo do after dinner?

23       A.    He went to Harlem to buy the food and brought it.

24       Q.    That was before dinner or after dinner?

25       A.    That was before dinner.

BAHAGA - DIRECT - COHEN

1     Q.   So once you had dinner at the gas station, what did
2  you see Maodo do?
3     A.   When he brought the food, we ate, and after -- after
4  dinner he told me, okay, I am going to do my prayer.
5     Q.   After Maodo did his prayers, what did you see him do?
6     A.   After finishing his prayers, he told me, okay,
7  Alhagie, I am going out, and I am going to try to work a little
8  bit.
9     Q.   Did you ever see Maodo again?
10    A.   No, I did not.
11         MS. COHEN:  No further questions.
12         MR. PATEL:  No questions.
13         THE COURT:  Any cross?
14         MR. PATEL:  No.
15         THE COURT:  Thank you, Mr. Bahaga.  You may step down.
16  Thank you very much.
17         Ms. Lansseni as well.
18         THE INTERPRETER:  You are welcome, Your Honor.
19         (Witness excused)
20         THE COURT:  Be careful of the wires and things when
21  you are walking around.  You can leave.  Thank you.
22         Call your next witness.
23         MS. COHEN:  Government calls Peter Willett.
24  PETER WILLETT,
25      called as a witness by the Government, having been duly

```
 1        sworn, testified as follows:
 2             THE DEPUTY CLERK:  Please be seated.  Please state
 3   your full name for the record and spell your last name slowly.
 4             THE WITNESS:  Peter Willett, W-I-L-L-E-T-T.
 5   DIRECT EXAMINATION
 6   BY MS. COHEN:
 7        Q.   Good morning, Mr. Willett.
 8        A.   Good morning.
 9        Q.   Where do you currently live?
10        A.   3435 Hunter Avenue, Bronx, New York.
11        Q.   How long have you lived there?
12        A.   Six years.
13             MS. COHEN:  Looking at the map that's to your right,
14   Government Exhibit 100.
15             With the Court's permission, I ask Mr. Willett to step
16   down and identify the general area where Hunter Avenue is.
17             THE COURT:  Yes.  You can step down and just point to
18   where you live on Hunter Avenue, approximately.  What part of
19   the Bronx is it, Mr. Willett?
20             THE WITNESS:  Baychester area.
21             THE COURT:  Baychester.  Maybe you can look for
22   Baychester and take it from there.  Isn't that in the southeast
23   Bronx or am I making that up?
24             THE WITNESS:  Yes.
25   BY MS. COHEN:
```

WILLETT - DIRECT - COHEN

```
 1        Q.    So Mr. Willett, is this Baychester?

 2        A.    Yes.  That's Baychester.

 3        Q.    Do you see -- do you see Eastchester?

 4        A.    No.

 5              THE COURT:  You can direct.  Can you direct?

 6   BY MS. COHEN:

 7        Q.    I direct your attention to where Eastchester is here

 8   on the map.

 9        A.    Yes.  I see Eastchester.

10        Q.    Can you identify where approximately Hunter Avenue is?

11   What area of the Bronx is it?

12        A.    It's Eastchester is --

13              THE COURT:  Baychester over on the side by 95.  Did

14   you say?

15              THE WITNESS:  Yes.  By I-95.

16   BY MS. COHEN:

17        Q.    Where is Hunter Avenue in relation to 95?

18        A.    On the left hand side of the highway and up north.

19        Q.    And are you familiar with Boston Road, Route 1?

20        A.    No.

21              THE COURT:  Sir, Ms. Cohen, you can't really have a

22   private conversation.

23              MS. COHEN:  Understood.

24              THE COURT:  Direct his attention to something and ask

25   him if perhaps this is where Hunter Avenue is.
```

```
 1   BY MS. COHEN:
 2        Q.   Is this the approximate location of Hunter Avenue?
 3        A.   Which one.  Over --
 4             THE COURT:  Okay.
 5             MS. COHEN:  That's fine.
 6             THE COURT:  He didn't -- we can't hear what he just
 7   said.  You asked him, is this approximately the area of Hunter
 8   Avenue.
 9             Mr. Willett --
10             Start over again, Ms. Cohen.  Direct his attention to
11   someplace on that exhibit, would you please?
12   BY MS. COHEN:
13        Q.   I am directing your attention to Route 95 and Co-op
14   City Boulevard.
15        A.   Yes.
16        Q.   Is that the general vicinity of Hunter Avenue?
17        A.   More up.  More up.
18             MS. COHEN:  That's fine.  Your Honor, that's fine.
19             THE COURT:  Take your seat.
20             MS. COHEN:  We will move on.
21             THE COURT:  Well, he said, no.  More up and to the
22   left-hand side.
23             THE WITNESS:  Yes.
24             THE COURT:  Which is a little nonspecific.  Ask your
25   next question.
```

```
 1   BY MS. COHEN:
 2        Q.   Mr. Willett, are you currently employed?
 3        A.   Yes.
 4        Q.   What did you do?
 5        A.   I am a carpenter.
 6        Q.   How long have you been a carpenter?
 7        A.   Thirty-three years.
 8        Q.   Directing your attention to August of 2014, what was
 9   your usual work schedule?
10        A.   7:00 to 2:30.
11             THE COURT:  Sir, you need to sit up.
12             THE WITNESS:  Yes.
13             THE COURT:  You need to sit about a foot away from
14   that microphone, and you need to speak clearly.
15             THE WITNESS:  Yes.
16             THE COURT:  Okay.  That's very important.  I know this
17   is not what you do for a living, but you need to help us out a
18   little bit.
19             THE WITNESS:  Yes, thank you.
20             THE COURT:  Ask your next question, please.
21   BY MS. COHEN:
22        Q.   You said 7:00 to 2:30; is that 7:00 in the morning?
23        A.   7:00 a.m. to 2:30 daytime, yes.
24        Q.   So approximately what time do you -- did you usually
25   leave your home?
```

1        A.    Between 4:45 a.m. and 5:15 a.m.

2        Q.    In August of 2014, how did you usually get to work?

3        A.    I drive to the train station on 130 Street and Grand

4   Concourse.

5        Q.    Focusing on August 5th, 2014, do you recall that day?

6        A.    Yes.

7        Q.    Sitting here more than four years later, why do you

8   remember that day?

9        A.    Because that's the morning when I saw the body on the

10  side of the road.

11       Q.    Let's talk about that.  Approximately what time did

12  you see the body?

13       A.    I would say between 4:15 and 5:15, approximately.  I

14  mean 4:45 and 5:15.

15       Q.    Okay.  And you said you saw it on the side of the

16  road.  What road was that?

17       A.    It's on Hunter Avenue.

18       Q.    Why were you out of the house that early?

19       A.    Going to work.

20       Q.    Can you describe for the jury what it is you saw that

21  morning?

22       A.    I saw the guy laying on the left-hand side of the road

23  and the bottom of Hunter Avenue bleeding.

24       Q.    Can you describe what you did once you saw that?

25       A.    I pick up the phone and called 911.

1      Q.   When you saw the man bleeding, could you tell whether

2  he was moving or not?

3      A.   No.

4           THE COURT:  No, you couldn't tell, or he was not

5  moving?

6           THE WITNESS:  I could not tell if he was moving or

7  not.

8  BY MS. COHEN:

9      Q.   After you placed the 911 call, what did you do?

10     A.   I proceed and went to work.

11     Q.   Showing you what's been marked for Identification as

12 Government Exhibits 403-C and 403-E.  C and E.  Do you recognize

13 those?

14     A.   Yes.

15     Q.   What are they?

16     A.   The spot where I found the body.

17     Q.   Both exhibits?

18     A.   Yes.

19          MS. COHEN:  Government offers 403-C and 403-E.

20          MR. PATEL:  No objection.

21          THE COURT:  Government Exhibits 403-C and 403-E are

22 received.

23          (Government Exhibits 403-C and 403-E received in

24 Evidence).

25          MS. COHEN:  Can we put up 403-E, please?

WILLETT - DIRECT - COHEN                      322

1    BY MS. COHEN:

2         Q.   So, Mr. Willett, what road are we looking at down the

3    center of the photograph?

4         A.   That's Hunter Avenue.

5         Q.   And what is the road running perpendicular to Hunter?

6    In other words, the road closest to us in the photograph?

7         A.   Tillotson Avenue.

8         Q.   And --

9              THE COURT:  It's called what?  I am sorry.

10             THE WITNESS:  Tillotson.

11             THE COURT:  Tillotson?

12             THE WITNESS:  Yes.

13   BY MS. COHEN:

14        Q.   Can you spell that?

15        A.   T-I-L-L-O-T-S-O-N.

16        Q.   Thank you.

17             Directing your attention to the blue area on the

18   left-hand side, what's that?

19        A.   A construction site putting up some houses.

20        Q.   And can you, using an object in this photograph, can

21   you tell us where you found the body?

22        A.   On the right-hand side about eight feet from the

23   construction site on the right-hand side.

24        Q.   Is there anything on the right-hand side of the

25   photograph that we can look to to see that area?  You can look

```
1    at the screen right in front of you or the hard copy exhibit if
2    that's easier.
3         A.    Yes.  There is a light pole there.
4         Q.    Okay.
5         A.    Yeah.  On the right-hand side.
6               MS. COHEN:  Can we put up 403-C, please?
7    BY MS. COHEN:
8         Q.    What street are we on here in this photograph?
9         A.    That's also Hunter.
10        Q.    What's on the left-hand side closest to the bottom of
11   the photograph?
12        A.    A driveway.
13        Q.    Okay.  And just above the driveway where that dirt is,
14   if we were to turn left, what would we see?
15        A.    A construction site, construction, yes.
16        Q.    And the right-hand side, the green, what's that?
17        A.    That's where they putting up the houses.
18        Q.    Can you identify in this photograph approximately
19   where you found the body?
20        A.    It's right where the fire hydrant is at.  If you go
21   down, down maybe like eight feet, cross over that driveway,
22   right there on the right-hand side.
23        Q.    Okay.  So you testified earlier that you called 911
24   when you saw the body; is that right?
25        A.    Yes, I did.
```

```
 1              MS. COHEN:  Your Honor, at this time I would like to
 2    read a paragraph out of the parties' 911 call stipulation, which
 3    is Government Exhibit 1002.
 4              THE COURT:  Sure.
 5              MS. COHEN:  "Government Exhibit 501 is a true and
 6    accurate recording of a call placed from phone number
 7    (321) 368-8970 to the New York City 911 emergency dispatch
 8    system at approximately 5:23 a.m. on August 5, 2014."
 9              The stipulation goes on to agree that Government
10    Exhibit 501 may be received into evidence.  On that basis, the
11    government offers Exhibit 501.
12              MR. RUHNKE:  Without objection.
13              THE COURT:  501 is received.
14              (Government Exhibit 501 received in Evidence)
15              MS. COHEN:  Can we play 501, please?
16              (Audio played)
17    BY MS. COHEN:
18        Q.   Mr. Willett, do you recognize the voice in that call?
19        A.   Yes.  That's my voice.
20              MS. COHEN:  No further questions.
21              THE COURT:  Any cross?
22              MR. PATEL:  No.  Thank you, Your Honor.
23              THE COURT:  Mr. Willett, thank you very much.  You can
24    step down.  You are free to go.  Just be careful.  Don't trip
25    over anything.  All right?
```

```
 1              (Witness excused)

 2              THE COURT:  Call your next witness.

 3              MS. COHEN:  The government calls Officer Austin,

 4   Kendall Austin.

 5   OFFICER KENDALL AUSTIN,

 6        called as a witness by the Government, having been duly

 7        sworn, testified as follows:

 8              THE DEPUTY CLERK:  Please be seated.

 9              Please state your full name for the record spelling

10   your last name slowly.

11              THE WITNESS:  It's going to be Officer Austin.

12   Spelling is going to be A-U-S-T-I-N.

13              THE COURT:  And first name, sir?

14              THE WITNESS:  Going to be Kendall.  First name is

15   going to be K-E-N-D-A, two Ls.

16              THE COURT:  Thank you.

17   DIRECT EXAMINATION

18   BY MS. COHEN:

19        Q.   Officer Austin, where are you currently employed?

20        A.   NYPD.

21        Q.   How long have you been with the NYPD?

22        A.   Almost seven years.

23        Q.   Back in August of 2014, where were you assigned?

24        A.   47th Precinct.

25              MS. COHEN:  And can we put up Government Exhibit 100,
```

1    please?

2    BY MS. COHEN:

3        Q.   Handing you a laser pointer, if you could just show us

4    the general vicinity of the 47th Precinct.

5        A.   Sure.

6        Q.   Can you describe that?

7        A.   Yes.  That area -- this area is the coverage for

8    second patrol in the 47th Precinct.

9        Q.   And what are the -- using roads -- outer bounds of the

10   47 Precinct?

11       A.   Sure.  This area over here is the Woodlawn Cemetery.

12   This is near Webster Avenue.  This covers 47 Precinct.

13   Stretching this way is going to be East Gun Hill Road taking you

14   towards Boston Road.  Baychester, which is this area right here,

15   and then the New England Thruway, which is this area right here.

16            THE COURT:  When you say New England Thruway, is that

17   Interstate 95?

18            THE WITNESS:  That's correct, Judge.  Interstate 95,

19   which is right around here.

20   BY MS. COHEN:

21       Q.   Thank you.  Directing your attention to August 5th,

22   2014, were you working that day?

23       A.   That's correct.

24       Q.   By yourself or with a partner?

25       A.   I had a partner.

1       Q.   What was your shift that day?

2       A.   My shift is the midnight shift, which is 2315 by

3   0750 hours.  Basically 2315 meaning 11:15 p.m., which is night,

4   until 0750 a.m. in the morning.

5       Q.   Did there come a time that you responded to Hunter

6   Avenue that evening?

7       A.   Yes, I did.

8       Q.   Looking again at Government Exhibit 100 -- strike

9   that.

10           Why did you respond to Hunter Avenue on August 2014?

11      A.   I responded because the central dispatcher assigned

12  the job.  The job was a 1054, which is a radio code for a heavy

13  bleeder in the confines of the 47th Precinct.

14      Q.   Approximately what time did you arrive?

15      A.   About 5:28 a.m.

16      Q.   Thinking back to 2014, how did Hunter Avenue compare

17  to a typical block in the 47th Precinct?

18      A.   It's mainly residential, the 47th Precinct, and Hunter

19  Avenue is no different.  It's private houses in that vicinity.

20      Q.   What did you do when you first arrived?

21      A.   When I first arrived on Hunter Avenue, I immediately

22  stepped out of my vehicle and began to canvas the location.

23      Q.   What does "canvassing" mean?

24      A.   Canvassing means you are investigating the location,

25  you are walking around basically looking for anything in

AUSTIN - DIRECT - COHEN                                    328

1    particular to the job at hand.

2        Q.   So what were you looking for?

3        A.   Basically I was looking for an aided victim.  The job

4    that we were assigned was a heavy bleeder, so we were looking

5    for a victim that was bleeding heavily.

6        Q.   What, if anything, did you find?

7        A.   I did find a male.  He was actually laying motionless

8    in front of a residence.

9        Q.   And what did you -- can you describe how the male

10   appeared?

11       A.   The male was laying flat on his back, his feet in the

12   street, his upper torso, half of it was on the sidewalk.  The

13   sidewalk was kind of a grassy location.

14       Q.   What, if anything, did you do to check if he was

15   alive?

16       A.   I walked up to the victim.  I tapped on his feet.  He

17   was unresponsive.

18       Q.   What did you observe about the rest of his body?

19       A.   I immediately tried to get his attention.  So by doing

20   so, I began to tap on his shoulder.  When I got to his -- close

21   to his head, I looked at his face and noticed that he had blood

22   on his forehead near his eye, and that point -- at that point I

23   noticed that he had a gunshot wound.

24       Q.   And more specifically where did you see the gunshot

25   wound.

1        A.    Right above his left eye.

2        Q.    What you did do when you observed the gunshot wound?

3        A.    Immediately I notified the central dispatcher that we

4   need the EMS in response to the location for advanced care.

5   Also notified my sergeant to respond to the scene who was my

6   supervisor for the tour.

7        Q.    Once EMS arrived, what happened?

8        A.    EMS began to apply first aid to the individual, to the

9   victim.  They placed him into the bus, which we call -- which is

10  the ambulance, and at that point my sergeant was already at the

11  scene.  We were instructed to establish a crime scene.

12       Q.    What does establishing a crime seen mean?

13       A.    It means looking for evidence that would -- in regards

14  to the crime that was committed; putting up crime scene tape;

15  looking for anything out of the ordinary that could help the

16  scene of the crime, to help the squad which is on night watch

17  for the tour.

18            MS. COHEN:  Can you put up 403-E, please?

19  BY MS. COHEN:

20       Q.    Officer Austin, what are we looking at here?

21       A.    What you are looking at here is Tillotson Avenue and

22  Hunter Avenue.

23       Q.    And how, if at all, does Hunter Avenue differ in this

24  photo from how it appeared when you first arrived?

25       A.    When I first arrived, it wasn't daylight.  It was

AUSTIN - DIRECT - COHEN                                      330

1    night.

2         Q.   Using a landmark that we can see in the photograph,

3    can you point out where you found the body?

4         A.   Sure.  The body was found -- can I use the laser?

5         Q.   Yes.  Sure.

6         A.   Right next to this brown fence.

7         Q.   Can you point out -- can we put up 403-C, please?

8              What are we looking at here?

9         A.   You are looking at the same location, but from the end

10   of the dead-end street.  Basically, this is the private house,

11   and right about here is the brown fence that I mentioned.  In

12   front of the brown fence is the gravely concrete road where we

13   found the victim with his feet laying in the street, the upper

14   torso on the grassy part, his head closer to the brown fence.

15             MS. COHEN:  Your Honor, at this time I would like to

16   read paragraph 1 of the parties' photograph stipulation, which

17   is Government Exhibit 1001.

18             THE COURT:  Okay.

19             MS. COHEN:  "The deceased individual encountered by

20   Kendall Austin on August 5th, 2014, was Maodo Kane.  Government

21   Exhibit 6 is a photo of Maodo Kane.

22   BY MS. COHEN:

23        Q.   Officer Austin, I am showing you what's marked as 6-A.

24   Can you read what that says?

25        A.   It says "Maodo Kane."

```
 1                  MS. COHEN:  Government offers 6-A.

 2                  MR. RUHNKE:  No objection.

 3                  THE COURT:  Received.  6 is already in evidence,

 4    right?

 5                  MS. COHEN:  It is, Your Honor.

 6                  THE COURT:  Okay.

 7                  (Government Exhibit 6-A received in Evidence)

 8                  MS. COHEN:  No further questions, Your Honor.

 9                  MR. PATEL:  Very briefly.

10                  THE COURT:  Okay.

11    CROSS-EXAMINATION

12    BY MR. PATEL:

13        Q.   Officer Austin, the yellow crime scene tape we see in

14    the photograph, did you put that up?

15        A.   No, I did not.

16        Q.   Your partner put it up?

17        A.   I am not sure who put it up.

18        Q.   That wasn't there when you first arrived?

19        A.   Say that again?

20        Q.   That wasn't there when you first arrived; is that

21    correct?

22        A.   The crime scene tape, no.

23        Q.   And one of the things that you created -- or

24    withdrawn.

25             You helped to create the crime scene; is that correct?
```

1        A.    That's incorrect.

2        Q.    Do you preserve the crime scene?

3        A.    That's correct.

4        Q.    Okay.  And part of preserving the crime scene is that

5   you or one of the officers you are working with put up the crime

6   scene tape; is that right?

7        A.    That's incorrect.  The second concern also responded

8   to the location.  The sergeant, the supervisor at the scene

9   instructed that the second concern establish a crime scene and

10  all the other responding officers would canvas for additional

11  evidence.

12       Q.    Okay.  You were the first responding officers; is that

13  correct?

14       A.    That's correct.

15       Q.    And was part of your assignment to make sure that the

16  scene was undisturbed until the other officers arrived?

17       A.    That's correct.

18             MR. PATEL:  Thank you.  No further questions.

19             THE COURT:  Anything further?

20             MS. COHEN:  No redirect.

21             THE COURT:  Okay.  Officer, thank you very much.  You

22  may step down, and just be careful of the wires and things.

23             (Witness excused)

24             THE COURT:  Okay.  Why don't we take a ten-minute

25  break at this point?  Why don't we do that?  Okay.

1            Ladies and gentlemen, we are going to take a

2    ten-minute break, a little shorter than usual because we got

3    started later than usual.  Keep an open mind.  Very important.

4    Don't discuss the case, also very important, with yourselves --

5    among yourselves or with anyone else.  If you happen to go out

6    of the jury room and you encounter anyone, again, continue to

7    not have any interaction with them if you possibly can.  You

8    really need to follow that instruction.  All right.  We will see

9    you in ten minutes.

10           THE DEPUTY CLERK:  All rise.

11           (Recess)

12           THE COURT:  Okay.  Welcome back, everybody.  Have a

13   seat, please.

14           Call your next witness.

15           MS. COHEN:  Government calls Robert Aronson.

16   ROBERT ARONSON,

17       called as a witness by the Government, having been duly

18       sworn, testified as follows:

19           THE DEPUTY CLERK:  Please be seated.  Please state

20   your full name for the record, spelling your last name slowly.

21           THE WITNESS:  Robert Aronson, A-R-O-N-S-O-N.

22           THE COURT:  Mr. Aronson, if you just sit about a foot

23   away from the microphone.

24           THE WITNESS:  Oh, yes, sir.

25           THE COURT:  That's fine.  We will let you know if

```
 1   there is a problem.  I don't think there will be.  Sounds like
 2   you have a pretty loud voice.
 3              All right, Ms. Cohen.
 4   DIRECT EXAMINATION
 5   BY MS. COHEN:
 6        Q.   Officer Aronson, where are you currently employed?
 7        A.   New York State Metropolitan Transportation Authority
 8   Police Department.
 9        Q.   Is that also known as the MTA?
10        A.   Yes.
11        Q.   How long have you been employed by the MTA?
12        A.   A little over 19 years.
13        Q.   Were you a parole officer with the MTA in August of
14   2014?
15        A.   Yes.
16        Q.   Can you generally describe what your duties as a
17   patrol officer were in August of 2014?
18        A.   Responded to calls for service, crimes in progress,
19   crimes in the past, taking reports, and conducting security
20   inspections of stations and facilities.
21        Q.   Directing your attention to August 5th, 2014, were you
22   working that day?
23        A.   Yes.
24        Q.   By yourself or with a partner?
25        A.   I was with a partner.
```

ARONSON - DIRECT - COHEN                                335

1       Q.   What was your shift that day?

2       A.   7:00 in the morning until 7:20 at night.

3       Q.   Did there come a time when you reported to the area of

4  the Yankee Stadium Metro-North station?

5       A.   Yes.

6       Q.   Why?

7       A.   We received a dispatch to respond there in regards to

8  a report of an abandoned vehicle blocking access to the station

9  at that location.

10          MS. COHEN:  Can we put up Government Exhibit 100,

11  please?  And if we would zoom in on the bottom half of the map,

12  please?

13  BY MS. COHEN:

14       Q.   Using your laser pointer, which should be up in front

15  of you, can you point out the general area of the Yankee Stadium

16  Metro-North station?  You can actually see it on the screen in

17  front of you as well.

18       A.   Yes.  It's -- I see.  It's approximately there where

19  it says --

20          THE COURT:  Where it says "Yankee Stadium"?

21          THE WITNESS:  Yes, sir.  I can't read that from here.

22          THE COURT:  I was good.  Anyway, we all know where

23  Yankee Stadium is.  Anyway, next question.

24          MS. COHEN:  Your Honor, we are going to put a number 7

25  on the physical version of Government Exhibit 100.

1   BY MS. COHEN:

2        Q.   And, Officer Aronson, can you just confirm that where

3   Special Agent Kenney puts the 7 is approximately where you

4   indicated?

5        A.   Yes.  Yes.  That's correct.

6        Q.   Approximately what time did you arrive at the site of

7   abandoned car?

8        A.   Approximately 11:15 in the morning.

9        Q.   When you arrived there, what kind of vehicle did you

10  observe?

11       A.   A black Lincoln Town Car.

12       Q.   Showing you Government Exhibits 404-F through 404-K,

13  can you look at those and tell us generally what they are?

14       A.   Yes.  These are photographs of the vicinity where we

15  found the vehicle which we received the abandoned vehicle report

16  on.

17            MS. COHEN:  Government offers Exhibits 404-F

18  through 404-K.

19            MR. RUHNKE:  No objection.

20            THE COURT:  Exhibits 404-F, G, H, I, J and K are

21  received.

22            (Government Exhibits 404-F, G, H, I, J and K received

23  in Evidence)

24  BY MS. COHEN:

25       Q.   Showing you what's been marked for Identification as

1    Government Exhibit 104, can you tell us what that is?

2         A.   Yes.  This is a map of the area around the Yankee

3    Stadium Metro-North station and the area just to the south of

4    it.

5              MS. COHEN:  Government offers Exhibit 104.

6              MR. RUHNKE:  No objection.

7              THE COURT:  Received.

8              (Government Exhibit 104 received in Evidence)

9              MS. COHEN:  Can you put up 104, please?  And if we

10   could zoom in on the top half of the photograph, please, or the

11   map?

12   BY MS. COHEN:

13        Q.   Office Aronson, using the laser pointer can you point

14   out more specifically where you found the abandoned car?

15        A.   It was approximately in that location.

16             MS. COHEN:  Can we put up 404-J, please?

17             THE COURT:  When you say that location, you were

18   pointing -- looked like you were pointing to the Major Deegan

19   Expressway at that point?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  Underneath?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Okay.

24   BY MS. COHEN:

25        Q.   Officer Aronson, I think you just testified that the

ARONSON - DIRECT - COHEN                    338

1    car was under the Deegan.  Can you see the Deegan in this

2    photograph?

3         A.   Yes.

4         Q.   Where is it?

5         A.   It's the elevated structure at the top of the picture.

6         Q.   Using a landmark in the photograph, can you describe

7    approximately where the car was when you found it?

8         A.   It was approximately in the -- what would be the

9    center of this picture, there appears to be a puddle on the

10   pavement, and it was approximately there.

11        Q.   Can you indicate that with the laser pointer, please?

12        A.   Right about there.

13             MS. COHEN:  Can we put up 404-I, please?

14   BY MS. COHEN:

15        Q.   Officer Aronson, how does the vantage point of this

16   photograph relate to the vantage point of last photograph?

17        A.   The last photograph, the area in the last photograph

18   would be to the right of this location.

19        Q.   Using this photograph, can you explain to us how you

20   would get to this location if you were driving south on the

21   Deegan?

22        A.   When driving southbound on the Major Deegan

23   Expressway, one would exit at the 153rd Street Yankee Stadium

24   exit.  The exit ramp then splits, and if one stays to the left

25   and takes the left fork, you would descend down to street level

ARONSON - DIRECT - COHEN

1    and would end up at this location.

2         Q.   Can you indicate for us on the map -- excuse me -- on

3    the photograph, where you would be as you exited from the

4    Deegan?

5         A.   That -- when one exits from the Deegan, that location

6    is not actually in sight.  That -- this photograph, the

7    perspective of it is looking north, and that -- the actual point

8    where the exit ramp comes off the Deegan Expressway is out of

9    view.

10        Q.   What is the road on the left-hand side of the

11   photograph?

12        A.   We refer to it as Exterior Street.

13        Q.   How does that relate to the exit off the Deegan?

14        A.   Well, this location, the ramp that I just referred to

15   feeds into Exterior Street.

16             MS. COHEN:  Can you put up 404-K, please?

17   BY MS. COHEN:

18        Q.   What are we looking at here?

19        A.   Again, this is a photograph of the vicinity where the

20   vehicle was found.

21        Q.   Can you describe for us where approximately the car

22   was in relation to this photograph?

23        A.   Again, approximately where the puddle is on the

24   pavement, maybe a little bit in front of it, or I am sorry, from

25   the perspective of this photograph, it would be beyond a little

ARONSON - DIRECT - COHEN                    340

1   bit beyond where the puddle is.

2        Q.   Looking at the chain link fence straight ahead in the

3   photograph, what's on the other side of that fence?

4        A.   That's the Metro-North right-of-way.  There are tracks

5   and two platforms.

6             MS. COHEN:  Can we put up 404-H, please?

7   BY MS. COHEN:

8        Q.   What are we looking at here?

9        A.   That's a little bit further, further along.  If one

10  walks east from the prior photograph, that's the same fence,

11  platforms and right-of-way.

12       Q.   If we were to take a right here, what would we see?

13       A.   That -- one would be facing south, and that -- and

14  would be facing the west entrance of the Yankee Stadium

15  Metro-North station.

16            MS. COHEN:  Can we put up 404-H, please?  I am sorry.

17  404-F.

18  BY MS. COHEN:

19       Q.   How does the vantage point of this photograph relate

20  to the vantage point of the last photograph?

21       A.   Again, that would -- relating to that last photograph,

22  if one made a right turn from the vantage point of the last

23  photograph, that would be the view.

24       Q.   What's on the left-hand side of the photograph?

25       A.   The same chain link fence you referred to earlier and

1    the Metro-North right-of-way and platforms.

2        Q.   If we were to walk down this walkway, where would we

3    end up?

4        A.   At the entrance of the staircase leading in the

5    Metro-North Yankee Stadium train station.

6             MS. COHEN:  Can you put up 404-G, please?

7    BY MS. COHEN:

8        Q.   What are we looking at here?

9        A.   This is a staircase which leads into the Metro-North

10   Yankee Stadium train station.

11       Q.   If you didn't go up the stairs into the station, where

12   would you end up?

13       A.   There is a -- to the right of the stairs there is an

14   elevator, and further to the right from the elevator there is a

15   small parking area and a lot, a parking lot, which is apparently

16   no longer in use.  I am not sure if it was in use at the time.

17       Q.   Have you ever had occasion to be in the vicinity of

18   this Yankee Stadium entrance, Metro-North entrance, I should

19   say, before 6:00 a.m.?

20       A.   Yes.

21       Q.   How would you describe the foot traffic at that time?

22       A.   Virtually nonexistent.

23            MS. COHEN:  You can take that down.  Thank you.

24   BY MS. COHEN:

25       Q.   Focusing again on when you arrived on the scene and

ARONSON - DIRECT - COHEN                342

1   found the car, can you describe the state of the car?

2       A.   The car -- the doors of the vehicle were opened, and

3   the trunk lid was open -- was partially opened as well.

4       Q.   What did you observe about the exterior of the car?

5       A.   There were -- there was some type of white residue on

6   the paint on certain portions of the car.

7       Q.   What did you notice about the odor?

8       A.   As I approached the car and was closer to it to see if

9   there was anything or anyone inside of it, I noticed a distinct

10  odor of bleach.

11      Q.   Can you describe what you did when you first arrived

12  on the scene?

13      A.   We scanned the area to see if the driver or operator

14  of the vehicle was around.  There was apparently no one around

15  at the time, and we checked the inside of the vehicle to see if

16  there was anything unusual that we needed to be concerned with.

17      Q.   Once did you that, what did you do next?

18      A.   The first thing I did was -- we -- I conducted a file

19  check of the vehicle registration to see if it was wanted or

20  there was some other issue with it.

21      Q.   What -- let me -- sorry to interrupt you, but what

22  does a file check mean?

23      A.   I am sorry.  Basically, most people would state we ran

24  the registration.  We conducted a DMV registration check on the

25  vehicle to determine the status of the registration, the owner

ARONSON - DIRECT - COHEN                    343

```
 1   of the vehicle, and whether it was subject of any warrants or
 2   holds.
 3        Q.   What did you do after you ran the vehicle?
 4        A.   The vehicle was -- I noticed a for-hire vehicle
 5   license by the New York City Taxi and Limousine Commission.  My
 6   first thought was to contact the dispatching base, TLC license
 7   base, which dispatches these vehicles, and see if anyone at the
 8   dispatching base knew what had happened to the driver or where
 9   the driver was.
10        Q.   What phone did you use to call the dispatch base?
11        A.   I used my personal cell phone.
12        Q.   And what did you do after you called the dispatch
13   base?
14        A.   Subsequent to talking to an individual at the base, I
15   was provided with a phone number for the owner, the registered
16   owner.  The registered owner of the vehicle was a corporate
17   entity, and I tried calling the phone number that the base had
18   given me to make contact with the owner.
19        Q.   What phone did you use for that phone call?
20        A.   Again, I would use my personal phone.
21        Q.   What was the result of that phone call?
22        A.   The phone number that I had been given was apparently
23   an invalid number.  I don't recall whether it was disconnected
24   or just not valid.  It was not a usable number.
25        Q.   So what did you do next?
```

ARONSON - DIRECT - COHEN

1      A.   Continued looking inside the vehicle.  We noticed, or
2  I noticed a cellular phone, what appeared to be a cellular phone
3  on the front center console, and our concern at that point,
4  since there was no sign of an operator, was that perhaps the
5  driver was in some type of trouble, and I was trying to
6  ascertain what had happened to the driver.  I removed the
7  vehicle -- I removed the phone from the vehicle, and it was not
8  powered on at the time.  I powered it on and saw that it had a
9  fully charged battery, and I looked through the recent contacts
10  on the phone to determine if I could make contact with anyone to
11  get some more information.
12      Q.   Did you reach anyone?
13      A.   Yes.
14      Q.   Can you describe the person that you spoke to?
15      A.   I spoke to at least two people.  Only the last one
16  that I spoke to provided any information, and this was a female
17  with a heavy accent, which I believed to be a West African
18  accent and spoke to her.
19      Q.   After you spoke to her, what did you do?
20      A.   My partner -- we were within the confines of the NYPD
21  44th Precinct.  My partner knew at least one police officer or,
22  actually, I believe it was a sergeant, a supervisor, who worked
23  in the 44th Precinct.  He called this individual to determine if
24  there was -- if there were any instances involving this --
25  incidents involving this vehicle or any livery driver in the

1    preceding evening.

2        Q.    What phone was used to make the call to the 44th

3    Precinct?

4        A.    That was my partner's phone, and he didn't actually

5    call the precinct.  He spoke -- he called this sergeant directly

6    on his cell.

7        Q.    After you called the 44th Precinct, what did you do?

8        A.    I again called the dispatching base, spoke to the same

9    individual that I had spoken to, who was a male, and again he

10   had a very heavy accent, which I believed to be a West African

11   accent, and I advised him that the phone number that he had

12   provided me was not a good number, and I asked him if he had

13   another number to provide me.

14       Q.    How did he respond?

15       A.    He stated to me that he actually --

16             MR. PATEL:  Objection.

17             MS. COHEN:  Your Honor, it's not being offered for the

18   truth.  It's being offered to explain Officer Aronson's next

19   steps.

20             THE COURT:  I will allow it.  Overruled.

21             THE WITNESS:  The individual that I was speaking to on

22   the phone stated that he actually was speaking to the owner; had

23   him on the other phone line, and that the owner was with

24   detectives who wanted to speak to me.

25   BY MS. COHEN:

ARONSON - DIRECT - COHEN                              346

1        Q.    So to clarify, you were on the phone with someone at

2   the dispatch; is that right?

3        A.    Correct.

4        Q.    And how were you distinguishing between dispatch and

5   owner?  In other words, what does that mean when you say

6   dispatch and owner?

7        A.    The owner of the vehicle is actually the owner of the

8   motor vehicle, whether it's an individual or a corporate entity.

9   The dispatching base is the TLC license base.  They are

10  responsible for basically assigning the for-hire people to jobs.

11       Q.    Once you were told that there was a detective who

12  wanted to speak to you, what did you do next?

13       A.    The man that I spoke to gave me a phone number and

14  stated that the detectives wanted me to call that number and

15  speak to them, and that's what I proceeded to do.

16       Q.    What did you do after speaking with the detective?

17       A.    At that point, we safeguarded the vehicle and waited

18  for the two detectives from the 47th Precinct to respond.

19       Q.    Showing you Government Exhibits 404-A, 404-B, 404-C,

20  and 404-M, can you generally describe what those are?

21       A.    These are photographs of the vehicle which was the

22  subject of the complaint.

23            MS. COHEN:  Government offers 404-A, B, C, and M.

24            MR. RUHNKE:  No objection.

25            THE COURT:  404-A, BC and M are received.

ARONSON - DIRECT - COHEN                    347

1              (Government Exhibits 404-A, B, C and M received in

2    Evidence)

3              MS. COHEN:  Can you put up 404-A, please?

4    BY MS. COHEN:

5       Q.    So Officer Aronson, can you just orient us, what's the

6    overpass here?

7       A.    That's part of the Major Deegan Expressway.

8       Q.    And the roadway we looked at earlier in relation to

9    the exit ramp from the Deegan, where is that?

10      A.    That would be to the left.

11      Q.    And the Metro-North tracks, where would those be?

12      A.    To the right.

13      Q.    Who are the people on the left-hand side of the

14   photograph?

15      A.    They are police officers.

16      Q.    You testified earlier that you noticed white residue

17   on the exterior of the car.  Do you see any of that in

18   photograph?

19      A.    Yes.

20      Q.    Can you describe where that is?

21      A.    Primarily the passenger's side, rear quarter panel

22   above the rear tire, and also the rear passenger door.

23             MS. COHEN:  Can we put up 404-B, please?

24   BY MS. COHEN:

25      Q.    Do you see any of that same white residue in this

1    photograph?

2         A.    Yes.

3         Q.    Where?

4         A.    On the trunk lid on the horizontal surface of the --

5    the top of the trunk lid and the rear bumper cover.

6         MS. COHEN:  Zoom in on that, please.

7    BY MS. COHEN:

8         Q.    Can you read the license plate of the vehicle, please?

9         A.    Yes.  Would you like me to read it out?

10        Q.    Yes, please.

11        A.    T611735C.

12        MS. COHEN:  Government would like to read, Your Honor,

13   paragraph 1 of the parties' vehicle manufacturer stipulation,

14   which is Government Exhibit 1010.

15        THE COURT:  Okay.

16        MS. COHEN:  "If called to testify, a representative of

17   the Ford Motor Company would testify that the 2006 Lincoln Town

18   Car VIN 1LNHM81WX6Y644698, and New York registration number

19   T611735C driven by Maodo Kane on or about August 5th, 2014, was

20   manufactured in Michigan."

21   BY MS. COHEN:

22        Q.    Showing you what's marked as 100-G.  Can you read

23   that?

24        A.    Yes.

25        Q.    Read it out loud, please?

1          A.    "8/5/14, Kane livery cab."

2                MS. COHEN:  Government offers 100-G.

3                MR. RUHNKE:  No objection.

4                THE COURT:  Received.

5                (Government Exhibit 100-G received in Evidence)

6    BY MS. COHEN:

7          Q.    Am I placing this approximately where you indicated

8    finding the car?

9          A.    Yes.

10               THE COURT:  On exhibit -- what is that?

11               MS. COHEN:  Government Exhibit 100.

12               THE COURT:  All right.

13   BY MS. COHEN:

14         Q.    Officer Aronson, did you observe the white residue

15   anywhere other than the exterior of the car?

16         A.    Yes.  There appeared to be a similar white residue on

17   the interior of the vehicle.

18               MS. COHEN:  Can we put up 404-C, please?

19   BY MS. COHEN:

20         Q.    Can you describe where we can see that in this

21   photograph?

22         A.    So on the top of the dashboard on the vertical surface

23   of the dashboard just to the left of the steering wheel and also

24   on the door on the trim panels of the driver's side door.

25               MS. COHEN:  Can we zoom in just on the lower half of

1  the car door, please?  And then can we zoom in on the dashboard,

2  please?

3  BY MS. COHEN:

4      Q.   Officer Aronson, did you observe anything else on the

5  interior of the car other than white residue?

6      A.   Yes.  The -- there was a puddle of liquid in the

7  driver's foot well where the driver would be seated, and also

8  the -- at least one of the rear carpeted floor mats was soaked

9  with some type of liquid.

10         MS. COHEN:  Could we put up 404-M, please?

11  BY MS. COHEN:

12     Q.   Officer Aronson, is that puddle visible anywhere in

13  this photograph?

14     A.   Yes.

15     Q.   Where?

16     A.   The lower left-hand corner of the photograph on the

17  floor of the vehicle.

18     Q.   Once you spoke to the detective, what did you do next?

19     A.   We stood by and safeguarded the vehicle until they

20  arrived.

21     Q.   After they arrived, did you have any further

22  involvement in the investigation into this car?

23     A.   No.  The crime scene detectives interviewed us to get

24  whatever information we could provide, and then we remained on

25  scene for a brief period of time in case any other questions

1    needed to be answered, and then we departed.

2              MS. COHEN:  No further questions.

3              THE COURT:  Any cross?

4              MR. PATEL:  No.  Thank you, Your Honor.

5              THE COURT:  Officer, thank you very much.

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  You are excused.  You may step down.

8              (Witness excused)

9              THE COURT:  Call your next witness.

10             MS. COHEN:  Detective Thomas Green.

11   DETECTIVE THOMAS GREEN,

12        called as a witness by the Government, having been duly

13        sworn, testified as follows:

14             THE DEPUTY CLERK:  Please be seated.  Please state

15   your full name for the record spelling your last name slowly.

16             THE WITNESS:  Thomas Green, G-R-E-E-N.

17   DIRECT EXAMINATION

18   BY MS. COHEN:

19        Q.   Detective Green, where are you currently employed?

20        A.   With the New York City Police Department, Special

21   Victims Division.

22        Q.   How long have you been with the NYPD?

23        A.   For 18 years.

24        Q.   Where were you assigned in August of 2014?

25        A.   The 47 Precinct detective squad.

1          Q.    Can you briefly describe what your duties as a

2    detective in the 47th Precinct were?

3          A.    Sure.  In the 47 Precinct squad we would investigate

4    all crimes with the exception of sex crimes that would be

5    reported in the 47 that needed additional investigation.

6          Q.    Directing your attention to August 5th, 2014, were you

7    working that day?

8          A.    Yes.

9          Q.    What was your shift?

10         A.    I had a day tour, 8:00 to 4:00.

11         Q.    Where did you first report that day?

12         A.    To the 47 Precinct station house.

13         Q.    And after that, where did you report?

14         A.    We went to Hunter Avenue.

15         Q.    Why?

16         A.    There was a reported homicide on Hunter.

17         Q.    Can you describe the scene when you arrived on Hunter?

18         A.    Yes.  The scene had already been secured, so there was

19   crime scene tape up, and the deceased had already been removed.

20   Patrol was there securing the scene, and there were already some

21   detectives out there beginning to investigate.

22         Q.    What did you personally do while you were at Hunter

23   Avenue?

24         A.    I helped out with the investigation by canvassing

25   through video, looking for video surveillance cameras, knocking

1  on doors, trying to look for witnesses, and looking for any

2  evidence that may be in the area.

3      Q.   Are you aware of whether or not video was successfully

4  collected from Hunter Avenue?

5      A.   I did not collect any video.

6      Q.   Where did you go after Hunter?

7      A.   After Hunter, I went back to the station, and then I

8  received a call from my lieutenant saying that the vehicle had

9  been recovered in the confines of the 44 Precinct.

10     Q.   Was a more specific location provided to you?

11     A.   Yes.  It was underneath the Major Deegan Expressway by

12  the Yankee Stadium MTA station.

13          MS. COHEN:  Can we put up Government Exhibit 104,

14  please?

15  BY MS. COHEN:

16     Q.   Using the laser pointer that's in front of you, can

17  you approximate where it was that you reported?

18     A.   It was up in this area here.

19     Q.   What did you observe when you arrived there?

20     A.   Two of the detectives from the 47 were already there.

21  There was a black vehicle, I believe Lincoln Town Car, that had

22  like white residue all over the outside and the inside.  There

23  was a smell of bleach coming from the car, and there was a -- a

24  cell phone that was wrapped up in rubber gloves on the truck.

25          MS. COHEN:  Go to 404-B, please?

1   BY MS. COHEN:

2       Q.   Can you point out the white residue you mentioned?

3       A.   Sure.  It's all over the back of the car here, here,

4   down on the bumper.

5       Q.   Did there come a time when you looked inside the car?

6       A.   Yes.

7       Q.   What, if anything, did you see inside the car?

8       A.   Again, I saw more white residue all over the panels,

9   the floor, and also there was a cell phone sitting on the center

10  console.

11      Q.   What kind of cell phone?

12      A.   It was a white iPhone with a gold case.

13      Q.   You indicated earlier that there was a cell phone

14  wrapped up in gloves on the trunk of the phone.  So what are the

15  total number of phones that were on the scene?

16      A.   There were two.

17           MS. COHEN:  Can you put up 404-M, please?

18  BY MS. COHEN:

19      Q.   And using your laser pointer, can you describe, point

20  out more specifically where it was that you saw the phone, the

21  iPhone, rather?

22      A.   The cell phone was right in the seat.  The iPhone was

23  right in this area here.

24      Q.   Was the console open or closed?

25      A.   It was open.

1       Q.    Showing you what have been marked as 404-D and E for

2   Identification, what are those?

3       A.    These are photos of the cell phone that was recovered

4   from the center console.

5             MS. COHEN:  Government offers 404-D and E.

6             MR. RUHNKE:  No objection.

7             THE COURT:  404-D and E are received.

8             (Government Exhibits 404-D and E received in Evidence)

9             MS. COHEN:  Can we just put up D quickly, please?

10  Okay.  We can take that down.

11  BY MS. COHEN:

12      Q.    Once you found the phone, what did you do with it?

13      A.    I secured it.  When crime scene arrived to process the

14  scene, I turned it over to them, and they processed the phone

15  for fingerprints and/or DNA, and then they returned it to me.

16      Q.    Once they returned the phone to you, what did you do

17  with it?

18      A.    I gave it to the case detective Regnier.

19      Q.    Showing you what's been marked as Government

20  Exhibit 204, what is that?

21      A.    This is the cell phone that I recovered from the

22  center console of the vehicle.

23            MS. COHEN:  No further questions.  Sorry.

24            Government offers Exhibit 204.

25            THE COURT:  Do you have an objection to 204, which is

1    the cell phone?

2              MR. RUHNKE:  No, sir.

3              THE COURT:  Okay.  So Exhibit 204 is received.

4              (Government Exhibit 204 received in Evidence).

5              THE COURT:  Any cross?

6              MR. RUHNKE:  Just briefly, Your Honor, mindful of the

7    hour.  I will have a couple of questions for the witness.

8              THE COURT:  Take as long as you want, Mr. Ruhnke.  Go

9    ahead.

10   CROSS-EXAMINATION

11   BY MR. RUHNKE:

12        Q.   Detective, you have been trained in processing crime

13   scenes, correct?

14        A.   Yes.

15        Q.   And your job is to -- when it comes to preserving a

16   crime scene, where the officer is on the scene to make sure to

17   the extent possible no one walks in or out or takes something or

18   leaves something on the scene, correct?

19        A.   Correct.

20        Q.   That's the purpose of the crime scene tape, and

21   usually an officer on the scene, to stop people from going in

22   and out, correct?

23        A.   That's correct.

24        Q.   Until the detectives who are trained on how to process

25   it actually arrive, correct?

GREEN - CROSS- RUHNKE

1          A.    Correct.

2          Q.    And in the photograph we had in evidence of the cell

3     phone there was a small placard next to the cell phone.  That's

4     a form you use basically to document what you photograph,

5     correct?

6          A.    Right.  That's -- crime scene does that.

7          Q.    Right.  And your basic job is to be sure that nothing

8     significant is overlooked in the first place, correct?

9          A.    I am sorry.  Could you rephrase?

10         Q.    That nothing significant is overlooked, that's job

11    one, correct?

12         A.    Yes.

13         Q.    And job two is to make sure nobody disturbs or alters

14    the crime scene, correct?

15         A.    Yes.

16         Q.    And that's what was done in this case, to your

17    knowledge, correct?

18         A.    Yes, sir.

19              MR. RUHNKE:  Thank you, sir.  I have no other

20    questions.

21              THE COURT:  Okay.  Any further questions?

22              MS. COHEN:  No, Your Honor.

23              THE COURT:  All right.  Detective, thank you very

24    much.

25              THE WITNESS:  Thank you, Your Honor.

1              THE COURT:  Please step down.

2              (Witness excused)

3              THE COURT:  Call your next witness.

4              MS. COHEN:  Government calls Mohamed Yahia.

5              THE COURT:  Please sit down.

6              (Interpreter sworn)

7              THE DEPUTY CLERK:  Please state your name for the

8    record.

9              THE INTERPRETER:  Marwan Abdel-Rahman.

10             THE DEPUTY CLERK:  And can you just spell both your

11   first and last name for the record?

12             THE INTERPRETER:  First name, M-A-R-W-A-N.  Last name

13   A-B-D-E-L, hyphen, R-A-H-M-A-N.

14             THE DEPUTY CLERK:  Now for the witness, please raise

15   your right hand.

16   MOHAMED YAHIA,

17        called as a witness by the Government, having been duly

18        sworn, testified as follows:

19             THE DEPUTY CLERK:  Please be seated.

20             Please state your full name for the record spelling

21   your first and last name.

22             THE WITNESS:  (Through interpreter.) Mohamed Yahia.

23             THE DEPUTY CLERK:  Could you please spell?

24             THE INTERPRETER:  Your Honor, the witness is spelling

25   his name in Arabic.

```
 1                THE COURT:  That's fine.  You translate into English.

 2                THE INTERPRETER:  You cannot translate a spelling

 3    because the Arabic alphabet is not compatible with English.

 4                THE COURT:  I understand.

 5                THE INTERPRETER:  I could spell the name on my own

 6    without his help.

 7                THE COURT:  Why don't you do that for me?

 8                THE INTERPRETER:  First name, M-O-H-A-M-E-D, middle

 9    name S-A-L-E-H.  Last name, Y-A-H-I-A.

10                THE COURT:  Y-A.

11                THE INTERPRETER:  H-I-A.

12                THE COURT:  How do you response that?

13                THE INTERPRETER:  Yahia.

14                THE COURT:  Yahia.  Okay.  Thank you.

15                Now, Mr. Abdel-Rahman, did I pronounce it correctly?

16                THE INTERPRETER:  Yes.

17                THE COURT:  Just speak loudly and clearly because

18    everybody needs to hear.  You are a little bit away from the

19    microphone.  That's okay.  Just speak up.  All right?

20                THE INTERPRETER:  Sure.

21    DIRECT EXAMINATION

22    BY MS. COHEN:

23        Q.   Mr. Yahia, where do you live?

24        A.   (Through interpreter) McLean Avenue.  You want my

25    address?
```

```
 1        Q.   What town do you live in?

 2        A.   Yonkers.

 3        Q.   How long have you lived in Yonkers?

 4        A.   Since 2004.

 5        Q.   Are you currently working?

 6        A.   Yes, I am working.

 7        Q.   Where?

 8        A.   Irish Minimart.

 9        Q.   What is the address of the Irish Minimart?

10        A.   821.

11        Q.   What street?

12        A.   McLean Avenue.

13        Q.   What town?

14        A.   Yonkers.

15        Q.   Who owns the Irish Minimart?

16        A.   I do.

17        Q.   How long have you owned the minimart?

18        A.   How long have I been working there?

19        Q.   How long have you been the owner of the minimart?

20        A.   Since 2004.

21        Q.   Do you remember the police coming to your store in

22   August of 2014?

23        A.   Yes.  In 2014.

24        Q.   Why did the police come to your store?

25        A.   They came after those guys came inside the store.
```

361

1          Q.    In one word, what did the guys do when they came in

2     the store?

3          A.    I opened the store.  I went inside the store along

4     with Harry.  I went around the counter.  Then they stormed into

5     the store.

6          Q.    Okay.  So let's talk about that a little more.

7                What time of day did the guys come into your store?

8          A.    About 5:15, 5:30, something like that.

9          Q.    Before they stormed into your store, what kinds of

10    things had you and Harry been doing?

11         A.    We brought the bread inside, and I started working on

12    fixing the rolls.

13         Q.    What does fixing the rolls mean?

14         A.    Preparing -- preparing rolls for sale for customers,

15    putting butter on them.  One of them came in suddenly, and then

16    one jumped over the fridge.  They both had guns, and one of them

17    snatched my cell phone away.

18         Q.    Mr. Yahia, just so we can follow your story, I am

19    going to ask you to tell the story in pieces.  Okay?

20               So you just said that they came into the store and

21    took your cell phone, right?

22         A.    Two of them came in.

23         Q.    Okay.  And what besides your cell phone did they take

24    from the store?

25         A.    They took the cell phone.  They opened the cash

 1   register and took the money.

 2       Q.   Were there any items from the store that were taken?

 3       A.   One of them reached down to the Clorox bleach and took

 4   it.

 5       Q.   So, Mr. Yahia, can you describe what kind of security

 6   systems were installed in the minimart in August of 2014?

 7       A.   We had cameras.

 8       Q.   Were the cameras inside the store or outside the

 9   store?

10       A.   Inside the store.

11       Q.   Do you know whether or not the cameras recorded the

12   men storming into your store?

13       A.   Yes, they did.

14       Q.   Have you seen that video?

15       A.   Yes.

16            MS. COHEN:  Your Honor, I would like to read

17   paragraphs 26 and 27(c) of the parties' video stipulation, which

18   is Government Exhibit 1001.

19            THE COURT:  Okay.

20            MS. COHEN:  "The minimart located at 821 McLean

21   Avenue, Yonkers, New York, herein after the Minimart, has

22   surveillance cameras installed at various locations inside the

23   store.  Government Exhibit 309-C is a true and accurate copy of

24   surveillance camera footage recorded by camera four, which is

25   located above the register and looks towards the front door of

1    the Minimart."

2            The government offers 309-C pursuant to the party's

3    stipulation.

4            MR. RUHNKE:  No objection.

5            THE COURT:  Received.

6            (Government Exhibit 309-C received in Evidence)

7    BY MS. COHEN:

8        Q.  Mr. Yahia, we are going to play the video once, and I

9    am going to ask you questions afterwards.

10       A.  Okay.

11           (Video played).

12           MS. COHEN:  Can we put it back to the opening frame,

13   please?

14   BY MS. COHEN:

15       Q.  Mr. Yahia, who is at the bottom of the screen?

16       A.  That's me.

17       Q.  What were you doing at that moment?

18       A.  I was fixing the rolls.

19       Q.  The door we see in the middle of the screen, where

20   does that door lead?

21       A.  It opens to the street.

22       Q.  Remind us what street that is.

23       A.  Mclean Avenue.

24           MS. COHEN:  Can we play the first 18 seconds, please?

25           (Video played)

YAHIA - DIRECT - COHEN                         364

1   BY MS. COHEN:

2       Q.   Mr. Yahia, who is the woman in the video?

3       A.   She is one of my customers, and she was waiting

4   outside the store waiting for me to open.

5            MS. COHEN:  Can we play to 28 seconds, please?

6            (Video played).

7   BY MS. COHEN:

8       Q.   Mr. Yahia, what do the three men have in their hands?

9       A.   Guns.

10           MS. COHEN:  Play to 50 seconds.

11           (Video played).

12  BY MS. COHEN:

13      Q.   Mr. Yahia, you said earlier that the men who stormed

14  into your store stole your phone, right?

15      A.   This one above the fridge.

16      Q.   Can you use the laser pointer next to you to point him

17  out on the screen?

18      A.   Shall I point it?

19      Q.   Point at the big screen.  The screen on the wall.  Can

20  you point that at the wall?  There you go.

21      A.   This is the guy on top of the fridge.

22           MS. COHEN:  Can we back up to 45 seconds?  And just

23  play from 45 to 51 more time, please.

24           (Video played).

25  BY MS. COHEN:

```
 1          Q.    In front of you, Mr. Yahia, is Government Exhibit 204
 2    in that plastic bag.  Can you take what's in that bag out?
 3          A.    It's a phone.  That's my phone.
 4          Q.    It's Government Exhibit 204.  How do you know that
 5    it's your phone?
 6          A.    I know it.
 7          MS. COHEN:  Can we continue playing to one minute and
 8    28 seconds?
 9               (Video played).
10    BY MS. COHEN:
11          Q.    Mr. Yahia, can we see you in the video anymore?
12          THE INTERPRETER:  I am sorry.  The interpreter
13    couldn't hear.
14    BY MS. COHEN:
15          Q.    Mr. Yahia, do you see yourself in the video in this
16    frame?
17          A.    No, I can't see.
18          Q.    Where did you go?
19          A.    They put me towards the cash register, so I am no
20    longer visible in the picture.
21          Q.    What was under the register at the time?
22          A.    Quarters.
23          MS. COHEN:  Can we play to a minute 39 seconds,
24    please?
25               (Video played).
```

YAHIA - DIRECT - COHEN                    366

```
 1              MS. COHEN:  Back up it up a frame?

 2              (Video played)

 3  BY MS. COHEN:

 4      Q.   Mr. Yahia, what is in the hands of the man closest to

 5  the register?

 6      A.   At that point I wasn't able to see what was in his

 7  hand.

 8              MS. COHEN:  Can we keep playing?

 9              (Video played)

10              MS. COHEN:  Pause it as he walks out.  Keep going.

11              (Video played)

12  BY MS. COHEN:

13      Q.   I am showing you what's been marked for Identification

14  as Government Exhibits 404 -- 401-A, 401-B, 401-C and 401-D.

15              Can you take a look at those, please?

16      A.   These are the quarters.

17      Q.   Don't tell me what they are yet.  Just take a look at

18  them.  Where were those taken?

19      A.   From inside the store.  This one was outside the

20  store.

21              MS. COHEN:  Government offers Exhibits 404 -- 401-A

22  through D.

23              MR. PATEL:  No objection.

24              THE COURT:  Okay.  401-A, B, C, and D are received.

25              (Government Exhibits 401-A, B, C and D received in
```

1   Evidence)

2           MS. COHEN:  Can we put up 401-C, please?

3   BY MS. COHEN:

4       Q.   Mr. Yahia, what are we looking at here?

5       A.   This is a yellow line was placed by the police, and

6   that's me with someone who works for me.

7       Q.   And the door that we saw the men rushing in and out

8   of, do you see that in this photograph?  In the video, the door

9   that we saw the men rush in and out of, do you see that same

10  door in this photograph?

11      A.   Yes.  That's a door.

12          MS. COHEN:  Could you put up 401-A?

13  BY MS. COHEN:

14      Q.   What are we looking at here?

15      A.   This is behind the counter inside the store.

16      Q.   Can you tell where you were standing in the prior

17  video?  Is that visible in this photograph?

18      A.   Where the cash -- I was -- I was standing there where

19  I was fixing the rolls.

20          MS. COHEN:  Can we put up 401-B, please?

21  BY MS. COHEN:

22      Q.   B.  What are we looking at in this photograph?

23      A.   It shows the quarters and the other change rolls.

24      Q.   Where is this in relation to the cash register?

25      A.   Beneath, beneath the cash register.

```
 1          Q.   What's to the left of the quarters?

 2          A.   This is the -- this is the tool that we use to put

 3    prices on the products.

 4               MS. COHEN:  Can we put up 401-D, please?

 5    BY MS. COHEN:

 6          Q.   What are we looking at in this photo?

 7          A.   Soap and different types of detergents, Clorox.

 8          Q.   How does this shelf appear when you open the store?

 9          A.   They were all straight upright.

10               MS. COHEN:  No further questions.

11               THE COURT:  Any cross-examination?

12               MR. PATEL:  No.  Thank you, Your Honor.

13               THE COURT:  Okay.  Thank you, sir.  You may step down.

14               (Witness excused)

15               THE COURT:  Just be careful walking so you don't

16    stumble over anything.  Thank you, sir.  I appreciate your time.

17               THE INTERPRETER:  He is excused?

18               THE COURT:  He is excused.

19               Okay.  Ladies and gentlemen, we are going to take our

20    lunch break at this time.  It's about -- looks like it's about

21    five minutes to 1:00.  So we are going to give you a little bit

22    of time today.  We will make it 2:15, so that's an hour and

23    20 minutes.  Remember, very important, keep an open mind.  Don't

24    discuss the case with each other or with anyone else.

25               Don't interact with any of the folks in this courtroom
```

1    or any of the witnesses or the parties or the lawyers or me, for
2    that matter.  Even I wouldn't really give you a smile if I saw
3    you in the elevator, but that's not being mean.  It's just the
4    way we do things.  It just prevents any misunderstandings, let's
5    put it that way.  So enjoy your lunch.  I will see you at 2:15.
6            THE DEPUTY CLERK:  All rise.
7            (In open court; jury not present)
8            THE COURT:  Have a seat, please.  Okay.  Seems like we
9    are moving along at a pretty good clip, which is good.  What's
10   up for this afternoon?
11           MS. COHEN:  Your Honor, the government is going to
12   offer a witness, another witness to the Minimart robbery,
13   another -- a witness from the Dunkin' Donuts robbery and time
14   permitting, we will start with video from 8/5.
15           THE COURT:  The video of?
16           MS. COHEN:  Video along the lines of what we did for
17   the 12th.  We will be calling a task force officer from the FBI
18   to go through the video, not just of the robberies, but of the
19   defendants leaving 3480 and sort of the narrative through the
20   day.
21           THE COURT:  So video clips in a series?
22           MS. COHEN:  Yes.
23           THE COURT:  Okay.  I understand.  Anybody need me for
24   anything?
25           MR. PATEL:  No.  Thank you, Your Honor.

```
1              THE COURT:  Okay.  Please enjoy your lunch.  See you

2    at 2:15.

3              THE DEPUTY CLERK:  All rise.  This court will be in

4    recess.

5              (Luncheon recess)

6              (In open court; jury not present)

7              THE COURT:  Good afternoon, everybody.  Have a seat.

8              Okay.  So, Mr. Scotten, are we going to proceed with

9    the immunity application at this time?

10             MR. SCOTTEN:  Well --

11             THE COURT:  Proceed.  Go ahead.

12             MR. SCOTTEN:  Your Honor, the government calls Nenobia

13   Washington.

14             THE COURT:  Mr. Kirton, nice to see you.

15   NENOBIA WASHINGTON,

16        called as a witness by the Government, having been duly

17        sworn, testified as follows:

18             THE DEPUTY CLERK:  Please be seated.  Please state

19   your full name for the record spelling your last name slowly.

20             THE WITNESS:  Nenobia Estella Washington,

21   W-A-S-H-I-N-G-T-O-N.

22             THE COURT:  And just your first name is N-E-N-O-B-I-A;

23   is that correct?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  And Mr. Kirton, could you just put your
```

1    appearance on the record as well?

2            MR. KIRTON:  Marlon Kirton, M-A-R-L-O-N, K-I-R-T-O-N.

3            THE COURT:  And you are here representing Ms.

4    Washington?

5            MR. KIRTON:  Yes, Your Honor.

6            THE COURT:  All right.  Go ahead.

7    DIRECT EXAMINATION

8    BY MR. SCOTTEN:

9        Q.   Ms. Washington, in your testimony I intend to ask you

10   some questions about criminal activity you may have been

11   involved in in 2014 or 2015.  Am I correct that you intend to,

12   on the advice of counsel, invoke your privilege against self

13   incrimination?

14       A.   Yes.

15           MR. SCOTTEN:  Your Honor, the government has placed

16   before the Court an application for a compulsion order and

17   corresponding use immunity for Ms. Washington testimony.  We

18   respectfully request that it be granted.

19           THE COURT:  Thank you.

20           Okay.  Ms. Washington, let just ask you a couple of

21   questions.

22           Have you discussed with your attorney this procedure

23   that Mr. Scotten just referred to, namely, an application for a

24   compulsion order which grants you immunity from the use of your

25   testimony in any forum from this point forward?

1                    THE WITNESS:  Yes, sir.

2                    THE COURT:  So you are familiar with what's happening

3      here today?

4                    THE WITNESS:  Yes, sir.

5                    THE COURT:  Okay.  And I am going to go -- I have read

6      the application, and I think it's sufficient under the law, and

7      so I am going to go ahead and sign the order.

8                    And let me just tell you what this means, and I will

9      try to do it in as plain English as possible.

10                   Ordinarily, people have the right to refuse to

11     incriminate themselves, to decline to give testimony that may

12     incriminate themselves.  It's called the Fifth Amendment

13     privilege, but this order says that no testimony or other

14     information compelled under this order or any information

15     directly or indirectly derived from such testimony or

16     information may be used against you in any criminal case except

17     the prosecution for perjury or giving a false statement or

18     failing to comply with the order.

19                   So what that means is the testimony that you give here

20     cannot be used against you, directly or indirectly, in any

21     criminal case except for prosecution for perjury or making a

22     false statement.  Do you understand that?

23                   THE WITNESS:  Yes, sir.

24                   THE COURT:  And because the order says that, you no

25     longer have a basis to assert your Fifth Amendment privilege

1    because the Fifth Amendment privilege says I am asserting my

2    privilege because I don't want to incriminate myself.  I don't

3    want to say something that could be used against me to prosecute

4    me; but I am telling you that there is nothing you can say today

5    that would be used against you to prosecute you, which means you

6    no longer have a Fifth Amendment privilege.  Do you understand

7    that?

8               THE WITNESS:  Yes, sir.

9               THE COURT:  What it also means is you are going to be

10   compelled to answer questions that are put to you by the

11   government, and also if the defense counsel wish to ask you

12   questions, you are going to have to answer those questions as

13   well, fully and truthfully.  Do you understand that?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  All right.  I think the witness is fully

16   informed and aware of both her rights and the nature of the

17   immunity and compulsion order.  So I am going to go ahead and

18   sign the order; and at this point, do you want to suspend her

19   testimony until later on in the trial?

20              MR. SCOTTEN:  Yes, Your Honor, please.

21              THE COURT:  Okay.  You may step down, although -- do

22   you need her today?

23              MR. SCOTTEN:  We will work that out with her.  I am

24   not sure we are going to get to her today.

25              THE COURT:  Well, you will work it out with her

COLAVECCHIO - DIRECT - COHEN                    374

```
 1   lawyer.

 2              MR. SCOTTEN:  Yes.

 3              THE COURT:  Thank you very much, ma'am.

 4              (Witness excused)

 5              THE COURT:  Okay.  Can we get the jury?  Hold on just

 6   one second.  That's not sealed?  That can be docketed in the

 7   normal fashion, right?

 8              MR. SCOTTEN:  It can, Your Honor.

 9              THE COURT:  Okay.  And the application.  Everything

10   can be docketed.

11              MR. SCOTTEN:  Judge, would you like us to go ahead and

12   bring the witness in also?

13              THE COURT:  Yes.

14              (Trial resumed; jury present)

15              THE COURT:  Hello, everybody.  Come in.  Have a seat.

16   Come in and have a seat.

17              Everybody else can have a seat as well.  Go ahead.

18              Call your next witness.  Sorry.  Call your next

19   witness.

20              MS. COHEN:  The government calls Victoria Colavecchio.

21   VICTORIA COLAVECCHIO,

22        called as a witness by the Government, having been duly

23        sworn, testified as follows:

24              THE WITNESS:  I do.

25              THE DEPUTY CLERK:  Please be seated.  Please keep your
```

```
 1    voice up.  Please spell your last name for the record slowly.
 2              THE WITNESS:  C-O-L-A-V-E-C-C-H-I-O.
 3              THE COURT:  Just sit back about a foot from the mic.
 4    About 12 inches is the sweet spot.
 5              THE WITNESS:  I am sorry.
 6              THE COURT:  Don't be sorry.
 7              Go ahead, Ms. Cohen.
 8    DIRECT EXAMINATION
 9    BY MS. COHEN:
10         Q.   Good afternoon, Ms. Colavecchio.
11         A.   Hi.
12         Q.   What town do you live in?
13         A.   Yonkers, New York, Westchester County.
14         Q.   Who do you live with?
15         A.   My father.
16         Q.   Do you live in a house or an apartment?
17         A.   An apartment.
18         Q.   How long have you lived in that apartment?
19         A.   1984.
20         Q.   I would like you to think back to August 5th, 2014.
21    Okay?
22         A.   Yes.
23         Q.   What did you do first thing that morning?
24         A.   I ran out for coffee at 5:30.
25         Q.   Where did you go for coffee?
```

COLAVECCHIO - DIRECT - COHEN                    376

```
 1        A.    The deli on McLean Avenue.

 2        Q.    And why did you go to the deli so early?

 3        A.    Because I was getting breakfast for my father.

 4        Q.    How did you get there?

 5        A.    I walked.

 6        Q.    What did you do when you first got to the deli on

 7  McLean Avenue?

 8        A.    I went and sat on the bench in front of the store.

 9        Q.    What did you see when you were sitting on the bench?

10        A.    I saw a car pull up.

11        Q.    Do you remember what kind of car?

12        A.    A four-door black Lincoln Continental.

13        Q.    What else did you see while you were sitting on the

14  bench?

15        A.    Nothing.

16        Q.    After the car pulled up, what happened?

17        A.    That's when the three men got out of the car, and then

18  they came over to me, and I remember the tall man pushing me.

19        Q.    Could you see the men's faces?

20        A.    No, I couldn't.

21        Q.    Why couldn't you see their faces?

22        A.    They had masks.

23        Q.    Do you remember if they were wearing anything other

24  than masks?

25        A.    A hat and gloves.
```

COLAVECCHIO - DIRECT - COHEN

1    Q.   After they pushed you, what happened?

2    A.   Then they pushed me, and they shoved me into the

3  store, into the deli.

4    Q.   Once you were inside the store, what happened?

5    A.   That's when he took my wallet, and he hit me with the

6  gun.

7    Q.   Do you remember what the gun looked like?

8    A.   Silver.

9    Q.   How did that make you feel?

10   A.   Not too good.  It hurt.  I was in a lot of pain.

11   Q.   What happened once they were inside the store?

12   A.   They -- they pushed me right to the ground, and I

13  couldn't see anything else after that.

14   Q.   Did they eventually leave the store?

15   A.   I would imagine, yes, because I didn't see because

16  they told me not lift up my head.  They said they would kill me,

17  and they would shoot me.

18   Q.   What happened after they left the store?

19   A.   I don't remember.

20        MS. COHEN:  No further questions.

21        THE COURT:  Any questions?

22        MR. PATEL:  No.  Thank you, Your Honor.

23        THE COURT:  Ms. Colavecchio, thank you very much.  You

24  are excused.  You may leave.  Thank you.  Just be careful

25  walking.  There is some wires and things around.

```
 1                (Witness excused)

 2            THE COURT:  Call your next witness.

 3            MS. COHEN:  Your Honor, before we call the next

 4    witness, I would like, with the Court's permission, to put up on

 5    our board two exhibits already in evidence, 407-A and 404-A.

 6            THE COURT:  Just to remind me what those are.

 7            MS. COHEN:  They are photographs of the cars from the

 8    5th and the 12th.

 9            THE COURT:  It's fine.  If it's in evidence, you can

10    put them up.

11            MS. COHEN:  The government's next witness is Subin

12    Jacob.

13    SUBIN JACOB,

14        called as a witness by the Government, having been duly

15        sworn, testified as follows:

16            THE WITNESS:  I do.

17            THE DEPUTY CLERK:  Please be seated.

18            THE WITNESS:  Thank you.

19            THE DEPUTY CLERK:  Please state your full name for the

20    record spelling your last name.

21            THE WITNESS:  Subin Jacob, J-A-C-O-B.

22            THE COURT:  What's your first name again?  I am sorry.

23            THE WITNESS:  Subin, S-U-B-I-N.

24            THE COURT:  Subin Jacob.  Thank you.

25    DIRECT EXAMINATION
```

JACOB - DIRECT - COHEN                    379

```
1   BY MS. COHEN:
2        Q.   Mr. Jacob, how old are you?
3        A.   I am 22.
4        Q.   Are you currently employed?
5        A.   Yes.
6        Q.   What do you do?
7        A.   I work as a software developer.
8        Q.   Were you working in August of 2014?
9        A.   Yeah.
10       Q.   Where were you working back in August of 2014?
11       A.   I was working at the Dunkin' Donuts.
12       Q.   Where is that Dunkin' Donuts located?
13       A.   Located in Central Park Avenue in Yonkers.
14       Q.   On August of 2014, how long had you worked there?
15       A.   I would say about four months.
16       Q.   Did you have a regular shift?
17       A.   Yes.
18       Q.   What was that shift?
19       A.   It was from 4:00 a.m. to 11:30.
20       Q.   11:30 at night or 11:30 --
21       A.   A.m.
22       Q.   What time did the store open to customers?
23       A.   5:00 a.m.
24       Q.   Can you describe how Dunkin' Donuts stocks its cash
25   registers from shift to shift?
```

1      A.   So the morning shift, the guys don't do that.  So the

2 the guys that do the night shift stack the cash, hundred colors

3 in the register, and if we need change, there is a hundred

4 dollars extra backup underneath the counter.

5      Q.   Sitting here today, do you recall the events of

6 August 5th, 2014?

7      A.   Yes.

8      Q.   Briefly, why do you remember that day?

9      A.   That was the day that the store got robbed.

10      Q.   Before we talk about the robbery, let's talk about the

11 layout of the Dunkin' Donuts.  I am handing you what have been

12 marked as 402-A, 402-B, 402-C, and 402-D.

13           Take a look at each of those and tell us generally

14 what they are.

15      A.   These are photographs of inside the store, of the

16 Dunkin' Donuts.

17      Q.   Just inside?

18      A.   And outside.

19           MS. COHEN:  Government offers 402-A through 402-D.

20           MR. RUHNKE:  Without objection.

21           THE COURT:  402-A through 402-D are received.

22           (Government Exhibit 402-A through 402-D received in

23 Evidence).

24           MS. COHEN:  Can we put up 402-A, please?

25 BY MS. COHEN:

1       Q.    Mr. Jacob, there should be a laser pointer in front of

2   you?

3       A.    Yes.

4       Q.    Can you point out on 402-A where the entrance to the

5   Dunkin' Donuts is?

6       A.    It would be that.

7       Q.    And how does that compare to something else in the

8   photograph?

9       A.    So there is the staircase rails, and that area right

10  there, and the orange door handles.

11      Q.    What street is that entrance?

12      A.    That is Central Park avenue.

13      Q.    To the left where we see the police cars, what's that?

14      A.    That would be the parking lot for the Dunkin' Donuts.

15      Q.    In your experience, where else do Dunkin' Donuts

16  customers park besides the parking lot?

17      A.    Usually in the early mornings customers park right on

18  Central Park Avenue.

19            MS. COHEN:  Can we put up 402-A side by side with

20  402-B, please?

21  BY MS. COHEN:

22      Q.    Mr. Jacob, the doors on the right, can you just point

23  out where they are?  When I say on the right, I mean in 402-B.

24  Can you point out where they are in 402-A?

25      A.    Sure.  It would be those right there.

```
 1              MS. COHEN:  Put up just 402-B.
 2   BY MS. COHEN:
 3        Q.   The window to the right of the doors, what does that
 4   look into?
 5        A.   That -- that shows the prep area where we make the
 6   beverages and food.
 7              MS. COHEN:  Can we put 402-B and 402-D next to each
 8   other?
 9   BY MS. COHEN:
10        Q.   402-D on the left, what is that?
11        A.   That would be the inside of the store as you can see
12   the prep area.
13        Q.   So the doors that are in 402-B where can we see those
14   in 402-D?
15        A.   You can see them little bit right there.
16        Q.   On the right-hand side of 402-D?
17        A.   Yes.
18              MS. COHEN:  Can we put up just 402-D?
19   BY MS. COHEN:
20        Q.   Looking at the ceiling in 402-D, can you tell us what
21   the dark-colored domes are?
22        A.   Those would be the security cameras.
23        Q.   Do you know whether or not the security cameras
24   captured the robbery on August 5th, 2014?
25        A.   They did.
```

1          Q.    How do you know?

2          A.    I reviewed the video tapes with a federal police

3     officer.

4               MS. COHEN:  Can we take down 402-D?

5     BY MS. COHEN:

6          Q.    So let's focus on the day of the robbery.

7     Approximately what time did you arrive at work?

8          A.    I arrived 4:05 a.m.

9          Q.    How long were you at the store before the robbery

10    happened?

11         A.    I would say a little past an hour.

12         Q.    Were you working alone?

13         A.    No.  I had a co-worker with me.

14         Q.    How many co-workers?

15         A.    Just one.

16         Q.    Can you generally describe the tasks that you and your

17    co-worker were performing that morning before the robbery?

18         A.    So early morning tasks usually are to stack the

19    doughnuts, prepare the ice and hot coffees, and to bake the

20    stuff like bagels and croissants and stuff.

21              MS. COHEN:  With the Court's permission, I would like

22    to read paragraphs 28 through 32 of the parties' video

23    stipulation, Government Exhibit 1001.

24              THE COURT:  Sure.

25              MS. COHEN:  "The Dunkin' Donuts located at 680 Central

```
 1   Park Avenue, hereinafter the Dunkin' Donuts, has surveillance
 2   cameras installed at various locations inside the store.
 3   Government Exhibit 310-D is a true and accurate copy of
 4   surveillance camera footage on August 5th, 2014, from
 5   approximately 5:20 a.m. to approximately 5:26 a.m. recorded by
 6   camera five of the Dunkin' Donuts, which looks down at the
 7   register in the direction of the doughnut display."
 8              Government offers 310-D pursuant to the party's
 9   stipulation.
10              MR. PATEL:  No objection.
11              THE COURT:  Received.
12              (Government Exhibit 310-D received in Evidence)
13              MS. COHEN:  Can we pull up 310-D, please?
14              THE COURT:  Mr. Jacob, can you just sit back just a
15   little bit?  Right there.  That's perfect.  Thanks.
16              MS. COHEN:  Go ahead and play the video.
17              (Video played)
18   BY MS. COHEN:
19       Q.   Mr. Jacob, who are the people in the video?
20       A.   That is me and my co-worker.
21       Q.   Who is who?
22       A.   The one walking away is my co-worker.  The one
23   standing in front of the doughnuts is me.
24       Q.   What are you guys doing?
25       A.   We were stacking the doughnuts.
```

1       Q.   Can you remind us where the entrance to the Dunkin'

2  Donuts is compared to the vantage point of this camera?

3       A.   It is to the exact right of us.

4       Q.   And how about that window by the door that looks into

5  the prep area?  Where would that be?

6       A.   The same as -- to the right of us.

7       Q.   If we were to walk left from behind the counter, where

8  would we end up?

9       A.   We would be -- we would be in the back, the manager's

10 office, the employees' bathroom and like the freezer area.

11      MS. COHEN:  Can we move the video forward to five

12 minutes and 45 second, please?

13      (Video played)

14 BY MS. COHEN:

15      Q.   Mr. Jacob, who are we looking at here, you or your

16 co-worker?

17      A.   That would be my co-worker.

18      Q.   Where are you at this point?

19      A.   I was in the back.

20      Q.   Remind us what is under the counter at this point?

21      A.   That's the backup hundred dollars that we have.

22      (Video played).

23      MS. COHEN:  I would like to read paragraph 33 of the

24 parties' video stipulation.  "Government Exhibit 310-E is a true

25 and accurate copy of surveillance camera footage on August 5th,

1    2014, from approximately 5:24 a.m. to approximately 5:26 a.m.

2    recorded by camera six at the Dunkin' Donuts, which looks from

3    the rear employees-only preparation area of the Dunkin' Donuts

4    towards the register."

5            Government offers 310-E pursuant to the parties' video

6    stipulation.

7            MR. PATEL:  No objection.

8            THE COURT:  Received.

9            (Government Exhibit 310-E received in Evidence)

10           MS. COHEN:  Can you put up 310-E but not play it yet,

11   please?

12   BY MS. COHEN:

13       Q.   Mr. Jacob, who are we looking at in this video?

14       A.   That would be my co-worker.

15       Q.   Could you point out using the laser pointer where the

16   front door is in this vantage point?

17       A.   That would be like right there.

18       Q.   How about that window that looks into the prep area?

19       A.   That would be that.

20       Q.   The bottom left-hand side of the screen where we see

21   stacked pink items, what's that?

22       A.   Those are the doughnuts that we were -- received.

23       Q.   If you take a left behind the doughnuts, where do you

24   end up?

25       A.   That would be the employee bathroom.

1           MS. COHEN:  Can we please play 310-E?

2           (Video played)

3    BY MS. COHEN:

4       Q.   Mr. Jacob, after your co-worker went out of view from

5    the screen, where did he go?

6       A.   We went into the employee bathroom.

7       Q.   Can you describe what happened in those moments?

8       A.   I came out of the freezer where I was, and then all of

9    a sudden I heard noises, and then I see my co-worker coming out

10   from the front area.  He grabbed me and pulled me into the

11   bathroom.

12      Q.   Once you were inside the bathroom, what happened?

13      A.   We stayed -- we tried our best to keep the door from

14   being opened, and we called 911.

15      Q.   Why did you need to try to keep the door from being

16   opened?

17      A.   We felt threatened, and my co-worker told me what was

18   happening.

19           MS. COHEN:  Can we put up 402-C, please?

20   BY MS. COHEN:

21      Q.   What's this?

22      A.   That would be the door to the employee bathroom.

23      Q.   And how -- can you describe for us where that would be

24   in relation to the video we just watched?

25      A.   The doughnut with the pink tray, it would be right

1    behind that.

2         Q.   When you say behind, right, left?

3         A.   Left.

4         Q.   You testified earlier that you are currently a

5    software developer; is that right?  Do you still work at the

6    Dunkin' Donuts?

7         A.   No.

8         Q.   Why not?

9         A.   From that incident I didn't feel comfortable working

10   in -- in a store like that, and especially in that time of the

11   hours, and my family wasn't really supportive of me continuing

12   my employment there.

13             MS. COHEN:  No further questions.

14             THE COURT:  Any cross?

15             MR. PATEL:  No.

16             THE COURT:  Okay.  Mr. Jacob, thank you very much.

17   You are excused.

18             THE WITNESS:  Thank you.

19             THE COURT:  You may leave.

20             (Witness excused.)

21             THE COURT:  Call your next witness.

22             MS. COHEN:  Government calls Detective Thomas Marello.

23   DETECTIVE THOMAS MARELLO,

24        called as a witness by the Government, having been duly

25        sworn, testified as follows:

```
1              THE DEPUTY CLERK:  Please be seated.  Please state
2    your full name for the record and spelling your last name
3    slowly.
4              THE WITNESS:  Sure.  Detective Thomas Marello,
5    M-A-R-E-L-L-O.
6    DIRECT EXAMINATION
7    BY MS. COHEN:
8         Q.    Detective Marello, where are you currently employed?
9         A.    City of Yonkers Police Department.
10        Q.    Are you assigned anywhere else?
11        A.    Yes.  FBI Task Force.
12        Q.    Handing you a CD containing Government Exhibits 301
13   through 304, 306 through 309, 309-A through 309-c, 310-A
14   through 310-F, 311 through 315, and 317 and 318.
15             Do you know what those exhibits are?
16        A.    Yes.
17        Q.    What are they?
18        A.    They would be videos from August 5th, 2014.
19        Q.    What are the general locations of those videos?
20        A.    They would be video surveillance from 3480 Third
21   Avenue in the Bronx, 815, 817, 821 McLean Avenue in the City of
22   Yonkers, 680 Central Park Avenue in the City of Yonkers and
23   Exterior Street in the Bronx as well.
24        Q.    Have you personally visited each of those locations?
25        A.    Yes, I have.
```

1      Q.   Have you personally reviewed each of those videos?

2      A.   Yes, I have.

3           MS. COHEN:  Government offers pursuant to the parties'

4  video stipulation, Government Exhibits 301 through 304, 306

5  through 309, 309-A through 309-C, 310-A through 310-F, 311

6  through 315, 317 and 318.

7           MR. RUHNKE:  We had stipulated, Your Honor.  We have

8  no objection.

9           THE COURT:  Just say objection.  That's fine.

10          All of those exhibits as listed by Ms. Cohen are

11 received.

12          (Government Exhibits 301 through 304, 306 through 309,

13 309-A through 309-C, 310-A through 310-F, 311 through 315, 317

14 and 318 received in Evidence)

15          MS. COHEN:  Can we put up Government Exhibit 100,

16 please?

17 BY MS. COHEN:

18     Q.   And Detective Marello, if you could look at the

19 version of Government Exhibit 100 that's actually on that board

20 to your right, physical board, can you remind us what number --

21 you may need to step down to see it?

22     A.   Sure.

23     Q.   -- is associated with 3480 Third Avenue?

24     A.   Two.  3480 Third Avenue is going to be number two.

25     Q.   Can you remind us what kind of building 3480 is?

MARELLO - DIRECT - COHEN                     391

1          A.    A multiple dwelling apartment building.

2                MS. COHEN:  Can we put up Government Exhibit 101,

3    please?

4    BY MS. COHEN:

5          Q.    And, Detective Marello, using the laser pointer,

6    remind us where 3480 Third Avenue is on this map?

7          A.    3480 Third Avenue is going to be in between East 168th

8    and East 167th Street, which is East 168th is there.  East 167th

9    is here.  This building right here would be 3480 Third Avenue.

10               MS. COHEN:  Can we put up 301, please?

11               Reading paragraphs 2 and 1(a) of the parties' --

12   excuse me -- 2 and 1(a) through (d) of the parties' video

13   stipulation.  "Government Exhibit 301 is a true and accurate

14   copy of surveillance camera footage from cameras one

15   through four in the Third Avenue building on August 5th, 2014,

16   from approximately 3:30 a.m. through approximately 3:31 a.m.

17               Camera one is on the exterior of the Third Avenue

18   building and looks at Third Avenue directly in front and to the

19   north of the Third Avenue building entrance.  Camera two looks

20   down at the vestibule of the Third Avenue building.  Camera

21   three looks at the lobby and lobby elevators of the Third Avenue

22   building, and camera four looks at the lobby out toward the

23   vestibule and entrance of the Third Avenue building.

24   BY MS. COHEN:

25         Q.    Detective Marello, can you remind us how each of the

MARELLO - DIRECT - COHEN                                    392

```
1    four squares associated with each of the cameras I just
2    mentioned?
3         A.   Sure.  The camera one, which is right here, would be
4    the outside of 3480 Third Avenue.  I am showing the front door
5    with the cameras facing northbound on Third Avenue.
6              Camera two, which is your upper right-hand corner, is
7    the vestibule.  That door would be the door that leads out to
8    the street, and this door right here would be the door that
9    leads into your lobby, which is shown in camera four.
10             Camera four is a view of the camera showing towards
11   that door leading towards the vestibule, and that is like almost
12   above the elevators that are in the building.
13             And camera three is blank right now.
14             MS. COHEN:  Can we play 301?
15             (Video played)
16   BY MS. COHEN:
17        Q.   And, Detective Marello, can you tell us how many
18   people you see enter the building?
19        A.   Right now I see one person entering the building, and
20   he is in the vestibule.  He is currently wearing a white shirt,
21   some kind of pattern, blue shorts with like a white stripe going
22   down the side.  The second male would be with a blue hooded
23   sweatshirt, tight like almost like skinny jeans, what appears to
24   be brown shoes.  Also the male with the hooded sweatshirt over
25   his left shoulder, his shoe laces are untied.  The sneakers are
```

1    white and appear to have like a black tongue on them.

2              The third male is wearing jeans, a blue shirt, which

3    is open with another blue shirt underneath.

4              Camera three here is the video with the video camera

5    facing the lobby, but it shows the elevator doors at which time

6    you will see all three males going in the elevator.

7              MS. COHEN:  But up 302, please?

8              Reading paragraphs 3 and 1(e) of the video

9    stipulation.  "Government Exhibit 302 is a true and accurate

10   copy of surveillance camera footage from camera 13 in the Third

11   Avenue building on August 5th, 2014, at approximately 3:33.

12   Camera 13 looks at a portion of the ninth floor hallway of the

13   Third Avenue building.

14   BY MS. COHEN:

15       Q.   Detective Marello, are you familiar with the ninth

16   floor of this building?

17       A.   Yes, I am.

18       Q.   Which apartment do we see the men entering?

19       A.   Where they are walking out of the elevator and that

20   door right there is Apartment 9A.

21       Q.   Can we play the video, please?

22            (Video played)

23       A.   You will see the same three -- what appear to be the

24   same three males from the lobby video as in the elevator and

25   entering 9A, which is right there.

MARELLO - DIRECT - COHEN                    394

1              MS. COHEN:  Can we put up 303, please?

2              Reading paragraph 4 the parties' video stipulation.

3    "Government Exhibit 303 is a true and accurate copy of

4    surveillance camera footage from camera 13 in the Third Avenue

5    building on August 5th, 2014, from approximately 3:49 a.m. to

6    approximately 3:50 a.m."

7              Can we play the video?

8              (Video played)

9    BY MS. COHEN:

10   Q.    And, Detective Marello, can you tell us the apartment

11   that the men are coming out of?

12   A.    Sure.  He appears to be become coming out of that 9A

13   apartment building.  That male is the male with the tighter blue

14   jeans, blue color hooded sweatshirt and tan boots with the white

15   stripes coming down, the white cords come down from the

16   sweatshirt.

17             That area that he's sitting at is right where the

18   elevator would be.  There is two elevators.

19             (Video played)

20             THE WITNESS:  You will see the male with the white

21   shirt and the blue shorts and that black sweatshirt over his

22   left shoulder coming out of 9A, and now a third person comes out

23   of 9A, and they all go into that elevator.

24             MS. COHEN:  Put up 304, please.

25             "Government Exhibit" -- reading paragraph 5 of the

 1  video stipulation, "Government Exhibit 304 a true and accurate

 2  copy of surveillance camera footage from cameras one through

 3  four in the Third Avenue building on August 5th, 2014, from

 4  approximately 3:51 a.m. to approximately 3:53 a.m."

 5              If we could play the video to 3:53:07, please?

 6              (Video played)

 7  BY MS. COHEN:

 8       Q.   And, Detective Marello, how many people are exiting

 9  the building?

10       A.   There are three people exiting the building.

11       Q.   Paying attention to the men closest to the doors, can

12  you explain what you observed them doing?

13       A.   The male with the white shirt and the black hooded

14  sweatshirt over his left shoulder appears to be handing what

15  appear to be purple gloves to a male wearing a blue hooded

16  sweatshirt, which appeared to have some kind of like a white

17  maybe Nike check on his chest and blue shorts which also appear

18  to have some kind of white line going on the bottom of the

19  shorts.

20       Q.   So if we --

21       A.   That third male is over here, that's the male with the

22  tighter jeans with the brown shoes, but now his hood is up, and

23  he appeared to have put some kind of white -- maybe a white doo

24  rag on his head while the hood is up.

25              MS. COHEN:  So let's play the video from the beginning

MARELLO - DIRECT - COHEN                    396

```
 1   to 3:53:07.
 2              (Video played).
 3              THE WITNESS:  That's the white doo rag what I was
 4   talking about now on his head.
 5   BY MS. COHEN:
 6        Q.   And can you point out in camera one specifically when
 7   it is you believe you see the gloves being handed?
 8        A.   Sure.  The male with the black sweatshirt appears to
 9   have them, and then he will walk towards this male again, and
10   this will -- it will be at this moment.
11              MS. COHEN:  And if we could just keep playing through
12   to 3:52:24?
13              (Video played)
14   BY MS. COHEN:
15        Q.   Focusing on camera one, Detective Marello, how many
16   people are visible now?
17        A.   There are three males with the smaller one of the
18   three at the front fender of the -- that looks like to be a
19   silver maybe SUV, which is marked on the street on Third Avenue.
20   The other two males are right here.
21              MS. COHEN:  Can we play through to 3:52:37, please?
22              (Video played)
23   BY MS. COHEN:
24        Q.   Focusing still on camera one, how many people are
25   visible now?
```

MARELLO - DIRECT - COHEN

```
 1        A.    Now there is two.

 2        Q.    Can you point them out?

 3        A.    One and two.

 4        Q.    What happened to the man that you identified as being

 5   on the far side of that silver SUV?

 6        A.    The male that was on that far side had now walked

 7   south on Third Avenue.

 8              MS. COHEN:  Can we play forward to 3:53:31, please?

 9              (Video played)

10   BY MS. COHEN:

11        Q.    Again, focusing on camera one, how many people are

12   visible now?

13        A.    One.

14        Q.    Which of the three men is still visible?

15        A.    This would be the male with the white shirt with the

16   black sweatshirt over his left shoulder.

17        Q.    And what happened to the other males who had been

18   standing there with him?

19        A.    The other male also walks out down on Third Avenue in

20   the same direction that the first male had left.

21              MS. COHEN:  Can we continue 304 to the end?

22              (Video played)

23   BY MS. COHEN:

24        Q.    Which direction does the man in the white T-shirt with

25   the dark sweatshirt over his shoulder walk?
```

```
 1        A.   He also walks in the same direction as the other two
 2   males on Third Avenue.
 3             MS. COHEN:  Ask we put up 101, please?
 4   BY MS. COHEN:
 5        Q.   So just to be clear, can you show us with your laser
 6   pointer the direction that the three men walked on Third Avenue?
 7        A.   They would walk from here down towards 167th, so come
 8   out and come down.
 9             MS. COHEN:  Can we put up 306, please?
10             Reading paragraphs 22 and 23 of the parties' video
11   stipulation.  "The supermarket located at 3470 Third Avenue in
12   Bronx, New York, herein after the supermarket, has exterior
13   surveillance cameras installed at various locations.  Government
14   Exhibit 306 is a true and accurate copy of surveillance camera
15   footage on August 5th, 2014, from approximately 3:52 a.m. to
16   approximately 3:54 a.m. recorded by camera 25 at the supermarket
17   which looks north on the east side of Third Avenue."
18   BY MS. COHEN:
19        Q.   So before we play the video, is the exit from 3480
20   Third Avenue visible in this frame?
21        A.   It's not -- the actual door is not visible, but you
22   will see that -- you will see people appear.  So it's just like
23   north of this white pillar, just on the top of the screen right
24   around this area.
25             MS. COHEN:  Can we please play the video to
```

```
1   26 seconds?

2            (Video played)

3   BY MS. COHEN:

4        Q.   And, Detective Marello, what do we see coming down the

5   center of the street?

6        A.   We see a male walking down the street right here.

7        Q.   What does he appear to be wearing?

8        A.   He appears to be wearing all dark sweatshirt and

9   possibly shorts.  Yes.  Shorts.

10           MS. COHEN:  Can we move the video forward to 3:55:21?

11  Sorry.  Back up up a couple of frames.  That's good.

12  BY MS. COHEN:

13       Q.   So for the record, that's 3:53:11, approximately.

14           Detective Marello, what do we see coming down the

15  center of the street?

16       A.   Here we see the other two males, one being the white

17  shirt with the black sweatshirt over his left shoulder.  The

18  other male in the blue hooded sweatshirt, white doo rag and

19  jeans.

20       Q.   From what direction are they coming?

21       A.   From 3480 Third Avenue.

22       Q.   And in what direction are they walking?

23       A.   South on Third Avenue.

24           MS. COHEN:  Could we put up 307, please?

25           Reading paragraph 24 from the parties' video
```

1    stipulation.  "Government Exhibit 307 is a true and accurate

2    copy of surveillance camera footage on August 5th, 2014, from

3    approximately 3:55 a.m. to approximately 4:00 a.m. recorded by

4    camera two at the supermarket which looks out over the parking

5    lot across Third Avenue and towards the intersection of Third

6    Avenue and 167th Street."

7    BY MS. COHEN:

8         Q.   Before we play the video, can you point out which

9    street is Third Avenue and which street is 167th Street?

10        A.   Sure.  This street running across is going to be Third

11   Avenue, and this street right here is East 167th.

12        Q.   So left to right is Third Avenue; is that correct?

13        A.   Correct.

14        Q.   And what are we looking at directly across the street?

15        A.   Directly across the street is a car wash.

16        Q.   Playing the video to 3:49:36, Detective Marello, how

17   many people do you see on Third Avenue?

18        A.   I see someone on -- about approximately two.

19        Q.   That's fine.  Can you point out where they are?

20        A.   Right here and here.

21        Q.   And can you describe just for the record which side of

22   the street you are indicating?

23        A.   That work the west side of Third Avenue.

24             MS. COHEN:  Can we continue playing?

25             (Video played)

1            THE WITNESS:  And there is a third person right there.

2    BY MS. COHEN:

3        Q.    Playing to 3:51:41, Detective Marello, what, if

4    anything, did you notice about the timestamps on the video?

5        A.    They seem to like almost skip a little.

6        Q.    As a detective with Yonkers Police Department and task

7    force officer with the FBI, have you participated in the

8    collection and review of video surveillance before?

9        A.    Yes, I have.

10       Q.    How common is it to encounter these kind of skips in

11   surveillance video?

12       A.    I wouldn't say it's common.  I also wouldn't say that

13   it's uncommon.

14       Q.    Now, do you see any people in this frame of the video?

15       A.    I do.  I see three.

16       Q.    Could you point out them out?

17       A.    There is one here.  There is one up here, and then

18   there is a third person of the corner of the tailgate or quarter

19   panel of that car just south of East 167th.

20       Q.    So with respect to the two people in the right-hand

21   side of the screen, just so the record is clear, can you

22   describe their location as you are pointing it out with the

23   laser pointer?

24       A.    Yes.  One on the west side of the street, and the

25   other is in the street, but on the east side of it.

402

1              MS. COHEN:  Can we play to 3:52:08, please?

2              (Video played)

3    BY MS. COHEN:

4         Q.   Please identify where you see people in this frame.

5         A.   Right here on the east side of the street, right there

6    on the west side of the street, and that person is still right

7    there on that corner just south of East 167th.

8              MS. COHEN:  Can we play forward to 3:52:31, please?

9    BY MS. COHEN:

10        Q.   Detective Marello, the person you identified on the

11   far side of Third Avenue on the right-hand side of the screen,

12   where is that person now?

13        A.   There is still one person right here, and then the

14   person that was standing right here appeared to be some kind of

15   like headlights.  You couldn't see the vehicle, but you could

16   see the headlights on the building, and when that happened, the

17   person that was here walked off screen northbound just off

18   screen on towards the headlights.

19        Q.   Indicating to the right of the frame?

20        A.   Yes.  This direction.

21             MS. COHEN:  Can we play the 3:52:33, please?

22             (Video played)

23   BY MS. COHEN:

24        Q.   What do you see from the right side of the screen?

25        A.   There is a vehicle, and the person that was right here

 1    is now almost like near the pole.  It's a little hard to see

 2    once you pause it, but he is going to be in that area, and that

 3    third male who was on this side of the street is now right here.

 4        Q.   When you say "right here," can you describe that?

 5        A.   I am sorry.  Yeah.  There is the fence here, and he is

 6    kind of like in the center right there walking towards the

 7    vehicle.

 8        Q.   How would you describe the vehicle?

 9        A.   Appears to be like a dark-colored four-door sedan.

10        Q.   The direction from which the black four-door sedan

11    came, how does that compare to the direction that the person

12    previously on the far side of the street disappeared into?

13        A.   It came from the direction where that male that was up

14    here disappeared to.

15             MS. COHEN:  Can we play to 3:53:18, please?

16             (Video played)

17    BY MS. COHEN:

18        Q.   And, Detective Marello, as it plays, can you point out

19    where you see people?

20        A.   There is one male, and that's the male that was over

21    here is now crossing the street, walking towards the vehicle

22    just parked right over here.

23        Q.   What appears to be happening around in and around the

24    vehicle?

25        A.   The people that walked towards there are now no longer

MARELLO - DIRECT - COHEN                404

1   there, and the vehicle is right here, and you will see it make a

2   turn going westbound on 167th Street right there, and it will go

3   that direction.

4           MS. COHEN:  Can we put back up Government Exhibit 100,

5   please?

6   BY MS. COHEN:

7       Q.   And, Detective Marello, it may be easier for you to

8   look at the physical board next to you.  Are you familiar with

9   821 Mclean Avenue, Yonkers, New York?

10      A.   Yes, I am.

11      Q.   What's located there?

12      A.   That would be the Irish Minimart.

13      Q.   Can you point out, starting with the physical exhibit

14  the general area of the minimart?

15      A.   Sure.  Right here.

16      Q.   Can you write a number 5 there, please?

17      A.   (Witness complies.)

18      Q.   And if we could zoom in here on the digital version,

19  and then if you could just point that out with your laser

20  pointer for the jury, please?

21      A.   Right there.

22          MS. COHEN:  Thank you.

23          All right.  Can we put up 308, please?

24          Reading paragraph 25 of the parties' video

25  stipulation, "Government Exhibit 308 is a true and accurate copy

1  of surveillance camera footage on August 5th, 20:14, from

2  approximately 5:18 a.m. to approximately 5:21 a.m. recorded by

3  an exterior surveillance camera at 815, 817, McLean Avenue,

4  Yonkers, New York, which looks east on McLean Avenue towards the

5  intersection with Aqueduct Avenue."

6  BY MS. COHEN:

7      Q.   Detective Marello, have you personally visited the

8  minimart at 821 McLean?

9      A.   Yes, I have.

10     Q.   Is the entrance to the minimart visible in this video

11 screen?

12     A.   It's not -- the doors aren't visible, but it's just in

13 front of the person right here.

14          MS. COHEN:  Can we play the video, please?

15          (Video played)

16 BY MS. COHEN:

17     Q.   Detective Marello, can you describe the vehicle in the

18 video?

19     A.   Yes.  That would be a dark-colored four-door sedan,

20 large vehicle.

21     Q.   And to be clear, through what door did the three men

22 enter?

23     A.   The door would be the front door to the Irish Minimart

24 at 821 McLean Avenue.

25     Q.   How does the vehicle in this video compare to the --

MARELLO - DIRECT - COHEN                         406

1    excuse me -- the vehicle we saw in the last video?

2         A.    Appear to be -- both appear to be a dark-colored

3    four-door sedan.  I see a front door opening right here which

4    appears to be the front passenger's side door.

5         Q.    Can you let us know what, if anything, you observed on

6    the interior of the vehicle as the video plays?

7         A.    It appears they are stepping on the brake lights.

8    Then you see what possibly a person maybe wearing a white hat

9    shut that door.  Now the front driver's side door opened and a

10   person got out, white hat, red hooded sweatshirt, possibly white

11   T-shirt underneath and like blue jeans, but a little baggier

12   than the smaller -- than we saw earlier.  That same person then

13   comes out and another male comes out the vehicle -- out off the

14   store and gets into the rear passenger side of the car.

15             That person now gets into the front passenger, and we

16   have one more person, and the door opens for that -- for him in

17   that car and he gets in, and they make a U-turn.

18             MS. COHEN:  Can we put up 309, please?

19             Reading paragraphs 26 and 27 of the video stipulation.

20   "The minimart located at 821 Mclean Avenue, Yonkers, New York

21   hereinafter the minimart has surveillance cameras installed at

22   various locations inside the store.  Government Exhibit 309 is a

23   true and accurate copy of surveillance camera footage on

24   August 5th, 2014, from approximately 5:18 a.m. to approximately

25   5:21 a.m. recorded by cameras at the minimart."

1    BY MS. COHEN:

2         Q.   Before we play, Detective Marello, can you explain to

3    us the four windows we are looking at?

4         A.   Sure.  Camera one is looking at -- there would be the

5    front door.  Our cash register would be to the left, and this is

6    in the far back corner looking towards that front door.

7              Camera two is just to the left when you walk into the

8    Irish Minimart, so the front door is somewhere right around

9    here.

10             Camera three, you can see the front door, and that's

11   to the right of it looking in the same direction that camera one

12   is facing, and your register is going to be right on the

13   right-hand side with the counter.

14             Camera four is behind the counter looking down at the

15   register where you will see the employee in the register

16   somewhere over there.

17        Q.   The door and camera four, where does that open up to?

18        A.   That is the front door.

19             MS. COHEN:  Play the video, please?

20             (Video played)

21             THE WITNESS:  You can see a vehicle pulling up right

22   here, at which time the person that is sitting there has now

23   gotten up, and the first person walked in with what appears to

24   be holding a gun.

25             MS. COHEN:  So we are going to play 309 through once,

1    and then I will ask you some more questions after we watch it

2    one time.

3                  (Video played).

4           MS. COHEN:  You can pull up 309-B please?

5           Reading paragraph 27(b) of the video stipulation,

6    "Government Exhibit 309-B is a true and accurate copy of

7    surveillance camera footage recorded by camera three, which is

8    located above the door and looks toward the back of the

9    minimart.

10                 (Video played)

11          MS. COHEN:  Put up 309-A, please.

12          Reading paragraph 27(a) of the parties' video

13   stipulation.  "Government Exhibit 309-A is a true and accurate

14   copy of surveillance camera footage recorded by camera two which

15   is located on the front wall of the minimart and looks down the

16   second aisle."  Play that, please.

17                 (Video played)

18   BY MS. COHEN:

19      Q.   Pausing here, Detective Marello, can you describe what

20   you can see of the clothing of the male the furthest away from

21   us in the shot?

22      A.   Yes.  The male here has a dark colored blue hooded

23   sweatshirt, shorts, kind of white stripe there, wearing what

24   appears to be purple gloves.

25          MS. COHEN:  Is there a way to take the time bar away

1    from the bottom?

2    BY MS. COHEN:

3        Q.   Can you describe the clothing of the male closest to

4    us?

5        A.   This male is wearing a -- what appears to be a black

6    hooded sweatshirt, dark colored shorts, also with a white stripe

7    on the side.  I can't really make out his socks there.  They

8    could be ankle socks, but just above the ankle maybe.

9            MS. COHEN:  Keep playing, please.  We can take that

10   down.  Thank you.

11           (Video played).

12           MS. COHEN:  And putting up 309-A, reading

13   paragraph 27(a) of the parties' video stipulation.  "Government

14   Exhibit 309-A is a true and accurate copy of surveillance camera

15   footage recorded by camera two which is located on the front

16   wall of the minimart and looks down the second aisle."  I am

17   sorry.

18   BY MS. COHEN:

19       Q.   Detective Marello, handing you what's marked as 100-E,

20   can you read that?

21       A.   Yes.

22       Q.   What does it say?

23       A.   "8/5/14, minimart robbery."

24           MS. COHEN:  Placing it in the vicinity of where

25   Detective Marello put a 5 on Government Exhibit 100.

1           Government offers 100-F.

2           THE COURT:  That's the label you just marked?

3           MS. COHEN:  Yes, Your Honor.

4           THE COURT:  100?

5           MS. COHEN:  F.

6           MR. PATEL:  Without objection.

7           THE COURT:  Okay.  I thought you said 100-E.

8           MS. COHEN:  I did.  I am sorry.

9           THE COURT:  Which one?

10          MS. COHEN:  It's 100-E.

11          THE COURT:  E.  Is there an objection?

12          MR. RUHNKE:  Not either.

13          THE COURT:  100-E is received.

14          (Government Exhibit 100-E received in Evidence)

15  BY MS. COHEN:

16      Q.   Detective Marello, are you familiar with 680 Central

17  Park Avenue in Yonkers?

18      A.   Yes, I am.

19      Q.   What's located there?

20      A.   A Dunkin' Donuts.

21      Q.   Can you point out on the version of Government

22  Exhibit 100 that's closest to you the general vicinity of that

23  Dunkin' Donuts?

24      A.   Yes.  It would be right here.

25      Q.   Can you put a Number 6 next to it, please?

1          A.    (Witness complies.)

2               MS. COHEN:  And can we blow up the top part of

3    Government Exhibit 100 on the screen?

4    BY MS. COHEN:

5          Q.    And, Detective Marello, can you point out using the

6    laser pointer both where the minimart and the Dunkin' Donuts are

7    just for our reference?

8          A.    Yes.  The Dunkin' Donuts would be right here, and the

9    minimart is right here.

10         Q.    Have you driven from the minimart to the Dunkin'

11   Donuts?

12         A.    Yes, I have.

13         Q.    Approximately how long does that drive take?

14         A.    About three minutes.

15              MS. COHEN:  Can we put up 310-A, please?

16              Reading paragraphs 28 and 29 of the parties' video

17   stipulation.  "Dunkin' Donuts located at 680 Central Park

18   Avenue, Yonkers, New York has surveillance cameras installed at

19   various locations inside the store.  Government Exhibit 310-A is

20   a true and accurate copy of surveillance camera footage on

21   August 5th, 2014, from approximately 5:24 a.m. to approximately

22   5:26 a.m. recorded by camera one at the Dunkin' Donuts, which

23   looks from the back wall of the public area toward the Dunkin'

24   Donuts entrance."

25              Can we play to 5:24:23, please?

MARELLO - DIRECT - COHEN                          412

```
1              (Video played)
2   BY MS. COHEN:
3       Q.   While it plays, Detective Marello, can you tell us
4   what you see on the exterior of the Dunkin' Donuts?
5       A.   Sure.  There is a vehicle that is backing up right
6   now.  You can see the tail lights.  This part of Central Park
7   Avenue is a one-way street, so that car is backing up, and it's
8   just underneath this sign on the window of Dunkin' Donuts in
9   your top right corner.  So you can see the tail lights right
10  there.
11             MS. COHEN:  Can we move the video forward, please, to
12  5:25:42?
13             (Video played)
14  BY MS. COHEN:
15      Q.   And while that plays, Detective Marello, can you
16  describe what you see occur outside of the Dunkin' Donuts?
17      A.   Yes.  There is a person coming right here.  You can
18  see like a white on the top of his head coming from the
19  direction of that vehicle.  Now you will see two more people.
20  One is there, and one is coming running behind going through the
21  front door, which is right here.
22      Q.   Can we keep playing?
23      A.   And that would be the male, tight blue jeans, tan
24  boots, or shoes with a blue hooded sweatshirt with a white thing
25  on the top.  That male is in all blue with the white check,
```

MARELLO - DIRECT - COHEN                    413

1    white line going down the side, and the second male was like

2    appeared to be a dark, like black hooded sweatshirt.

3             Now that vehicle on the exterior is reversing.  And

4    it's somewhere here with the tail lights here, the headlights

5    here and the door here.  All three males are now running out

6    towards the direction of that vehicle, and --

7        Q.    Detective Marello, as we saw the video -- excuse me --

8    the vehicle backing up, how does that compare to the vehicle we

9    saw at 821 McLean?

10       A.    They appear to be the same a dark-colored large sedan.

11       Q.    How does that compare to the vehicle that we saw in

12   the vicinity of 3480 Third Avenue?

13       A.    The same as well.

14            MS. COHEN:  Can we put up 310-C please?

15            Reading paragraph 31 of the video stipulation,

16   "Government Exhibit 310-C is a true and accurate copy of

17   surveillance camera footage on August 5th, 2014, from

18   approximately 5:24 a.m. to approximately 5:26 a.m. recorded by

19   camera three of the Dunkin' Donuts, which looks down at the

20   register in the direction of the back wall of the public area of

21   the Dunkin' Donuts."

22            (Video played)

23   BY MS. COHEN:

24       Q.    Detective Marello, can you describe what we are

25   seeing?

1  A.  Yes.  It's a male, black hooded sweatshirt, whitish
2  possibly Nike foam sneakers with white ankle socks above the
3  ankle, blank hooded sweatshirt, look to be blue shorts with a
4  white line down the side.  That person is in a blue hooded
5  sweatshirt with that little check on his chest wearing purple
6  gloves, and there is the smaller male of the three wearing the
7  tighter blue jeans the tight hooded sweatshirt, white top and
8  tan boots and also appear to have gloves on.
9  Q.  Showing you Government Exhibit 100-F.  Can you read
10  that?
11  A.  Yes.
12  Q.  What does it say?
13  A.  "8/5/14, Dunkin' Donuts robbery."
14  MS. COHEN:  Government offers 100-F.
15  MR. RUHNKE:  No objection.
16  THE COURT:  Received.
17  MS. COHEN:  Placing it adjacent to where Detective
18  Marello put a 6 on Government Exhibit 100.
19  Your Honor, I am happy to continue going.  I am done
20  with Dunkin' Donuts.  So --
21  THE COURT:  Okay.  If this is a convenient spot, we
22  will take a break now.  Thank you.
23  All right.  Ladies and gentlemen, we will take our mid
24  afternoon break, and we will go to about 3:40.  Now remember,
25  keep an open mind.  Don't discuss the case.  I will see you in

MARELLO - DIRECT - COHEN                    415

```
 1    about 15 minutes.

 2              THE DEPUTY CLERK:  All rise.

 3              (Recess)

 4              THE DEPUTY CLERK:  All rise.

 5              THE COURT:  Welcome back, everybody.  Have a seat.

 6              Okay.  Ms. Cohen.

 7    BY MS. COHEN:

 8         Q.   Detective Marello, are you familiar with the Yankee

 9    Stadium Metro-North stop?

10         A.   Yes, I am.

11         Q.   Looking at version of Government Exhibit 100 physical

12    map that's next to you, can you remind us what number is

13    associated with the vicinity of that Metro-North station?

14         A.   Number 7.

15         Q.   Can we put up Government Exhibit 100 on the screen,

16    please?  And just zoom in on the bottom half.  And just point

17    out where it says Yankee Stadium on there for us?

18         A.   Sure.  Right there.

19         Q.   In particular, are you familiar with the western

20    entrance to the Yankee Stadium Metro-North stop?

21         A.   Yes, I am.

22         Q.   How are you familiar with that?

23         A.   I have been there before.

24         Q.   Will you put up Government Exhibit hundred 104,

25    please?  And zooming in on the top, can you point out to us
```

```
 1   where the western entrance is?
 2        A.   Yes.  The western entrance is going to be somewhere in
 3   this vicinity.
 4        Q.   Indicating the white --
 5        A.   I am sorry.  Yes.  This white road right over here, I
 6   believe it's on this road, and then like over in this area, not
 7   exactly where that road is, but just under to the right.  So
 8   somewhere over here.
 9        Q.   When you say "under" you mean under the Deegan?
10        A.   I apologize.  Yes.  Under the Deegan.
11        Q.   Do you see Exterior -- can we zoom out?
12             And zoom in along Deegan, please.  Do you see Exterior
13   Street on the map?
14        A.   Yes, I do.
15        Q.   Can you point that out?
16        A.   Yes.  It's the white line that's just left of the
17   Deegan, but when you are there, it's actually underneath the
18   Deegan.
19             MS. COHEN:  Can we put up 404-J, please?
20   BY MS. COHEN:
21        Q.   Detective Marello, can you remind us what this
22   location is?
23        A.   Yes.  This is the -- I don't know if you call it a
24   service road or not.  You get -- when you are driving on the
25   Deegan southbound you get off exit six, and you come down, and
```

```
 1    it leads you to right here.  Once you are here, this is like a
 2    little walkway or a pathway that you can take that leads you to
 3    that west side of the train station where the steps are to get
 4    up to the train.
 5         Q.   What's the overpass?
 6         A.   The overpass would be 87, the Deegan.
 7              MS. COHEN:  Can we put up 404-H, please?
 8    BY MS. COHEN:
 9         Q.   Where are we in this photograph in relation to the
10    last photograph we saw?
11         A.   We are further down that path that I just pointed out
12    that was off that service road.  If you took that straight, this
13    is where you would wind up, and from here, you have to make this
14    right going down this side of the pathway.
15         Q.   You would have to make the right to do what?
16         A.   To continue to walk to get to the steps to the train
17    station.
18              MS. COHEN:  Can we put up 404-F, please?
19    BY MS. COHEN:
20         Q.   How does the location of this photograph relate to the
21    last photograph?
22         A.   This is the view that you would have once you made the
23    right on that pathway, and now you are looking at -- you are
24    looking straight down, and right in that direction you will see
25    that those are the steps that take you to the train station.
```

1    Q.   If you didn't go up the steps to the train station,

2  where would you end up?

3    A.   There is like a little pathway, but like a fence and

4  two gates.  You would then walk through that and you go into

5  another parking lot, and at that point if you continued to walk

6  through that parking lot, you would end up on Exterior Street.

7    Q.   Detective Marello, have you done that walk yourself?

8    A.   Yes, I have.

9    Q.   If you did not follow this pedestrian pathway, but

10  instead went out to the service road and took a left, where

11  would you end up?

12   A.   If you did not go down this pathway and you continued

13  straight on the service road, you would actually end up on

14  Exterior Street.

15       MS. COHEN:  Can we put up 311, please?

16       Reading paragraphs 35 and 36 of the parties' video

17  stipulation, "Bronx Terminal Market located at 6710 Exterior

18  Street, Bronx, New York hereinafter Bronx Terminal Market, has

19  exterior surveillance cameras installed at various locations.

20  Government Exhibit 311 is a true and accurate copy of

21  surveillance camera footage on August 5th, 20:14, from

22  approximately 5:44 a.m. to approximately 5:45 a.m. recorded by

23  camera one at Bronx Terminal Market, which is above the

24  northernmost parking exit for Bronx Terminal Market on Exterior

25  Street and faces northbound on Exterior Street."

1   BY MS. COHEN:

2        Q.   So, Detective Marello, that's a long description.  Can

3   you point out where Exterior Street is in this video?

4        A.   Sure.  Exterior Street is the road that the truck and

5   that car are on.

6        Q.   Where is the Metro-North pathway we looked at earlier

7   in relation to this video?

8        A.   The train station would be -- it's -- you can't see it

9   on the screen, but if you were to follow this, it would be in

10  your upper right corner that would be the road and the train

11  station would probably be -- if you continued, would probably be

12  somewhere around here.

13       Q.   Indicating off the right-hand side of the street?

14       A.   Off -- yes.  Up and to the right.

15       Q.   And walking from the Metro-North station towards this

16  camera, would be walking in what direction?

17       A.   You would be walking south, so you would actually be

18  walking towards the camera in the same direction that the cars

19  are traveling.

20            MS. COHEN:  Can we please play 311?

21  BY MS. COHEN:

22       Q.   And, Detective Marello, can you identify any

23  pedestrians that you see?

24       A.   Okay.  You can start to see them right over here

25  walking.

MARELLO - DIRECT - COHEN                    420

1          Q.    What road are they on?

2          A.    They are in the top right corner.   The vehicle is

3    passing them now, and you can start to see right here behind

4    this pillar they will reappear again.

5                And now they are located right there.   Appears to be

6    like a white shirt that you can actually see the best.   And as

7    it gets closer, you can see someone wearing dark clothing and

8    like a -- like a white thing on their top -- on top of their

9    head, and then here is the white shirt.   Here is that dark

10   colored shirt that I was mentioning with the white top on head

11   all three are now off screen.

12               MS. COHEN:   Can we put up Government Exhibit 312,

13   please?

14               Reading paragraph 37 of the parties' video

15   stipulation.   "Government Exhibit 312 is a true and accurate

16   copy of surveillance camera footage on August 5th, 2014, from

17   approximately 5:48 a.m. to approximately 5:49 a.m. recorded by

18   camera two at Bronx Terminal Market, which is above the delivery

19   entrance to Bronx Terminal Market on Exterior Street just north

20   of 150th Street and faces southbound on Exterior Street."

21   BY MS. COHEN:

22         Q.    So, Detective Marello, in this screen can you point

23   out which road is Exterior Street and describe it for the

24   record?

25         A.    Exterior Street is going to be right here.   This part

```
 1    there is both lanes of traffic, but we are going from the far
 2    right to the far left underneath the I-87 Deegan.
 3        Q.   And the road that has the word "stop" in it and the
 4    stop sign, what's that?
 5        A.   I believe it's a parking lot or like a loading area
 6    for the buildings that are in here.
 7        Q.   And how does this relate in location to the last
 8    camera angle?
 9        A.   This is further south down Exterior Street from the
10    last camera that we saw, and it's also facing south.
11             MS. COHEN:  Can we put up Government Exhibit 104,
12    please?
13             If we could zoom in?  Actually, if we could zoom in
14    more narrowly just to Exterior Street along the Deegan?
15    BY MS. COHEN:
16        Q.   So using the laser pointer, Detective Marello, can you
17    trace where we are looking from the pedestrian area near the
18    western entrance to the Metro-North station, and then the first
19    video we watched the vantage point of the second video?
20        A.   The first video we watched was somewhere around here
21    pointing in this direction towards the train station.  The
22    second video that we haven't seen yet, but we are about to watch
23    is going to be somewhere in this area facing this direction
24    going towards 150th.
25             MS. COHEN:  We can take that down, please?  And can we
```

```
 1   please play the video?
 2              (Video played)
 3   BY MS. COHEN:
 4       Q.   As you watch the video, Detective Marello, can you
 5   describe any pedestrians you see?
 6       A.   Here you will see a person walking, dark-colored
 7   hoodie, dark-colored pants, possibly shorts, holding -- holding
 8   an object in his right hand, and now you are going to see three
 9   more people crossing Exterior Street from the west side to the
10   east side.  You will see the dark colored shirt, the white top
11   and white sneakers.
12       Q.   When you say "white top," what do you mean by that?
13       A.   Hat.
14       Q.   Can we replay that video one more time and can you
15   tell us how many pedestrians you see?
16       A.   Sure.  We have the first pedestrian here, dark
17   clothing, holding an object in the right hand, and then three
18   more will appear right here and will across in the same
19   direction as the first person was walking.  So a total of four
20   pedestrians that you will see.  Again, one appears to possibly
21   be wearing a white shirt from this angle.
22              MS. COHEN:  Can we put up 313, please?  Reading
23   paragraphs 38 and 39 of the parties' video stipulation, "Hostos
24   Community College located at 560 Exterior Street, Bronx, New
25   York, hereinafter Hostos, has exterior surveillance cameras
```

MARELLO - DIRECT - COHEN                423

1    installed at various locations.  Government Exhibit 313 is a

2    true and accurate copy of surveillance camera footage on

3    August 5th, 2014, from approximately 5:49 a.m. to approximately

4    5:50 a.m. recorded by camera 13 at Hostos, which faces

5    southbound on Exterior Street toward the intersection with 150th

6    Street."

7    BY MS. COHEN:

8         Q.   Detective Marello, can you point out where Exterior

9    Street is on this video?

10        A.   Exterior Street is right here, running from left to

11   right on the screen.

12        Q.   And where is 150th?

13        A.   That would be right here.  In the top left part of

14   your screen, the road that leads into Exterior Street.

15        Q.   Can we go back to Government Exhibit 104, please?  Can

16   you using your laser pointer explain to us first where the

17   camera is located and, actually, can we zoom in on the bottom

18   sort of around Hostos?  So where is the camera located on the

19   map, and where is it looking?

20        A.   It would be in this area looking down right over here

21   looking up southbound on Exterior Street.

22        Q.   And zooming back out, how does that relate to the

23   locations of the prior two cameras we looked at on Exterior

24   Street?

25        A.   It is south of the prior two cameras that we had seen.

MARELLO - DIRECT - COHEN                           424

1      Q.   Going back to 313, please?  Can we play that video

2  and, Detective Marello, can you describe the pedestrians that

3  you see?

4      A.   Sure.  Male dark hoodie, dark shorts, looks like a

5  black bag, black shoes, walking south.  Now we have a red

6  sweatshirt dark-colored sweatshirt.  Those two people are

7  wearing jeans, and this last male is in a black hooded

8  sweatshirt with a white hat.

9           MS. COHEN:  Replay that one more time.  Can we pause

10  it here?

11  BY MS. COHEN:

12      Q.   And, Detective Marello, can you just describe that

13  again when you don't have to rush?

14      A.   The person right here is in a red sweatshirt with

15  appears to be blue jeans.  The person next to him is in a dark

16  color hooded sweatshirt with lighter jeans.  Looking at the

17  angle here, these jeans appear to be a little baggier than the

18  person over here.  And now this person right here is in a black

19  hooded sweatshirt, white hat, dark colored shorts and white

20  sneakers.  This person right here in the red shirt is wearing

21  black sneakers, and from this angle I can't really tell from

22  here.

23      Q.   You can't tell what from here?

24      A.   The shoes on the person in the middle of the street.

25      Q.   Okay.  Let's finish playing another video, please.

1    The street that they are on now at the end of the video, what

2    street was that?

3          A.    That would be 150th.

4                MS. COHEN:  Can we put up 314, please?  Reading

5    paragraph 40 of the parties' video stipulation, "Government

6    Exhibit 314 is a true and accurate copy of surveillance camera

7    footage on August 5th, 2014, from approximately 5:49 a.m. to

8    approximately 5:50 a.m. recorded by camera two at Hostos, which

9    faces southbound at the intersection of Exterior Street and

10   150th Street."

11   BY MS. COHEN:

12         Q.    So in this frame of the video, Detective Marello,

13   which street is Exterior Street?

14         A.    Right here.

15         Q.    Indicating along the right-hand side of the screen?

16         A.    Correct.

17         Q.    And where is the Deegan?

18         A.    Right above it.

19         Q.    Where is 150th Street?

20         A.    This street right here where the arrow is.

21         Q.    So where is this camera in relation to the camera in

22   the last video we watched?

23         A.    Just south.

24         Q.    Can we play the video and, Detective Marello, can you

25   describe the pedestrians that you see?

1        A.   Sure.   That male is in all dark clothing, shorts,

2  black shoes, black bag.   You have -- can you pause it right now?

3  That person was in a red hooded sweatshirt, blue jeans, and

4  black sneakers with like some kind of white emblem on them.

5  Here the person is in a hooded sweatshirt, a lighter blue jeans,

6  like I said, that person in the red with the pants were a little

7  baggier than this person, and these appear to be possibly tan

8  boots.   This male right here is in a black hooded sweatshirt,

9  dark colored shorts, white sneakers, and a white hat.

10       Q.   Can we back up the video to the beginning?   Just play

11 it through?

12       A.   You will see when he is walking, you can see the white

13 on the sneaker.

14            MS. COHEN:   Go ahead.

15            (Video played)

16 BY MS. COHEN:

17       Q.   And the street that the individuals are walking down

18 is what street?

19       A.   150th.

20            MS. COHEN:   Can we put up 315, please?   Reading

21 paragraph 41 of the video stipulation, "Government Exhibit 315

22 is a true and accurate copy of surveillance camera footage on

23 August 5th, 2014, at approximately 5:50 a.m. recorded by camera

24 one, which is on the rear of Hostos and faces southbound, the

25 intersection of River Avenue and 150th."

```
 1   BY MS. COHEN:
 2        Q.   So before we play, which road is River Avenue?
 3        A.   River is this road right here, which runs from left to
 4   right from where my pointer is pointing.
 5        Q.   And which road is 150th?
 6        A.   It would be the road that this person is walking off
 7   of.
 8             MS. COHEN:  Can we put up 104, please?  Just zoom in
 9   on the bottom part of the map, please.
10   BY MS. COHEN:
11        Q.   So can you point out, Detective Marello, where the
12   camera in the prior video was looking at 150th?
13        A.   We are right in this area.
14        Q.   The prior video?
15        A.   Oh, I am sorry.  Right in this area.
16        Q.   And the video that we just pulled up, Exhibit 2315,
17   where is that?
18        A.   It would be right in this area.
19        Q.   Indicating River and 150th?
20        A.   Correct.
21             MS. COHEN:  Go back to 315, please.  Can we play the
22   video and pause it here?
23   BY MS. COHEN:
24        Q.   Can you describe the clothing of the four individuals
25   here?
```

428

1        A.   Yes.   The clothing is the same from the last video,

2   the dark colored outfit here with the shorts, the black bag in

3   the right hand, black sweatshirt, white hat, white and black

4   sneakers here, red hooded sweatshirt, jeans and black which

5   again appears to have some kind of white emblem on the sneaker

6   right in the middle, and that person still in the dark colored

7   hooded sweatshirt, the hood appears to be up right now.

8        Q.   Can we keep playing?  Okay.  Let's go back to 3480

9   Third Avenue and just remind us the number on Government

10  Exhibit 100 associated with 3480 Third Avenue.

11       A.   It would be number 2.

12            MS. COHEN:  Can we put up Government Exhibit 317,

13  please.

14            Reading paragraph 6 of the parties' video stipulation.

15  "Government Exhibit 317 is a true and accurate copy of

16  surveillance camera footage from cameras one through four in the

17  Third Avenue building on August 5th, 2014, from approximately

18  6:01 a.m. to approximately 6:02 a.m.

19            Can we play the video?  And play it to 6:01:47,

20  please.

21            (Video played)

22  BY MS. COHEN:

23       Q.   Detective Marello, how many people do you see outside

24  the front door of 3480 Third Avenue?

25       A.   I see three outside the front door and one in the

MARELLO - DIRECT - COHEN                    429

```
 1   vestibule.
 2            MS. COHEN:  Can we play forward to 6:01:55, please?
 3            (Video played)
 4   BY MS. COHEN:
 5        Q.   How many people enter the building?
 6        A.   Four.
 7        Q.   And if we go back to 6:01:47, please?  If you could
 8   just pause it here?
 9            What do you observe the first man to be carrying?
10        A.   Appears to be a blue item, but he is holding it like
11   there may be something -- I don't know -- a little heavier than
12   possibly a sweatshirt or something.
13        Q.   And what -- how would you describe his clothing?
14        A.   Blue shorts, black sneakers, and a possibly blue
15   T-shirt.
16        Q.   And the man behind him, how would you describe this
17   man?
18        A.   The man behind him is in a white T-shirt, blue hooded
19   sweatshirt over his right shoulder, the -- those tighter,
20   light-colored jeans, and tan shoes.
21        Q.   And the third man in camera two, could you describe
22   what he is wearing?
23        A.   The third male is wearing a white shirt with a pattern
24   similar to the one that we had seen in the beginning of this
25   whole thing with the dark colored shorts, those white sneakers,
```

MARELLO - DIRECT - COHEN                                        430

1   and but now he is wearing a white hat with some kind of emblem

2   on the front of it, and he still has a dark-colored sweatshirt

3   over his left shoulder.

4       Q.   Can we continue to play the video?  Pausing it here,

5   actually back up a frame, pausing it here.

6            Can you describe looking at camera two, the clothing

7   of the man entering the exterior door to the vestibule?

8       A.   Yes.  He is wearing a white T-shirt, darker colored

9   jeans from the other person that was wearing pants a little

10  baggier than the other pair, black shoes and again, you see that

11  little white emblem on the sneaker and it appears that he is

12  holding a dark object in his left hand.

13      Q.   Can we continue playing, please?  If we pause here,

14  and back it up a few frames, please?  Pausing here, what, if

15  anything, do you observe in the right-hand of the male you

16  described as white T-shirt, darker and baggier jeans and white

17  and black shoes?

18      A.   That object that at first I had seen in the left hand

19  appears to be in his right-hand now because the left-hand seems

20  to be holding his pants.

21      Q.   Please continue with the video.

22      A.   And then they all go in the elevator.

23           MS. COHEN:  Put up 318, please.  Reading paragraph 7

24  of the video stipulation, "Government Exhibit 318 is a true and

25  accurate copy of surveillance camera footage from camera 13 in

MARELLO - DIRECT - COHEN                                      431

```
 1   the Third Avenue building on August 5th, 2015 at approximately
 2   6:04 a.m."
 3   BY MS. COHEN:
 4       Q.   Before we play the video, can you remind us what we
 5   are looking at here?
 6       A.   Yes.  This would be the ninth floor hallway.
 7       Q.   And can you use your laser pointer to remind us where
 8   apartment 9A is?
 9       A.   Sure.  Apartment 9A is going to be right here.
10       Q.   The door on the left-hand side of the screen closest
11   to 9A, can you point that out with your laser pointer?
12       A.   That would be right here.
13       Q.   Have you been through that doorway?
14       A.   Yes, I have.
15       Q.   What's through that door way?
16       A.   It's like a garbage chute room.  You open the door.
17   If the door opens, there is like a garbage chute and containers
18   there.
19           MS. COHEN:  Can we play the first ten seconds of the
20   video, please?
21              (Video played)
22   BY MS. COHEN:
23       Q.   Can you describe the items that the four men have at
24   this point in time to the extent you can see it?
25       A.   Yes.  The man in the front is similar to the person
```

1    that walked in first into the building, and you can see that

2    he -- but now you can see that it's possibly an item of clothing

3    that he was holding because it looked like possibly a sleeve was

4    hanging, and he is putting that on the floor.  You can still see

5    the other males.  One here holding a sweatshirt, and then it

6    kind of gets cut off.

7              MS. COHEN:  Can we play forward a second or two?

8    Pausing here.  Let's go back a frame, please?  Pausing here.

9    BY MS. COHEN:

10        Q.   So the man directly behind the man at the door, can

11   you describe what he has with him?

12        A.   Appears he may be holding something right over here

13   and then that male is holding that sweatshirt over his left

14   shoulder.

15             MS. COHEN:  Let's play the video all the way through,

16   please.

17             (Video played)

18             THE WITNESS:  And now that room you will see them all

19   walking in holding their sweatshirts, and there is the smaller

20   man of the four, and right there that male that was holding

21   something in his hand seemed to lift it up, and they all go in

22   the garbage chute, and when they come back, none of them is

23   holding anything.

24   BY MS. COHEN:

25        Q.   So more specifically -- let's play that again.

MARELLO - DIRECT - COHEN                    433

1              Can you identify the items that they have before they

2    go into the garbage room and the items they no longer have after

3    they leave the garbage room?

4         A.   So in this video, three males are holding sweatshirts

5    that walk in, and then the last male, the second one with the

6    baggier set of jeans had something in his hand at which time

7    he -- you see it lift up.  They all go into the room, and when

8    they all walk out, nobody appears to hold anything or having any

9    additional items of clothing on them.

10        Q.   The man you described earlier as having the white

11   T-shirt, dark shorts, white and black sneakers, and black

12   sweatshirt over his shoulder, what else did he have with him

13   prior to entering the garbage room?

14        A.   He had a hat.

15        Q.   When you say the hat, can you describe it?

16        A.   That white hat with the marking on the front.

17        Q.   And after he leaves the garbage room, where is the

18   hat?

19        A.   It's not on him.

20             MS. COHEN:  Your Honor, that completes this portion of

21   the live video.  I was going to move to something else.

22             THE COURT:  Okay.

23             MS. COHEN:  Can we put up -- let me hand you a

24   Redweld.

25   BY MS. COHEN:

MARELLO - DIRECT - COHEN                                   434

1          Q.    Hand you the Redweld.  The Redweld contains the
2    following Exhibits 309-A1.  Let me start at the beginning.
3    301-A1, 301-B, 301-C, 301-D, 304-A, B, and C, 306-A and B, 308-A
4    and B.  308-B1, 308-C and D, 308-D1, 308-E, 308-E1, 308-F,
5    308-G, 308-H, and I, 309-A1, 309-B1 through B6, 309-C1 through
6    C5.  310-B1 through B3, 310-C1 through C3, 311-A, 312-A and B,
7    313-A and B, 314-A, 315-A, 317-A and B, 317-B1, 317-C, 317-C1,
8    317-D, 317-D1, 317-E and F, 310-F, 318-A, do you know what those
9    exhibits are?

10         A.    Yes.

11         Q.    What are they?

12         A.    They would be still photos from the videos we watched.

13               MS. COHEN:  Government offers each of those exhibits.

14               MR. RUHNKE:  Your Honor, as I understand it, they are
15    all stills from the videos; is that correct?

16               MS. COHEN:  They are.

17               MR. RUHNKE:  We have no objection.  The videos are in
18    evidence.

19               THE COURT:  Thank you.  Okay.  All of them, I am not
20    going to read it again, of course, but all the exhibits listed
21    by Ms. Cohen, Government Exhibits, are received.

22               (Government Exhibits 301-A1, 301-B, 301-C, 301-D,
23    304-A, B, and C, 306-A and B, 308-A and B.  308-B1, 308-C and D,
24    308-D1, 308-E, 308-E1, 308-F, 308-G, 308-H, and I, 309-A1,
25    309-B1 through B6, 309-C1 through C5.  310-B1 through B3, 310-C1

1    through C3, 311-A, 312-A and B, 313-A and B, 314-A, 315-A, 317-A

2    and B, 317-B1, 317-C, 317-C1, 317-D, 317-D1, 317-E and F, 310-F,

3    318-A received in Evidence)

4          MS. COHEN:  Your Honor, I apologize.  I am also

5    offering 318-A1.  I don't think I listed that.

6          MR. RUHNKE:  I suppose you would be surprised if I

7    objected to the, but I am not.

8          THE COURT:  318-A1 is added to that same list and it's

9    received.

10          (Government Exhibit 318-A1 received in Evidence)

11          MS. COHEN:  Thank you.  Can we please put up 301-A,

12    301-B, 304-A?

13    BY MS. COHEN:

14    Q.   Detective Marello, focusing on the first top picture

15    on the left, can you describe the clothing of that individual?

16    A.   Yes.  That is appears to be a white shirt with some

17    kind of pattern on it, black sweatshirt.  This his left

18    shoulder, blue shorts and white possibly black sneakers with the

19    shoelaces untied.

20    Q.   How does that compare to the clothing down at the

21    bottom of the screen 304-A?

22    A.   Similar, same.

23    Q.   And focusing on the top right-hand, which is 301-B,

24    the man in the center of the vestibule, can you describe his

25    clothing?

MARELLO - DIRECT - COHEN                    436

1       A.   Sure.  That's a blue hooded sweatshirt, light colored

2   jeans, tan shoes.

3       Q.   Sorry.  Go ahead.

4       A.   Yeah.

5       Q.   How does that compare to what the man in the front of

6   304-A, the bottom still is wearing?

7       A.   Same light, similar colored light blue sweatshirt,

8   light blue tighter jeans, the tan shoes, but this time with a

9   doo rag on the top of his head.

10      Q.   Put up 304-A and 306-B, please?  Can you compare the

11  clothing of the two men you just described on the left-hand side

12  to the clothing seen in 306-B on the right-hand side?

13      A.   Yes.  You can see the white colored shirt, dark

14  shorts, white sneakers, black sweatshirt over the left shoulder

15  just like he is in here, and here appears to be the blue hooded

16  sweatshirt, white on the top, just underneath the hood just like

17  how it is here with light colored pants.

18           MS. COHEN:  Can we put up please 304-C, 309-B4 and

19  309-A1?  Can we have the top left-hand still, 304-C?

20  BY MS. COHEN:

21      Q.   Can you describe the clothing of the man closest to

22  the door, please?

23      A.   Yes.  That would be a blue hooded sweatshirt, blue

24  shorts, there is that like white little emblem on the left chest

25  and another white little emblem on the bottom of the left leg of

DARBY GINSBERG, RPR (914) 390-4102

1    his shorts and appears to be black sneakers.

2         Q.   And remind us what he appears to be handed in that

3    still?

4         A.   This was in the point where they appear to be handing

5    out like purple gloves.

6         Q.   Looking at photograph still, rather, top right-hand

7    side 309-B4, can you compare the clothing of the individual in

8    the left still to the individual on the right still?

9         A.   Yes.  They appear to be the same.  Blue hooded

10   sweatshirt with that white emblem on the left chest, and then

11   you have those blue shorts with the left emblem on the bottom of

12   the left leg and he's got purple gloves on.

13        Q.   And looking at the bottom of the screen, can you

14   compare that clothing to the two men we see in the bottom?

15        A.   Yes.  That blue hooded sweatshirt with the little

16   white emblem on the left chest, purple gloves, which is similar

17   to here, and the top two pictures, and then we have another male

18   with a black hooded sweatshirt, which could be consistent with

19   the black sweatshirt that he is holding here in the left

20   shoulder.

21        Q.   Can we put up 304-A and 310-C1, please?

22             Can you compare the clothing of the male in the front

23   of 304-A with the man standing on the counter in 310-C1?

24        A.   Sure.  We have the blue hooded sweatshirt, lighter

25   tight jeans with the tan boots, which is similar in here, except

1  in this picture he is also wearing purple gloves.

2      Q.   And you identified earlier a white doo rag in 304-A?

3      A.   Yes.  It could be a white doo rag on his head with the

4  strings hanging down, and here you can see the white string.

5           MS. COHEN:  Could we put up 301-A, 310-B3, and 317-D,

6  please?

7  BY MS. COHEN:

8      Q.   Can you compare the footwear across these three

9  stills, please?

10     A.   Yes.  You have the -- what appear to be white sneakers

11 with like a black tongue shoelace untied here.  You have the

12 same thing also his socks are, like I said, a little ankle high

13 but just above the ankle fitting the same description here and

14 the shoelace is also hanging off the shoe, just as it is in this

15 one, and in the bottom one you can see again the white and black

16 shoe with the ankle high ankle sock and the shoelaces hanging

17 from each shoe.

18          MS. COHEN:  Can we put up 308-1?  308-I.  I am sorry.

19 315-A, and 317-C?  Can we zoom in on 308-I, please?

20 BY MS. COHEN:

21     Q.   Can you describe the clothing of the man pictured in

22 308-I?

23     A.   Yes.  There is a red sweatshirt, white hat, appears to

24 be some kind of white clothing underneath sticking out from the

25 sweatshirt and the black shoes, which if you look close enough,

1    right in this area you can see like a little like white emblem.

2         Q.   How would you describe his pants?

3         A.   They would be looks like blue jeans, but I am sorry,

4    but a little much baggier than the one with the light are pants

5    with the tan shoes.

6         Q.   Just remind us the location of this still?

7         A.   Yes.  This is outside 821 Mclean Avenue in Yonkers,

8    the Irish Minimart.

9         Q.   And can we zoom in on 315-A, please?  Remind us what

10   this is from?

11        A.   Yes.  That is, I believe, River Street and 150th in

12   the Bronx, and red hooded sweatshirt, blue jeans, baggier, than

13   the other person that we had seen with the lighter colored and

14   the tan shoes and the black sneakers which, again, appear to

15   have that little white marking on them.

16        Q.   And 317-C, please?  Can you describe the clothing of

17   the man entering the vestibule now?

18        A.   Yes.  He is wearing a white shirt, blue jeans baggier

19   than the person that would be here with the tan shoes and black

20   sneakers what appear to have that white emblem right there on

21   the side.

22        Q.   Put up 309-C3, 315-A, 317-C, and 318-A?  If we could

23   zoom in on 309-C3, please?  Could you describe the clothing of

24   the man in the doorway?

25        A.   Sure.  That is a red hooded sweatshirt, white hat

MARELLO - DIRECT - COHEN                    440

```
1   possibly a black or a dark colored brim with some kind of dark
2   colored emblem on the front of the hat.
3        Q.   And remind us what the still is from.
4        A.   This would be the inside of the Irish Minimart located
5   at 821 Mclean Avenue in Yonkers, and that's the front door.
6        Q.   And what, if anything, does the person in the red
7   sweatshirt and white hat appear to have on their face?
8        A.   Some kind of like possibly mask.
9        Q.   We could move to 315-A, please?  Which of the items of
10  clothing you just identified from the minimart do you now see in
11  315-A?
12       A.   I now see a white hat on the male wearing a black
13  sweatshirt with the white and black sneakers.
14       Q.   And can you compare the clothing of the individual in
15  the doorway from 309-C3 to the individuals here in 315-A?
16       A.   The red sweatshirt just without the hat.
17       Q.   And how about the rest of the clothing?
18       A.   The same.
19            MS. COHEN:  Okay.  Zoom back out to 317-C, please?
20  BY MS. COHEN:
21       Q.   How does the clothing here of the individual entering
22  the vestibule compare to the clothing of the male in the red
23  sweatshirt on River Avenue and 150th?
24       A.   Here is the male in the back with the pattern that we
25  had seen in the beginning and throughout the video.  He is
```

MARELLO - DIRECT - COHEN                    441

1  wearing a white hat, appears to be a dark color or possibly

2  black brim, and then that logo right on the front which appears

3  to be extremely similar to the one that the person in the red

4  hooded sweatshirt is wearing at the Irish Minimart at 821 Mclean

5  Avenue in Yonkers.

6       Q.   And how about the man just walking into the vestibule?

7  How does his clothing compare to what we saw in 315-A?

8       A.   The blue jeans and the black sneakers with the white

9  marks seem to be very similar.

10      Q.   And moving to 318-A, please?  Can you describe the

11 clothing of the man in the center of the hallway?

12      A.   Yes.  White T-shirt, baggier blue jeans, black

13 sneakers with the white little mark, same as the person that

14 walked into the building.

15      Q.   What, if anything, does he appear to have in his right

16 hand?

17      A.   That was that dark object that we had seen that he had

18 in one hand and then switched it to the other from going from

19 the vestibule into the hallway into the elevator.

20           MS. COHEN:  So can we put up 317-C and 317-E?

21           And can we zoom in on the male entering the vestibule

22 in 317-C?

23 BY MS. COHEN:

24      Q.   Can you point out the object?

25      A.   Right there.

MARELLO - DIRECT - COHEN                    442

```
 1              MS. COHEN:  Okay.  And can we go to 317-E, please, and
 2   zoom in on the male to the right in the white T-shirt?
 3   BY MS. COHEN:
 4       Q.   Can you identify where that object is now?
 5       A.   Appears to be a little here blending in with the
 6   pants, but the left hand is now you can see palm is open,
 7   fingers and thumb face down towards the floor.
 8              MS. COHEN:  And if we could just put 318-A back up one
 9   time?  And zoom in on the man in the center of the -- thank you.
10              Your Honor, I, again, have another section I can move
11   to.
12              THE COURT:  No.  I think this would be a good time to
13   break if that's what you are suggesting.
14              MS. COHEN:  Yes, it is, Your Honor.
15              THE COURT:  That's what I kind of figured.
16              All right.  We will break for the day.  We have some
17   things we need to do first thing tomorrow morning, right, that
18   we talked about earlier?  Is that tomorrow?
19              MR. CHOW:  Yes.
20              THE COURT:  Yes.
21              MR. CHOW:  Yes, Your Honor.
22              THE COURT:  So I am going to have you come in at 10:00
23   tomorrow because I know that there is something that I have to
24   address with the attorneys first thing in the morning.  So we
25   will be here a little later tomorrow.
```

1              I really appreciate how attentive you have been,

2    how -- you know, how great you have been in terms of getting

3    here on time and being available on breaks.  It's fantastic.

4    It's my experience that jurors really, especially after they --

5    you know, get into it for a day or so, they really realize how

6    important it is and how important it is that they are fully

7    engaged in the process.

8              And it's clear to me that all of you are.  So thank

9    you for that.  But remember, keep an open mind.  Don't discuss

10   the case with anyone, with any other members of the jury or

11   anyone else for that matter.  Don't interact with anyone that

12   you see here in the courtroom, and have a nice evening, and we

13   will see you tomorrow at 10:00.

14             THE DEPUTY CLERK:  All rise.

15             (In open court; jury not present)

16             THE COURT:  Have a seat.

17             It's not crystal clear to me how long it will take to

18   hear the testimony of the witness that I want to hear outside

19   the presence of the jury, but I think we should try to start at

20   9:15.  I think everybody can be here at 9:15 tomorrow.  Is that

21   doable?

22             Marshals, is that doable?

23             THE MARSHAL:  Yes.  That is very doable.

24             THE COURT:  Thank you.

25             Defense counsel?

1          MR. RUHNKE:  Oh, yes.

2          THE COURT:  We will plan to start at 9:15, so we will

3    try to do whatever we need to do as quickly as we can and not

4    delay the jury unnecessarily.  Anybody need me for anything at

5    this point?

6          MR. SCOTTEN:  Are you ready?  So we had told the

7    defense earlier today that we are likely to call the cooperating

8    witness who may get on tomorrow afternoon.  We notified defense.

9          THE COURT:  CW 1?

10          MR. SCOTTEN:  This is actually CW 2.  I think Your

11   Honor knows who they both are.

12          THE COURT:  I do.  If it's not CW 1, then I can figure

13   out who CW 2 is, but fair enough.

14          MR. SCOTTEN:  We gave the defense sort of our views on

15   what were and were not proper topics of cross-examination in

16   light of the Court's rulings at the pretrial conference.

17          We gave them five days, but I can hardly blame them

18   for not looking since we weren't certain we were calling this

19   witness, and we told them earlier today.  So at some point we

20   need to discuss that with the Court, and to the extent there is

21   agreement or not, I am not sure defense counsel is ready to

22   discuss that.

23          THE COURT:  I am not sure what you are talking about.

24   I mean I generally -- I don't know specifically what you are

25   talking about.  Maybe you can enlighten me just a little bit.

1    What am I to be on the lookout for here?

2            MR. RUHNKE:  Your Honor, frankly, I am not sure

3    because until 1:00 this afternoon, we didn't know that the

4    witness was going to be called or maybe mid morning they told us

5    that the witness was going to be called.  So it's nothing that I

6    have really paid much attention to since we were told that the

7    witness would not be called.  And --

8            THE COURT:  Did you say the witness -- wait a minute.

9    Wait, wait, wait.

10           MR. RUHNKE:  The government always reserves the right

11   to change their mind, but we were operating under the assumption

12   that the witness would not be called.

13           THE COURT:  Well, I guess it was Mr. Chow who opened.

14   He did say in the opening -- maybe I am misheard it -- but I

15   thought what he said in the opening was, you are not going to

16   hear from someone who will be able to tell you the whole story

17   of what happened, or something like that.

18           Am I mis-recalling that?

19           MR. CHOW:  I said, unlike what you may have seen on

20   TV, no one witness will be able to tell the full story of the

21   defendant's crimes.

22           THE COURT:  So I drew from that that at least at that

23   point in time, you weren't planning on call the cooperating

24   witness, but of course, I don't know that for sure, but

25   that's -- that was my reaction.  But listen, you can call the

PROCEEDINGS                        446

```
 1    cooperating witness.  The question is still the scope of
 2    cross-examination of that witness.
 3              MR. SCOTTEN:  That is correct, Your Honor.  So we have
 4    the Court's rulings as to CW 1.
 5              THE COURT:  Right.
 6              MR. SCOTTEN:  I don't think the principles are going
 7    to be very different, but we provided the defense sort of an
 8    enumeration of bad act by bad act.  This is how we think the
 9    Court's ruling applies.  We think this is fair.  We think this
10    is not fair, and consistent with what the Court has said, which
11    we appreciate, that we will know in advance what's going to come
12    out and what's not, to the extent that the defense counsel
13    disagrees with us, you know, we would like to litigate that
14    before the cooperating witness takes the stand.  The defense may
15    not be in a position to disagree with us yet, so we don't need
16    your time now, Your Honor.  We may tomorrow.
17              THE COURT:  Okay.
18              MR. RUHNKE:  Just to be clear, that letter was the one
19    I happened to refer to yesterday.
20              THE COURT:  Which I have never seen.
21              MR. RUHNKE:  Did not come to you.
22              MR. SCOTTEN:  Trying to keep the letters to a minimum.
23              THE COURT:  Right, keep the letters to a minimum is
24    fine.  I never told someone not to send me a letter.  Right?
25    Isn't that correct?  I think I said you can do it, but we do
```

 1    have to use a certain amount of discretion.

 2            The point is, if I need to rule on something, you need

 3    to give me something to look at so that I can rule on it,

 4    especially if there is something to look at.

 5            MR. RUHNKE:  The defense and the government become

 6    email pals every night, so we -- I am sure we will at least get

 7    an understanding of where we stand by some reasonable hour or

 8    unreasonable hour.

 9            THE COURT:  I urge you to -- well, listen, I tried a

10    lot of cases as a lawyer, so I feel your pain.  What can I tell

11    you?  I have been there.  I know what you are talking about.  I

12    get it.

13            So I will try to minimize your disputes.  What else

14    can I say?  If I have to rule, I will rule.  Okay.

15            Anything further?

16            MR. SCOTTEN:  Not from the government, Your Honor.

17            THE COURT:  Great.  9:15.  Okay.

18            THE DEPUTY CLERK:  All rise.  This court will be in

19    recess.

20            (Proceeding adjourned until August 30, 2018 at 9:15

21    a.m.)

22

23

24

25

PROCEEDINGS

448

```
1                       INDEX OF EXAMINATION
2
3
4    Examination of:                                    Page
5    SPECIAL AGENT BRENDAN KENNEY
6    Direct By Ms. Cohen . . . . . . . . . . . . . . . 302
7
8    ALHAGIE BAHAGA
9    Direct By Ms. Cohen . . . . . . . . . . . . . . . 310
10
11   PETER WILLETT
12   Direct By Ms. Cohen . . . . . . . . . . . . . . . 315
13
14   KENDALL AUSTIN
15   Direct By Ms. Cohen . . . . . . . . . . . . . . . 325
16   Cross By Mr. Patel . . . . . . . . . . . . . . . 331
17
18   ROBERT ARONSON
19   Direct By Ms. Cohen . . . . . . . . . . . . . . . 333
20
21   THOMAS GREEN
22   Direct By Ms. Cohen . . . . . . . . . . . . . . . 351
23   Cross By Mr. Ruhnke . . . . . . . . . . . . . . . 356
24
25
```

449

```
 1                    INDEX OF EXAMINATION

 2

 3

 4   Examination of:                              Page

 5   NENOBIA WASHINGTON

 6   Direct By Mr. Scotten . . . . . . . . . . . . . . . . 370

 7

 8   VICTORIA COLAVECCHIO

 9   Direct By Ms. Cohen  . . . . . . . . . . . . . . . . 374

10

11   SUBIN JACOB

12   Direct By Ms. Cohen  . . . . . . . . . . . . . . . . 378

13

14   THOMAS MARELLO

15   Direct By Ms. Cohen  . . . . . . . . . . . . . . . . 388

16

17

18

19

20

21

22

23

24

25
```

DARBY GINSBERG, RPR (914) 390-4102

```
 1                    GOVERNMENT EXHIBITS

 2

 3   Exhibit No.                            Received

 4

 5   342-C    . . . . . . . . . . . . . . . . . 309

 6

 7   6        . . . . . . . . . . . . . . . . . 312

 8

 9   403-C and E . . . . . . . . . . . . . . . . 321

10

11   501      . . . . . . . . . . . . . . . . . 324

12

13   6-A      . . . . . . . . . . . . . . . . . 331

14

15   404-F, 404-G, 404-H, 404-I, 404-J, 404-K  . . . . 336

16

17   104      . . . . . . . . . . . . . . . . . 337

18

19   404-A, 404-B, 404-C, 404-M . . . . . . . . . . 347

20

21   100-G    . . . . . . . . . . . . . . . . . 349

22

23   404-D, 404-E . . . . . . . . . . . . . . . . 355

24

25   204      . . . . . . . . . . . . . . . . . 356
```

PROCEEDINGS                              451

```
 1                    GOVERNMENT EXHIBITS

 2

 3   Exhibit No.                            Received

 4

 5   309-C   . . . . . . . . . . . . . . . . . 363

 6

 7   401-A, 401-B, 401-C, 401-D  . . . . . . . . 366

 8

 9   402-A, 402-B, 402-C, 402-D  . . . . . . . . 380

10

11   310-D . . . . . . . . . . . . . . . . . . . 384

12

13   310-E . . . . . . . . . . . . . . . . . . . 386

14

15   301, 302, 303, 304, 306, 307, 308, 309, 309-A,

16   309-B, 309-C, 310-A 310-B, 310-C, 310-D, 310-E,

17   310-F, 311, 312, 313, 314, 315, 317 and 318  . . 390

18

19   100-E . . . . . . . . . . . . . . . . . . . 410

20

21   301-A1 . . . . . . . . . . . . . . . . . . . 435

22

23   317-A1 . . . . . . . . . . . . . . . . . . . 435

24

25   318-A1 . . . . . . . . . . . . . . . . . . . 435
```