UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x
UNITED STATES OF AMERICA

        v.                14 CR. 604(VB)

TYRONE FELDER,

              Defendant.
————————————————————————x
              U.S. Courthouse
              White Plains, N.Y.
              September 6, 2018
              9:40 a.m.


Jury Trial Before:   HON. VINCENT L. BRICCETTI,
                  United States District Judge


APPEARANCES:

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
BY:  CELIA V. COHEN
     HAGAN C. SCOTTEN
     ANDEN F. CHOW
Assistant U.S. Attorneys

ANDREW G. PATEL, Esq.
DAVID A. RUHNKE, Esq.
BENJAMIN A. SILVERMAN, Esq.
Attorneys for Defendant


Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

```
 1              (Jury not present in the courtroom)
 2              THE COURT:  Good morning, everybody.
 3              Have a seat, please.
 4              I just wanted to confirm that you received the
 5  revised jury charge which we e-mailed last night.
 6              Government receive it?
 7              MR. CHOW:  Yes, Your Honor.
 8              MR. RUHNKE:  Yes, Your Honor, we received it.
 9              THE COURT:  Great, and also the verdict sheet.
10              As far as the charge is concerned, I found what I
11  thought was a typo on Page 36 of the -- it was the previous
12  version of the charge, which was -- hold on one second.  On
13  the draft that I sent you the other day, which was dated
14  9/5/2018, on Page 36, we were talking about the firearms
15  offense elements.  And it says, "Third, the Defendant acted
16  willfully and knowingly."  I don't think that that's correct.
17  In fact, in the, in the more detailed explanation of the
18  third element, which was not objected to by the Defense, it
19  says basically that the Defendant had to know that he was
20  carrying or using a firearm, et cetera.  That's on Page 42.
21  The word "willfully" doesn't appear in there, it doesn't
22  appear in the Indictment, and it also doesn't appear in the
23  statute, so I changed it to -- instead of willfully, I
24  changed it on what is now Page -- well, I guess it's still
25  Page 36.  Sometimes these change.  Yeah, I changed it on
```

1    Page 36 of what I sent you last night to, "The Defendant

2    acted unlawfully and knowingly," and didn't change anything

3    else.

4             Do you agree with that?

5             MR. CHOW:  Yes.

6             THE COURT:  So, was it just a typo?  I mean,

7    willfully, unlawfully, knowingly, intentionally, all those

8    things are kind of related, but there are differences, of

9    course.

10            MR. CHOW:  Yes.  I think it's fine that willfully

11   was taken out.

12            MR. RUHNKE:  We have no objection to the change,

13   Your Honor.

14            THE COURT:  Thank you.  It's funny.  You know, all

15   these eyes are pouring over these -- this -- a jury charge,

16   and yet, we missed that.  But that's okay.  Better that we

17   catch it now.  That was one.

18            The second thing was, I did move -- I did include

19   what the Government wanted me to include from the charge

20   regarding no particular -- hold on one second.  What page is

21   that?  Sorry.

22            MR. CHOW:  Page 3?

23            THE COURT:  Page -- what was it?

24            MR. CHOW:  Three.

25            THE COURT:  Yeah, but what -- the investigative

1       techniques charge, where was that in the original charge?

2               MR. CHOW:  Oh.

3               THE COURT:  Not the original, but the first draft

4       that I sent you.  I want the record to be clear here.

5               MR. SILVERMAN:  Your Honor, it's Page 55 of your

6       draft of yesterday.

7               THE COURT:  I'm looking at the wrong version.  But,

8       anyway, remember that the Defense objected to the language

9       about the "you've heard arguments during cross-examination --

10      you've heard in the arguments of counsel and in

11      cross-examination of witnesses about the failure to perform

12      certain types of investigative actions."  They didn't want

13      that in there, but the Government wanted in the reference to

14      the fact that the Government -- that there's no legal

15      requirement that the Government prove its case through any

16      particular means.  So, what I did is I moved that into the

17      presumption of innocence, burden of proof, reasonable doubt

18      charge starting on Page 3.

19              Do you see that?

20              MR. CHOW:  Yes.

21              THE COURT:  Is that acceptable to the Government?

22              MR. CHOW:  Yes.

23              THE COURT:  To the Defense?

24              MR. PATEL:  No objection, Your Honor.

25              THE COURT:  Okay.  It's now the third paragraph on

 1    Page 3 of what I sent you last night.  Anyway, I think that's
 2    certainly correct.

 3            And then, finally, the Pinkerton charge.  I did
 4    give some more thought to this.  You know, again, this is one
 5    of those situations where, arguably, both sides are right.
 6    The Government is correct that Pinkerton liability exists,
 7    and that there are circumstances under which it's appropriate
 8    to charge the jury on Pinkerton liability.  I just don't
 9    think that this is one of those cases.  That's the bottom
10    line, for all the reasons that we talked about yesterday.  I
11    don't have to go over it again, but I just think it's
12    unwarranted under the circumstances of this case.

13            We read Judge Engelmayer's decision that had been
14    cited by the Defense, and it was a different -- the
15    circumstances were quite different there, but the point was
16    the same, which is that sometimes it's warranted and
17    sometimes it's not, and it's a judgment call.  And in that
18    case, he made the judgment call not to include a Pinkerton
19    charge; and then, although he didn't say this exactly,
20    apparently regretted it later on, because later on the --
21    after -- you know, after trial, the defendant in that case
22    was convicted of the conspiracy charge but not the
23    substantive offense that was the object of the conspiracy, or
24    one of the substantive offenses.  And, so, the defendant
25    argued, well, these are inconsistent verdicts and therefore

1  you should set aside the guilty verdict on the conspiracy

2  charge.  Judge Engelmayer denied that application, and

3  although he didn't say this exactly, it was, it was -- we

4  already discussed this -- in a footnote.  It was almost sort

5  of an ironic situation, where he was saying, well, I gave you

6  the benefit of not having a Pinkerton charge, and apparently,

7  as a result of that -- or if I had given a Pinkerton charge,

8  it's much more likely that you would have been convicted on

9  both the substantive and the conspiracy and then there would

10  be no inconsistency.  So, I'm not going to -- having given

11  you that benefit, I'm not going to give you the additional

12  benefit of declaring some sort of inconsistency between those

13  two verdicts.

14          In any event, the bottom line is, it's out.  Okay?

15  So, I'm sure you noticed that.  All right.  That's all I had.

16          Oh, on the verdict sheet, the only change I made

17  was from what we had talked about yesterday was in the

18  caption for Count Nine on Page 4, it said conspiracy.  I just

19  added the word "robbery," robbery conspiracy.  That's the way

20  it's defined, or that's the way it's captioned in the

21  Indictment, and that language seems to be consistent with

22  the -- you know, with the other captions for all of the other

23  counts in the verdict sheet.  I don't know if you noticed

24  that, but I wanted to point that out to you.  Okay.

25          Anything else we need to do before I bring the jury

1   out?

2           MR. CHOW:  Not from the Government.

3           MR. RUHNKE:  Not from us, Your Honor.

4           THE COURT:  All right.  Great.

5           Ms. Cohen, you're going to be closing?

6           MS. COHEN:  That's correct, Your Honor.

7           THE COURT:  Best guess on how long it's going to

8   take?  I'm not going to restrict you.  I'm just --

9           MS. COHEN:  Yeah.  Probably around an hour and a

10  half.

11          THE COURT:  Okay.  That's fine.

12          All right.  Let's get the jury.

13          MR. RUHNKE:  And, Your Honor, it may be obvious, but

14  I'll need a break after her closing to set up.

15          THE COURT:  It is obvious.  You'll get it.

16          MR. RUHNKE:  Thank you.

17          (Jury present in the courtroom)

18          THE COURT:  Okay.  Welcome, everybody.  Have a seat.

19          Okay.  We have come to that point in the trial

20  where the Government is going to make a closing argument and,

21  if the Defense wants to make one as well, they will follow.

22  And then after that, if the Defense makes a closing argument,

23  the Government will have an opportunity to make a rebuttal

24  argument.

25          Ms. Cohen.

Cohen—Summation

1          MS. COHEN:  Thank you, Your Honor.

2          THE COURT:  You may proceed.

3          MS. COHEN:  At the start of this trial, Mr. Chow

4    stood up in front of you and told you what the evidence would

5    prove.  Ladies and gentlemen, now you know what that evidence

6    proves.  It proves that in August of 2014, Tyrone Felder led a

7    crew that killed and terrorized people unlucky enough to cross

8    their path.  You know that four men working together committed

9    a series of heinous crimes in the early morning hours of

10   August 5th, 2014.  They lured cab driver Maodo Kane to a

11   secluded section of the Bronx, where they executed him with a

12   single gunshot to his head.  Then they drove off in Mr. Kane's

13   stolen cab, leaving him dead on the side of the road.  They

14   drove to Yonkers, where they used not one, but three guns to

15   rob the Irish mini mart and a Dunkin' Donuts and to terrorize

16   the people inside.  Then they ditched Mr. Kane's cab under the

17   Deegan, doused it in bleach, and went back to the Third Avenue

18   apartment to split up the loot.

19          After a week and a half of trial filled with hours

20   of video, pages of phone records, cell site data, DNA,

21   ballistics and the testimony of dozens of witnesses, you know

22   exactly who those four men are:  Tyrone Felder, Kareem

23   Martin, Takiem Ewing and Tommy Smalls.  You also know the

24   truly terrible fact, that Felder and his crew set out to

25   commit the same heinous crimes again exactly one week later.

Cohen-Summation

1   And, once again, a cab driver, doing nothing but trying to

2   earn a living in the Bronx, was killed.  Aboubacar Bah

3   suffered the same death as Mr. Kane, executed with a single

4   gunshot to his head, his body dumped in the street.

5              Ladies and gentlemen, there is no reasonable

6   dispute that these monstrous crimes occurred, and there is no

7   reasonable dispute that Felder and his crew are the four men

8   who committed them.  Piece after piece, the evidence has

9   piled up.  You saw for yourself Felder chase Mr. Bah's cab on

10  August 12th as it rolled down Bryant Avenue with a dead man

11  behind the wheel.  You saw Felder drive off in that cab,

12  Mr. Bah lying in a pool of his own blood in the middle of

13  Bryant Avenue.  You saw him ditching the cab after wiping it

14  down, and running away with a gun in his hand as he and the

15  rest of the crew went to dump the clothes they were afraid

16  would give them away, not realizing it was too late.  But it

17  was too late then, and it's too late now.

18             Felder's crimes recorded by dozens of cameras and

19  witnessed by people in the neighborhood.  People like

20  Anastasa Burgess, who called 911 to report Felder and the

21  others dumping Mr. Bah's body, and Donna Spry, who saw them

22  ditching the cab and dumping their clothes.  That evidence,

23  ladies and gentlemen, is devastating.

24             Felder does no better on August 5th.  His phone

25  records show you that he's in constant contact with his crew

1    leading up to the carjacking.  Phone records also show you,

2    as soon as Felder crews —— Felder's crew gets into Mr. Kane's

3    cab, it heads straight to Bailey Avenue to pick Felder up.

4    And after Mr. Kane is brutally killed, Felder is on video

5    driving the dead man's stolen cab.  He's on video

6    participating in the Yonkers robbery.  And he's on video

7    right after they ditched that cab.  Just 11 minutes later,

8    he's right there in the lobby of Ewing's building with the

9    rest of the crew, wearing the same jeans and same sneakers he

10   had at the robberies, the same jeans and same sneakers he had

11   when they dumped Mr. Kane's stolen cab.  And what did Felder

12   do when he got back to Ewing's building?  You watched him

13   destroy evidence, throwing it down the trash chute, exactly

14   what Ewing, Martin and Smalls do.

15           Ladies and gentlemen, this past week and a half has

16   built a mountain of evidence, and I know you've paid close

17   attention to all of it.  Because of that, I know that I don't

18   have to go over every last thing that you saw and heard.  I

19   want my time up here to be helpful, so I'll spend the rest of

20   it showing you how that evidence lines up with the charges in

21   the Indictment.  That will show you what I think you already

22   know, that as much as this is a violent case, it's not a hard

23   one.  The evidence clearly, plainly, beyond a reasonable

24   doubt proves Felder guilty as charged.

25           As Judge Briccetti told you at the start of the

1    trial, Felder is charged with nine separate crimes.  They

2    fall into four categories: two counts of carjacking resulting

3    in death for the fatal carjackings of Mr. Kane and Mr. Bah;

4    two counts of robbery for robbing the Irish mini mart and the

5    Dunkin' Donuts; four counts of firearms offenses, one for

6    each of the carjackings and robberies; and, finally, one

7    count of participating in a robbery conspiracy, for agreeing

8    to participate in those crimes.

9         Judge Briccetti is going to instruct you on the law

10   that you must follow in deciding this case.  It's what he

11   says that matters.  But I'm going to walk you through what I

12   expect those instructions on the law to be, and why, when you

13   apply that law to the facts in this case, you know that

14   Felder is guilty as charged.

15        Let's start with Counts One and Seven, the

16   carjacking counts.  Carjacking has four elements.  Elements

17   are just the parts of a crime.  As I will explain, it's

18   because the evidence you've seen and heard proves each of

19   these four elements that Felder is guilty of Counts One and

20   Seven.

21        Let's start with the first element, that the

22   Defendant took a motor vehicle from the person or presence of

23   another.  There is no question that Mr. Kane and Mr. Bah's

24   cabs were taken from them.  As you heard from Officer Aronson

25   and as you saw in photos from August 5th, 2014, Mr. Kane's

1    bleach-soaked Lincoln Town Car was ditched under the Deegan

2    near the Yankee Stadium Metro-North Station.  You know from

3    the maps that are in evidence that this is miles away from

4    Hunter Avenue, where the 911 caller, Mr. Willet, found

5    Mr. Kane's body and where Officer Austin, the first

6    responder, found him.

7              You know from Detective Beltry and photos from

8    August 12th that Mr. Bah's bloody, battered Toyota was found

9    next to the school on Underhill Avenue, while Mr. Bah lay

10   lifeless, exactly where the 911 caller, Miss Burgess, saw his

11   body dumped in the middle of Bryant Avenue.

12             But how do you know that Felder participated in

13   taking Mr. Kane and Mr. Bah's cars?  You know that Felder was

14   with Martin, Ewing and Smalls from start to finish on both

15   August 5th and August 12th, based not just on witness

16   testimony, but on dozens of videos, pages of phone records,

17   and cell site evidence.

18             Let's talk about some of that evidence, and let's

19   start with August 12th, because that's when Felder and his

20   crew messed up.  That's when they not only killed Mr. Bah

21   inside his cab, but they damaged that cab.  Remember the cell

22   site expert, Special Agent Perry?  He explained to you that

23   based on the cell phone towers used by Martin, Ewing and

24   Smalls, we know that the three of them were hanging out

25   together at River Park Towers from approximately 2:00 a.m. to

1    4:00 a.m. on August 12th.  Some of the very calls and text

2    messages that generated that cell site show you that Felder

3    was with them too.

4              Look at the first two text messages.  Felder tells

5    Ewing, "he's coming down now, bro."  What does Ewing do?  He

6    tells Martin that Felder is on his way down so that they can

7    all get going, and they do.  Cell site again shows you that

8    Martin, Smalls and Ewing traveled to Ewing's apartment

9    building on Third Avenue.  And the video from Ewing's

10   apartment building tells you that Felder is right there with

11   him.  You watched Ewing, Martin, Smalls and Felder walk into

12   Ewing's building together at approximately 4:20 a.m..

13             Ladies and gentlemen, you know who those four men

14   are, Special Agent Kenney told you when he testified last

15   week, but, ladies and gentlemen, you also know who those four

16   men are because you have spent the better part of the past

17   week -- last week and a half looking at that face board and

18   looking at Mr. Felder, and you can tell, plain as day, who is

19   in that video.

20             Based on the same testimony and, once again, your

21   own two eyes, you know that around 5:00 a.m., Martin came out

22   of Ewing's apartment in a Brooklyn Nets sweatshirt, and Ewing

23   came out in an Adidas sweatshirt and black backpack.  They

24   walked out of the building and headed south, the same

25   direction they had walked one week earlier, on August 5th,

1    only this time they walked half a block closer to the Futa
2    Islamic Center.  You know from Tommy Smalls that while Ewing
3    and Martin looked for a cab, Smalls and Felder waited in the
4    apartment with the guns.

5           The phone records tell you the same thing.  While
6    Martin and Ewing were out looking for a cab, they used
7    Smalls's cell phone to call Smalls and Felder, who were still
8    back in Ewing's apartment, to keep them updated on the cab
9    situation.  From just 5:01 to 5:19, Smalls's phone connects
10   with Ewing's apartment phone eight times.  And what happens
11   right after the last call?  The video shows Smalls and Felder
12   exiting Ewing's apartment building to join Ewing and Martin
13   at Third Avenue and 166th Street.  Now, as you remember,
14   these video time stamps are approximate.  Here, you see
15   Smalls and Felder exiting Ewing's apartment building moments
16   after the last call from Smalls' phone to Ewing's apartment.

17          And there is a mountain of evidence that when
18   Felder and Smalls joined up with Martin and Ewing, all four
19   of them got into Mr. Bah's cab.  To start, you saw Felder and
20   the rest trying to get a cab on Third Avenue.  In fact, you
21   not only saw them trying to hail cabs in Government
22   Exhibit 337, but you heard from one of the cab drivers who
23   stopped, Mr. Barrie.  Remember Mr. Barrie told you this was
24   his cab?  The light-colored Marquis on the right-hand side?
25          Mr. Barrie also told you that a heavyset black man

1262

1    in his twenties flagged him down and asked for a ride to

2    Hunts Point.  And Mr. Barrie told you that as this heavyset

3    man was asking for a ride to Hunts Point, two things

4    happened: the man was looking inside Mr. Barrie's cab for

5    cameras and three other men approached the car.  Mr. Barrie

6    felt unsafe, so he said no and drove away.

7            But that didn't deter Felder and the others.  You

8    watched as Felder and his crew lured Mr. Bah in on August

9    12th.  You know from Mr. Barrie that Mr. Bah had also been at

10   the Futa Islamic Center during those early morning hours.

11           Driving up Third Avenue, Mr. Bah pulls over.  He's

12   driving his black Toyota livery cab.  And as you can see,

13   four men approach to get into the cab, wearing the same

14   clothes they were wearing in the video from Ewing's apartment

15   building.  Watch as Smalls comes from the top of the screen,

16   walks in front of Mr. Bah's cab and uses his sweatshirt to

17   open the back passenger door.

18           (Video playing)

19           MS. COHEN:  All of them are in.  The plan is in

20   motion.  Ladies and gentlemen, this is the last video

21   capturing Mr. Bah alive.  Felder's crew directed Mr. Bah to

22   Hunts Point, the same place they had tried to direct Mr.

23   Barrie.  But in Hunts Point things didn't go as planned.

24   Mr. Bah was killed inside the cab and the cab itself was

25   damaged.  You know that because you watched Felder and the

Cohen-Summation

1    others chase Mr. Bah's cab as it rolled down Bryant Avenue.
2    That cab, ladies and gentlemen, had no one but a dead man
3    behind the wheel.

4            To be absolutely clear, this video shows Felder in
5    the same sweatshirt, the same distinctive black-and-white
6    sneakers that he wore when he was captured on video walking
7    out of Ewing's apartment building earlier that morning.
8    Smalls is also in the same clothes as he was earlier, a light
9    color hoodie and jeans.  Ewing is in the same clothes too, an
10   Adidas sweatshirt and a black backpack.  And the same for
11   Martin, a dark-colored sweatshirt with white writing and dark
12   shorts.

13           You know that after Felder and the rest of the crew
14   chased Mr. Bah's cab, they caught up with it.  Miss Burgess,
15   who was living on Bryant Avenue at the time, told you she saw
16   men chasing the cab.  She saw them pull Mr. Bah's lifeless
17   body from the cab, throw it in the middle of Bryant Avenue
18   and drive off.  You listened to her describe the scene in
19   real time in her 911 call.  You saw the exact same thing as
20   you watched this video from 750 Bryant Avenue.

21           The next time you saw Felder and the others, they
22   were ditching the car on Underhill Avenue next to the school.
23   Felder, unmistakably wearing a blue sweatshirt with white
24   strings, dark shorts and black-and-white sneakers, is first
25   out of the car.  He's followed by Ewing in an Adidas

1    sweatshirt, Martin in the Brooklyn Nets sweatshirt, and

2    Smalls in the light sweatshirt and jeans.  You can plainly

3    see these same four men in the same clothes as they run

4    across to Bolton Avenue.

5                    (Video playing)

6                    MS. COHEN:  And you can see Felder in the same

7    shorts and the same sneakers, wearing his same blue

8    sweatshirt, throwing the clothes into the dumpster on Bolton.

9                    You can follow Felder, with not only his black-and-

10   white shoes in plain sight, but his face, uncovered for

11   everyone to see, all the way across Stevenson Commons, back

12   to Ewing's apartment building and back up to Ewing's

13   apartment on the ninth floor.

14                   And if Felder's first time to the dumpster somehow

15   wasn't clear enough, you know he went back a second time.

16   You saw that less than ten minutes after Felder, Ewing,

17   Martin and Smalls gathered back at Ewing's apartment, Smalls,

18   Felder, and then Martin decided to go back to the dumpsters

19   to get what they had left behind.  You know that the three of

20   them all went back.  Smalls tried to grab everything he

21   could, stuffing things into the black backpack that Ewing had

22   been carrying during the carjacking.  But you know Smalls

23   missed something: Martin's latex gloves.  Remember, you saw

24   Martin in the Brooklyn Nets sweatshirt peel off his latex

25   gloves as he ran behind Felder towards the dumpsters on

Cohen-Summation

1    Bolton earlier that morning after they ditched the cab.

2    Smalls missed those gloves when he and Martin and Felder went

3    back to the dumpster, but the police found them.  You know

4    those are Martin's gloves because the DNA expert, Miss Perez,

5    confirmed they had Martin's DNA on them.

6            So, with Martin's gloves still at the bottom of the

7    dumpster, you watched Smalls throw everyone's sweatshirts

8    into Ewing's backpack, and you watched Felder, Martin and

9    Smalls retrace their steps from earlier that morning almost

10   exactly, back down Bolton Avenue, across Stevenson Commons,

11   to White Plains Road, where they got in a cab back to Ewing's

12   apartment.

13           The video shows Felder, Martin and Smalls coming

14   back with Ewing's black backpack stuffed with the hoodies

15   they wore when they carjacked Mr. Bah.  And although there's

16   no question who these three men walking through the lobby at

17   Third Avenue are, Felder confirms it with his phone records.

18   You can see Felder's phone in his hand as he walks into the

19   building, and his phone records show him trying to text Ewing

20   three times to let them into the building.  And then,

21   finally, an IM to Ewing goes through.  "Buz."

22           Ladies and gentlemen, the phone records, cell site,

23   video and witness testimony all show that Felder participated

24   in the August 12th carjacking of Mr. Bah.

25           Let's talk about August 5th.  Like August 12th,

Sue Ghorayeb,  Official Court Reporter

Cohen-Summation

1   August 5th also started at River Park Towers.  Once again,

2   you know that Felder, Martin and Smalls were there, because

3   the cell site tells you that.  Remember, the Felder phone is

4   green, the Martin phone is in black, and the Smalls phone is

5   in red.  And, once again, the phone records show that Felder

6   is right in the mix.  From just 2:00 a.m. to 2:45 a.m.,

7   Felder, Martin and Smalls reach out to each other eight

8   times.

9            Cell site tells you that Felder then travels to his

10  apartment on Bailey Avenue.  He gets there at approximately

11  3:30, and he stays there until about 4:19, repeatedly talking

12  to Smalls and Ewing by phone in between.  You know that while

13  Smalls and Ewing are talking to Felder, they're with Martin

14  at Ewing's apartment.  You watched them walk into that

15  building together at 3:30.  You watched them walk back out,

16  now in their carjacking and robbery clothes, around 3:51.

17           You know that the reason Felder didn't go to

18  Ewing's apartment with Smalls, Martin and Ewing was because

19  Felder needed to go to Bailey Avenue to change his clothes.

20  He also needed to pick up the guns.  You know that from Tommy

21  Smalls, but you also know that from Felder's phone records.

22  Those records show that from the moment Smalls, Ewing and

23  Martin got to Ewing's apartment, until they headed back out

24  to pick up a cab, Felder stayed in close contact, calling or

25  being called 11 separate, times from around 3:29 a.m. until

Cohen—Summation

1   around 3:53.  You know that Mr. Kane picked up Martin, Ewing

2   and Smalls from Third Avenue at 167th Street, because we've

3   sat together in this courtroom and we've watched this video,

4   this eerie video, of that fateful moment.

5            (Video playing)

6            MS. COHEN:  You watched them get into the cab, and

7   you watched it drive away.  And you know where Mr. Kane drove

8   them, to Felder's place at Bailey.  Ladies and gentlemen, this

9   is the last video capturing Mr. Kane alive.

10           Felder's phone records show Smalls called Felder to

11  let him know they were getting close, and then called again

12  to let Felder know that they had arrived.  Cell site confirms

13  that Smalls and Felder were both in the vicinity of Felder's

14  apartment on Bailey Avenue at 4:19 a.m.  Then everyone's

15  phones go quiet.  Why?  Because there's no need for any more

16  phone calls.  There's no need for text messages.  Felder,

17  Martin, Ewing and Smalls are now together in Mr. Kane's cab.

18  The plan is in motion.

19           Now, you might be asking yourselves, how do I know

20  that Felder was in the car before Mr. Kane was killed?  I'll

21  show you.  Remember that Number 2 on the map that is

22  Government Exhibit 100 represents Ewing's apartment and where

23  Mr. Kane picks up Ewing, Martin and Smalls in the cab.

24  Number 3 is Felder's place at Bailey Avenue.  And Number 4 is

25  Hunter Avenue, where Mr. Kane is carjacked and dies.  Video

Cohen—Summation

1    shows Mr. Kane picking up Ewing, Martin and Smalls at

2    Location Number 2 around 4:00 a.m.  There's no dispute about

3    that timing.  It's right there in a parties' video

4    stipulation.  And as you just saw, phone records and cell

5    site indicate that Smalls and Felder are at Bailey Avenue

6    19 minutes later.

7            Ladies and gentlemen, it is quite simply impossible

8    for Ewing, Martin and Smalls to have carjacked Mr. Kane at

9    Hunter Avenue, Location Number 4, before going to pick up

10   Felder.  You know that because Detective Marello told you he

11   drove between those locations in the very early morning

12   hours, and he told you that it takes at least 15 minutes.

13   So, given that Mr. Kane picks up Ewing, Martin and Smalls

14   around 4:00 a.m., the soonest they could have gotten to

15   Hunter Avenue, where Mr. Kane's body was found, is 4:15 a.m.

16   And even if that killing took no time at all, the earliest

17   that Ewing, Martin and Smalls could have gotten to Bailey

18   Avenue is 4:30 a.m.  In other words, it is impossible for

19   Ewing, Martin and Smalls to have gotten in Mr. Kane's car at

20   4:00 a.m. and then to have driven to Hunter Avenue, committed

21   the carjacking, and then have gotten back to Bailey by 4:19.

22   The only way this evidence fits together is if Mr. Kane drove

23   Ewing, Martin and Smalls to Bailey Avenue to pick up Felder

24   and then drove all four of them to Hunter Avenue, where he

25   was killed.  That's exactly what Tommy Smalls told you.  And

Cohen-Summation

1   it is the only explanation consistent with all the other
2   evidence.
3           The other way you know that Felder participated in
4   the carjacking is because it is Felder who was with Ewing,
5   Martin and Smalls for the rest of that morning.  The easiest
6   way for you to tell is to look at the compilation video that
7   is Government Exhibit 323, which is just clips from video
8   you've already seen, strung together in chronological order.
9   I'm going to walk you through that video now.
10          (Video playing)
11          MS. COHEN:  Mr. Kane's black Lincoln Town Car is at
12  the Irish mini mart, not with Mr. Kane behind the wheel, but
13  with Felder driving, as Mr. Kane lay lifeless at Hunter
14  Avenue.
15          (Video playing)
16          MS. COHEN:  Felder is in a white hat, orange
17  sweatshirt, white T-shirt and baggy jeans, black sneakers with
18  white emblems on them.  He runs up to the mini mart, hiking
19  his pants up.  You get a good view of his white hat, orange
20  sweatshirt and black mask as Felder puts his head in the door,
21  tells his crew to hustle.  Felder and the others return to
22  Mr. Kane's car with their loot, plus the bleach and the mini
23  mart owner's iPhone in hand.
24          (Video playing)
25          MS. COHEN:  Video again captures Felder and his crew

Cohen-Summation

1   as they walk away from Kane's bleach-soaked Lincoln Town Car,

2   carrying the loot from the robberies but forgetting the mini

3   mart's iPhone -- mini mart owner's iPhone back in the car.

4           As they walk down the street, you can see Felder,

5   still in his orange sweatshirt, white T-shirt and black

6   sneakers with white emblems, baggy jeans that he has to hike

7   up again.  His white hat is now on Martin, and Ewing carries

8   the bag of money.  Felder, Martin, Ewing and Smalls walk

9   across River Avenue at 150th Street, heading for a cab.

10          (Video playing)

11          MS. COHEN:  Just 11 minutes later, Ewing, Smalls,

12  Felder and Martin return to Ewing's apartment, too fast to

13  have gotten there by walking, but as Detective Marello told

14  you, exactly how long it takes to drive to Ewing's building

15  from River and 150th Street.  Their faces aren't covered,

16  plain for you to see.  Felder has ditched his orange

17  sweatshirt.  But, ladies and gentlemen, I know that's not

18  enough to fool you.

19          (Video playing)

20          MS. COHEN:  You've seen those baggy jeans before.

21  You've seen those black sneakers with white emblems.  Not only

22  that, but you've seen that Felder walks into the building with

23  something dark in his hand.  You see, if you look in his right

24  hand, he's passed it from left to right as they walk in.

25          (Video playing)

Sue Ghorayeb,  Official Court Reporter

Cohen—Summation

1           MS. COHEN:  They go to Ewing's apartment on the

2    ninth floor.  And when they get to the ninth floor, what does

3    Felder do?  He throws that item out.  Go into the trash room

4    with Ewing, Martin and Smalls, who are throwing out the

5    clothes they wore to carjack and to rob.

6           (Video playing)

7           MS. COHEN:  Ladies and gentlemen, Felder's phone

8    records, the cell site evidence, dozens of videos, and witness

9    testimony all show that Felder participated in the August 5th

10   carjacking of Mr. Kane.  The first element of carjacking is

11   satisfied.

12          Let's talk about the second element, that the

13   vehicle was taken by force or violence.  You know that

14   violence was used.  You watched Felder and his crew chase

15   down Mr. Bah's cab on Bryant Avenue and throw his lifeless

16   body into the street.  You've seen the gruesome crime scenes,

17   not just on Bryant Avenue, but also on Hunter.  Mr. Kane and

18   Mr. Bah each found shot through the head, their bodies miles

19   away from their cars.  There is no clearer example of using

20   violence than that.  The second element is satisfied.

21          The third element of carjacking is that the

22   Defendant acted with intent to cause death or serious bodily

23   harm.  Let me be clear, this is not a murder charge.  You do

24   not have to find that the victims' deaths were premeditated.

25   Instead, I expect that Judge Briccetti will instruct you that

Cohen-Summation

1    you must decide whether, during the carjacking, Felder
2    intended to use violence himself or intended that someone
3    else in the crew would.

4            Let's start with August 12th again.  You know that
5    on August 12th, Felder was willing to have someone in his
6    crew take Mr. Bah's cab by force, if necessary.  You know
7    that because exactly one week earlier, Felder participated in
8    a carjacking with the same three men, and the cab driver in
9    that carjacking was shot and killed.  As the video makes
10   clear, no one forced Felder to show up on August 12th, and
11   Felder could not have shown up for the August 12th carjacking
12   without at least being willing to use force, just as he had
13   done the week earlier.

14           In the same way, Felder's participation in the
15   August 12th carjacking shows his mindset on August 5th.  If
16   he was not prepared to use force against Mr. Kane on
17   August 5th, if that had shocked him, why did he willingly
18   show up on August 12th, a smile on his face?  The answer,
19   ladies and gentlemen, is he knew exactly what could happen
20   during both of those carjackings, and he was prepared to use
21   violence.  The third element is satisfied.

22           The fourth element you must find is that Mr. Kane
23   and Mr. Bah's vehicles traveled in interstate commerce.  You
24   know that element is satisfied because the parties agreed
25   that employees of Ford and Toyota would testify that

1    Mr. Kane's Lincoln Town Car and Mr. Bah's Toyota were both

2    manufactured outside the state of New York.  The fourth

3    element is also satisfied.

4          Felder is guilty of both carjacking counts.

5          There will be one additional question that you'll

6    have to answer about those carjacking counts.  You must

7    decide whether Mr. Kane and Mr. Bah's deaths were the result

8    of actions taken during the carjackings.  This is another

9    very straightforward element.  You see here Dr. Prial's

10   testimony.  The TR that you see is just a reference to the

11   transcript page at which her testimony appears.  As Dr. Prial

12   testified, both Mr. Kane and Mr. Bah died as the result of

13   gunshots to the head.  You also saw and heard evidence that

14   Mr. Kane and Mr. Bah received those deadly wounds at the

15   sites of their carjackings.

16         Now, there's another point of the law that I want

17   to be very clear on, and it's the second point on this slide.

18   The Government is not required to prove that Felder intended

19   to cause Mr. Kane and Mr. Bah's deaths, nor is the Government

20   required to prove who killed Mr. Kane or Mr. Bah.  It is

21   enough that you know the victims were killed as a result of

22   the carjackings in which Felder participated.

23         But, of course, you know exactly what happened on

24   August 5th and August 12th.  You know how Mr. Kane and

25   Mr. Bah were killed.  Tommy Smalls spent Tuesday on that

Cohen-Summation

1  witness stand telling you the details of both of those

2  carjackings, and he told you in no uncertain terms that

3  Felder shot both of those men.

4          Let me spend a minute now talking about Tommy

5  Smalls.  I expect Judge Briccetti will tell you that you

6  should carefully evaluate the testimony of cooperating

7  witnesses.  That means Tommy Smalls.  And you should evaluate

8  his testimony carefully.  When you do, you will find lots of

9  reasons to credit it.

10          Ladies and gentlemen, there is no question that

11  Tommy Smalls participated in truly horrific crimes.  No one

12  is asking you to like him, and, certainly, no one is asking

13  you to excuse anything that he has done.  That's why he's

14  facing up to a lifetime in jail, and why Judge Briccetti is

15  free to give Smalls exactly that.  But Smalls has admitted

16  his crimes.  He took the stand and told you what happened on

17  August 5th and August 12th, ready to accept whatever

18  punishment he receives.

19          So, why should you credit his testimony?  Let's

20  start with his demeanor.  Smalls had no problem admitting to

21  his crimes when he was asked about them on the stand.  The

22  same was true whether he was answering questions from

23  Mr. Chow or from Felder's lawyers.  Smalls told you things

24  that, frankly, make him look bad and that he could have

25  easily kept to himself.  But he told you those things because

1    he knows he has to tell the truth, the whole truth.

2             For example, he told you he actually recruited

3    Ewing to do the carjackings and robberies on August 5th.  He

4    admitted to carrying one of the two guns on August 12th,

5    something you would have otherwise never known.  And he was

6    totally candid about knowing that the victim of the

7    August 12th carjacking might get killed, because that's what

8    happened on August 5th.  As horrifying as those crimes were,

9    Smalls wasn't hiding a thing when he testified.

10            You should also credit his testimony because he has

11   every reason to tell the truth.  I wanna talk very carefully

12   about the sequence of events that led to Smalls entering into

13   a cooperation agreement in this case.  That sequence is

14   really important.  Before Smalls had a cooperation agreement,

15   he pled guilty to carjacking Mr. Kane and Mr. Bah.  As part

16   of that plea, Smalls admitted the same facts you heard from

17   the witness stand, including that Felder shot both of those

18   innocent cab drivers.  As a result of that plea, Smalls faced

19   no mandatory minimum, and the maximum sentence he was facing

20   was 30 years.

21            Ladies and gentlemen, he traded that plea for a

22   cooperation agreement.  And you know what that cooperation

23   agreement says?  Judge Briccetti can give Smalls a lot more

24   than 30 years.  He can give Smalls life.  You know what else

25   it says?  If Smalls lies, the Judge has no discretion but to

Cohen—Summation

1    send Smalls to jail for no less than 132 years.  As Smalls

2    told you himself, the only thing that will make a difference

3    for him at sentencing is his truthfulness, not the outcome of

4    this case.

5           So, why would Smalls trade a thirty-year plea for

6    an agreement that lets the Judge send him to jail for the

7    rest of his life if he was just going to get up there and lie

8    in front of the judge that's going to sentence him?  He

9    wouldn't.

10          Now, Smalls did tell you that when he first came in

11    to talk to the Government, back in January of 2017, he said

12    that Felder wasn't there for the August 5th carjacking.  Why

13    did he do that?  Because Felder was like a brother to him.

14    Felder was his day one.  Back in January 2017, Smalls thought

15    that because Felder wasn't on video leaving Ewing's apartment

16    with the rest of the crew on August 5th, Smalls could lie and

17    protect Felder.  But for all the reasons we've talked about

18    this morning, the cell site, phone records, video, Smalls was

19    wrong.  There is no protecting Felder.  Smalls knows that.

20    He knew that when he pled guilty the first time.  He knew

21    that when he signed his cooperation agreement.  And he knows

22    that now.  So do you.

23          One last point on Smalls.  You should credit his

24    testimony because it's backed up by all the other evidence in

25    this case.  Here are just a few examples.  You know from the

Cohen-Summation

1   phone records and the cell site that Felder was with Smalls

2   both on August 5th and on August 12th.  You know that the

3   location of Mr. Kane's body on Hunter Avenue makes perfect

4   sense, given what Smalls says happened when they were out

5   there.  That Mr. Kane drove to the dead end, did a U-turn,

6   came back, before being pulled out of the driver's side of

7   the car and killed between the two driver's side doors.  And

8   you know everyone was sitting in Mr. Bah's cab on August 12th

9   in exactly the order that Smalls told you, because that's how

10  you see them running down Bryant Avenue.

11          Ladies and gentlemen, you know Felder shot and

12  killed Mr. Kane and Mr. Bah.  And you certainly know, even

13  before hearing from Smalls, that both of those victims died

14  as a result of the carjackings that Felder and his crew

15  committed.

16          Ladies and gentlemen, each of the elements of

17  carjacking is satisfied.  Felder is guilty of the fatal

18  carjackings of Mr. Kane and Mr. Bah, as charged in Counts One

19  and Seven of the Indictment.

20          So, now I would like to move to the robberies of

21  the Irish Mini Mart and the Dunkin' Donuts.  You know from

22  watching the video of these robberies that Felder was the

23  getaway car driver.  He did not personally carry money or

24  other property out of those stores.  What he did do was aid

25  and abet those robberies; and for that, he's guilty of Counts

Cohen—Summation

1    Three and Five of the Indictment.

2          Aiding and abetting is a legal phrase for a

3    straightforward concept.  I expect Judge Briccetti will

4    instruct you that a defendant can be convicted of a crime if

5    he helped someone else commit that crime.  The getaway car

6    driver can't avoid punishment just because he didn't

7    personally grab cash out of the register.  Neither can

8    someone who helps carjack a car to get the robbers where they

9    are going, especially when he kills the driver.  Of course,

10   you have to find that someone committed the charged robberies

11   in order to find that Felder aided and abetted them.  And you

12   certainly know that someone robbed the Irish Mini Mart and

13   the Dunkin' Donuts because you watched those robberies on

14   video and you heard directly from the victims.

15         But how do you know those robberies violated

16   federal law?  Let's talk about the elements, starting with

17   the first.  You know that the first element is satisfied

18   because in both robberies, Felder's crew took someone else's

19   property.  In the mini mart, they robbed the register, they

20   stole the change from under the counter, and they took

21   bleach, all belonging to the mini mart.  And in the Dunkin'

22   Donuts, they stole cash from the register and from under the

23   counter.  The first element is satisfied.

24         You also know that the second element is satisfied

25   because in both robberies, Felder's crew took that money and

Sue Ghorayeb,  Official Court Reporter

1   property by force.  At the mini mart, they pointed their guns

2   at Mr. Yahia's head and at his worker, Harry.  Remember Miss

3   Colavecchio was at the mini mart only to buy her father

4   breakfast?  They hit her over the head with a gun.  And at

5   the Dunkin' Donuts, they again pointed their guns at the

6   store employees, this time at Mr. Jacob and his coworker, and

7   chased them into a bathroom.  The second element is

8   satisfied.

9          Finally, you know that the third element is

10  satisfied because the parties agreed that both of those

11  robberies affected interstate commerce.

12         So, ladies and gentlemen, you know that the

13  robberies of the Irish Mini Mart and the Dunkin' Donuts

14  committed by Martin, Smalls and Ewing violated federal law.

15  The remaining question for you is whether Felder unlawfully

16  and knowingly aided and abetted those robberies.

17         To start, you know that Ewing, Martin and Smalls

18  didn't go to the robberies alone.  The mini mart -- the video

19  shows you that there's a fourth man, a getaway car driver.

20  And video from the Dunkin' Donuts shows you the same thing.

21  How else does Mr. Kane's cab back up outside the Dunkin'

22  Donuts while Ewing, Martin and Smalls are all inside?  So,

23  it's clear, there was a fourth person at both of those

24  robberies.  And you know that fourth man was Felder for the

25  same reasons you know that Felder was part of the brutal

Cohen—Summation

1    carjacking and killing of Maodo Kane earlier that morning.
2    I've walked you through all of that evidence when we talked
3    about the carjackings, and I won't go through all of it
4    again.

5              Ladies and gentlemen, because Felder was the
6    getaway car driver on August 5th, he is guilty of aiding and
7    abetting the robberies, the Irish Mini Mart and the Dunkin'
8    Donuts, as charged in Counts Three and Five of the
9    Indictment.

10             Let's talk about the firearms offenses.  As I
11   mentioned earlier, Felder is charged with four separate
12   firearms offenses, two relating to the carrying and use of a
13   firearm during each of the carjackings, and two relating to
14   the carrying and use of firearms during each of the
15   robberies.

16             I expect that these are the elements Judge
17   Briccetti will instruct you on.  We can easily check off the
18   first and second elements you see here for all four of the
19   firearms offenses.  Putting aside for the moment who carried
20   and used firearms during the carjackings and robberies, there
21   is no question that firearms were used.  You know that
22   Mr. Kane and Mr. Bah were each killed by a gunshot to the
23   head.  And you watched on video as three different handguns
24   were pointed at the terrified folks in the mini mart and the
25   Dunkin' Donuts.  The victims of those robberies told you

1    exactly that.

2                (Video playing)

3                MS. COHEN:   The first element is satisfied.

4                The second element requires that the firearm be

5    used or carried during a crime of violence.  We can check

6    that second element off too.  That's because I expect Judge

7    Briccetti will instruct you that the carjackings of Mr. Kane

8    and Mr. Bah and the robberies at the Irish Mini Mart and the

9    Dunkin' Donuts are all crimes of violence under the law.  And

10   on the question of whether the use or carrying of firearms

11   was during those crimes, we just talked about that when we

12   talked about the first element.  Firearms were unquestionably

13   used during the carjackings and the robberies.  The second

14   element is also satisfied.

15               Let's turn to the third element, whether the

16   Defendant acted knowingly and unlawfully.  This is a good

17   point to also talk about who used or carried guns during the

18   robberies and carjackings.  Let's start with the firearms

19   offenses tied to the August 5th robberies.  As I've already

20   said this morning, Felder didn't walk into those stores and

21   steal anything with his own two hands.  He was the getaway

22   car driver.  So, when you consider the firearms offenses tied

23   to the robberies, you should consider whether Felder aided

24   and abetted the use of firearms by other members of his crew

25   during those robberies.  I expect Judge Briccetti to instruct

Cohen—Summation

1   you that in order to aid and abet any of the firearms

2   offenses, Felder had to have advance knowledge that someone

3   else would use or carry firearms during those crimes.

4   Advance knowledge just means knowledge at a time when Felder

5   could attempt to alter the plan or withdraw from it.

6           So, let's talk about what Felder knew at the time

7   of the August 5th robberies.  To start, the use of the

8   firearms during the robberies couldn't have been a surprise

9   to Felder because he had just used one of those guns to kill

10  Mr. Kane.  Felder certainly didn't withdraw from the robbery

11  plan after Mr. Kane got killed.  What did he do?  He drove

12  the crew to the Irish Mini Mart and he gave them the guns to

13  commit that robbery.  When Felder came to the mini mart door,

14  he saw his crew pointing those guns at the robbery victims.

15  He didn't walk away then either.  Instead, he loaded everyone

16  back into Mr. Kane's cab and drove them to the Dunkin' Donuts

17  for the next armed robbery.  Ladies and gentlemen, there is

18  no reasonable argument that Felder didn't know guns would be

19  used during the August 5th robberies.

20          So, let's turn to the firearms offenses related to

21  the carjackings.  As I said earlier, when I talked to you

22  about the carjacking offenses themselves, you don't need to

23  decide who shot Mr. Kane and Mr. Bah.  The same is true for

24  these firearms offenses.  Felder is guilty of these crimes,

25  no matter who shot those victims, so long as Felder used or

Cohen-Summation

1    carried a firearm or aided and abetted one of his crew

2    members in doing the same.  But as I've also said, you do, in

3    fact, know that Felder shot both of the victims.  So, you

4    also know that he personally used a firearm during each of

5    those crimes.  You know that he used a firearm because Tommy

6    Smalls told you.  And you know that because on August 12th,

7    you actually saw Felder with a gun in his hand.

8          Remember the video from 735 Bryant Avenue where

9    Felder leads the charge as they chase Mr. Bah's cab down the

10   street?  You saw how Felder ran, and you know that's not

11   normal.  Instead of letting his arms swing at his side, he's

12   got his hands clutched at his stomach.  Ladies and gentlemen,

13   you know why he's doing that.  He's doing that because he's

14   carrying a gun that he doesn't want to fall out.  And when

15   they get to IS-131 over between Underhill and Bolton, Felder

16   has got the gun in his left hand as he takes off the hooded

17   sweatshirt where he was concealing it.  You can see it from

18   both the front and the back as he runs towards the dumpsters.

19          (Video playing)

20          So, ladies and gentlemen, you know that Felder

21   personally carried and used firearms during both of the

22   carjackings.  That makes him guilty of those firearms

23   offenses.  The third and final element is satisfied.

24          That brings us to a final thing you need to

25   consider on the firearms counts.  I expect Judge Briccetti to

Sue Ghorayeb,  Official Court Reporter

Cohen—Summation

1    tell you that after concluding that the Defendant used or
2    aided and abetted the use of firearms during the carjackings
3    and robberies, you also need to answer an additional question
4    about how those firearms were used.

5              For the August 5th robberies, you need to decide
6    whether Felder aided and abetted the brandishing of a
7    firearm.  Here is what I expect Judge Briccetti to tell you
8    about brandishing.  You know that Felder is guilty of exactly
9    that for all of the reasons we've talked about.  The only
10   thing I'll add is this:  Why would you bring guns to a
11   robbery if you didn't plan to use them?  What is the point of
12   carrying a gun into a mini mart or a Dunkin' Donuts if you're
13   just going to keep it in your hoodie pocket?  You bring guns
14   to a robbery, ladies and gentlemen, 'cause you're going to
15   use them.  Period.

16             Let's turn from the robberies to the carjackings.
17   For both carjackings, you need to decide whether a firearm
18   was discharged.  Here is what I expect Judge Briccetti will
19   tell you about discharge.  Ladies and gentlemen, there is no
20   question that guns were discharged during each carjacking.
21   You've seen the shell casings, and you heard from Dr. Prial
22   that both Mr. Kane and Mr. Bah were killed as a result of
23   gunshots to the head.

24             Finally, I wanna talk to you about the robbery
25   conspiracy count.  As Judge Briccetti will tell you, a

1    conspiracy is really just the legal term for an agreement to

2    commit a crime.  Ladies and gentlemen, you know exactly what

3    that agreement was in August of 2014, to carjack cars and

4    then use those cars to go rob businesses.  And you know that

5    Felder was part of that agreement.  You know that was the

6    agreement because you saw that agreement turn into a

7    carjacking and two armed robberies on August 5th, and you saw

8    the beginnings of that agreement put in motion on

9    August 12th.

10            Remember, the only reason that the August 12th

11   carjacking didn't lead to any robberies is because the

12   carjacking went bad.  Mr. Bah was killed inside the cab,

13   leaving the driver's seat covered in blood.  The car itself

14   was all banged up.  And when Felder, Martin, Ewing and Smalls

15   heard police sirens, they decided just to ditch the car.  But

16   as piece after piece of evidence shows, the agreement was to

17   do on August 12th exactly what Felder, Martin, Ewing and

18   Smalls had done on August 5th.  As Tommy Smalls told you, to

19   do it the same way we did it last time.  Ladies and

20   gentlemen, just reaching that agreement is a crime.

21            Let's talk about three other reasons you know that

22   Felder agreed to carjack cars to use in robberies: planning,

23   Felder's friendship with the other members in the crew, and

24   Felder's role as the leader.  Let's start with evidence of

25   planning.  You know that on August 5th, Felder, Smalls and

Cohen-Summation

1    Martin were at River Park Towers talking, planning.  Cell

2    site shows you that.  You know that when they leave River

3    Park Towers and Felder doesn't go to Ewing's apartment, he

4    does that because the plan requires guns.  So, Felder has to

5    go back to Bailey to get those guns.  But Felder stays in

6    close touch, talking to his crew 11 more times before they

7    come pick him up at Bailey.  All of that phone contact is for

8    one purpose, ladies and gentlemen, and you know what that

9    purpose is, so that Felder is ready to go when Ewing, Martin

10   and Smalls, now in Mr. Kane's cab, come to Bailey Avenue to

11   pick Felder up.  What does ready to go mean?  It means Felder

12   has his orange hoodie and his white hat.  It means he has his

13   black mask.  It means he has the guns.

14          Now, there's a lot of evidence that all of this

15   planning wasn't just to take an innocent ride in a cab.  Take

16   as an example the video of Ewing, Martin and Smalls first

17   leaving Ewing's apartment to hail a cab.  Let's start at the

18   top.  First, who needs purple latex gloves unless you're

19   planning to go commit crimes when you don't want your

20   fingerprints to be found?  Second, they don't walk down the

21   street and stand together the way you would, for example, if

22   you were just out with friends.  No.  They split up, knowing

23   that a cab driver is more likely to stop for one or two

24   people than he is to stop for three.

25          How else do you know that Felder wasn't making

Cohen—Summation

1   innocent plans?  You saw him right there with the rest of the
2   crew throwing evidence down the trash chute across from
3   Ewing's apartment.  If Felder had nothing to do with the
4   August 5th carjacking and robberies, why did he suddenly show
5   up at Ewing's apartment with something that he just had to
6   get in the trash chute?  Your common sense tells you that
7   makes no sense.  Felder was there in the trash room because
8   he was there with Martin, Ewing and Smalls at the carjacking.
9   He was there at both of the robberies.  He was there when
10  they ditched Mr. Kane's cab under the Deegan.  And he came
11  back to Ewing's apartment to finish getting rid of evidence
12  and to split up the loot.
13          Now, of course you know the conspiracy doesn't end
14  on August 5th.  Phone records, cell site and video from
15  exactly one week later show you that the agreement to carjack
16  and rob was still in action, and Felder is right in the
17  middle of that too.
18          August 12th starts at River Park Towers, just like
19  August 5th.  Martin, Ewing and Smalls are talking, planning.
20  Remember these text messages?  Felder tells Ewing he's coming
21  down.  What does Ewing do?  He tells Martin that Felder is on
22  his way, so they can all get going.  And they do.  You
23  watched Ewing, Martin, Smalls and Felder walk into Ewing's
24  building.  And you know they don't just happen to come back
25  to Ewing's apartment.  They came back to change into clothes

Cohen—Summation

1    for the planned jewelry store robbery.  You know that for a

2    couple of reasons.  You saw Smalls go out to get a sweatshirt

3    to wear, instead of the jersey he had on.  And then you saw

4    for yourself Martin, Ewing, Smalls and Felder come out of

5    Ewing's building.  Like on the 5th, they're split into two

6    different groups.  And like on the 5th, they've changed into

7    their carjacking clothes, just like Smalls told you when he

8    testified.

9            You know that the reason they came out in two

10   groups was because Ewing and Martin were supposed to look for

11   a cab while Smalls and Felder waited in the apartment with

12   the guns.  That matches up with the phone records, which show

13   that Ewing, using Smalls' phone, calls Ewing's apartment

14   repeatedly to keep Felder and Smalls updated before Felder

15   and Smalls meet the rest of the crew out on Third Avenue.

16           You also know getting in Mr. Bah's cab and going to

17   Hunts Point, that was part of the plan.  Remember Mr. Barrie

18   told you the four men who flagged him down?  Where did they

19   wanna go?  Hunts Point.  And while the rest of the day didn't

20   go according to plan, you know that Felder worked with the

21   others to clean that situation up.  You watched the four of

22   them throw their hoodies, gloves and backpack into the

23   dumpster together.  You watched them split up, just like they

24   did at the start of the day, to get cabs back to Ewing's

25   apartment building.  And then you saw Felder go back to the

Cohen-Summation

1   dumpsters to make sure that the evidence of their crimes was
2   destroyed.
3            Ladies and gentlemen, you know there was an
4   agreement to carjack cars in order to commit robberies
5   because you saw that agreement in action.  And you know
6   Felder was a member of that agreement because you saw him
7   participate in each and every step along the way.  Not once,
8   twice.  You also know that August 5th and August 12th are
9   linked through ballistics.  Remember Detective Fox?  He told
10  you that the gun that was used to kill Mr. Kane and the gun
11  that was used to kill Mr. Bah were both used in an earlier
12  shooting in the Bronx.  That's not a coincidence.  That's
13  evidence that the guns that killed Mr. Kane and Mr. Bah, and
14  so those two crimes are connected.
15           Let's talk for a minute now about how do you know
16  that the substance of the agreement to carjack cars to use in
17  the robberies wasn't a surprise to Felder.  Of course, as
18  I've said, you know that because he shows up on August 12th
19  with a smile on his face, ready to do exactly what he had
20  done on August 5th.  There are other reasons too.
21           Let's talk about Felder's friendship.  First, you
22  know who Felder committed those crimes with, his close
23  friends.  Ewing, Martin and Smalls aren't strangers to
24  Felder.  They're not planning an armed carjacking and armed
25  robberies and keeping that important fact from him.  That's

Cohen—Summation

1  not just true because the four of them are friends, it's true
2  because Felder is the leader in the group.  How do you know
3  that?

4       Remember Miss Washington?  She knew Felder and each
5  of the other three members of this conspiracy, Martin, Ewing
6  and Smalls.  She told you that she saw them all the time at
7  River Park Towers, and she told you that at River Park
8  Towers, Felder was given a certain level of respect, respect
9  none of the others got.  Remember what she -- when she was
10 asked how Martin, or Reem, was treated by comparison?  "What
11 about Reem?"  That was her answer.  Same thing for Smalls.
12 Felder carried the weight.  Felder got the respect.

13      Ladies and gentlemen, even Mr. Figueroa told you
14 Felder was in charge.

15      The video from the mini mart, where Felder comes to
16 the door and tells others to hustle, that tells you he is a
17 leader too.  When he tells them to get back to the car, what
18 do they do?  They immediately stop what they're doing and
19 follow Felder back to Mr. Kane's cab.  And on August 12th,
20 Felder leads the charge down Bryant Avenue.  Felder drives
21 Mr. Bah's cab to Underhill, and he leads the charge away from
22 the bloody, damaged car.  Felder is the first down the
23 stretch between Underhill and Bolton.  And he's the first at
24 the dumpsters, directing everyone else to throw out their
25 clothes.  And what does everybody do?  They listen.  Just

Cohen-Summation

1    like they listened on August 5th, when Felder told them to

2    hurry up at the mini mart.  They take off their hoodies.

3    They take off their latex gloves.  Ewing takes off the black

4    backpack.  Everything goes in the dumpster, and they head to

5    Stevenson Commons.

6            Ladies and gentlemen, you know there was an

7    agreement to break the law, an agreement to carjack cars that

8    could be used to go rob businesses.  You know that was the

9    agreement because you saw two cab drivers out in the Bronx in

10   the early morning hours, just trying to earn a living, who

11   lost their lives because of this plan.  You know that was the

12   plan because you watched two armed robberies and you heard

13   from three separate victims terrorized by those robberies.

14   And you know Felder was a part of that plan, from start to

15   finish.  You know that Felder is guilty of the robbery

16   conspiracy in Count Nine.

17           Before I sit down, let's take a step back and just

18   talk in simple terms about what you know.  Over the course of

19   a single week in August 2014, two livery cab drivers were

20   brutally killed, each with a single bullet to the back of his

21   head.  They were killed for no other reason than to steal

22   their cars.  Between these two violent carjackings were two

23   armed robberies in Yonkers, robberies that left victims

24   wondering if they would spend the last moments of their lives

25   looking down the barrel of a gun.

Sue Ghorayeb,  Official Court Reporter

Cohen—Summation

1          Ladies and gentlemen, you know that the same crew

2    of four men committed each of those fatal carjackings and

3    each of those terrifying armed robberies.  And for all the

4    reasons we've talked about this morning, you know that Tyrone

5    Felder was the leader of that crew.  You know that Felder is

6    responsible for the death of Maodo Kane.  You know that

7    Felder is responsible for the death of Aboubacar Bah.  You

8    know that Felder is responsible for the two gunpoint

9    robberies in between.  Ladies and gentlemen, hold Felder

10   responsible.  Find him guilty as charged.

11          THE COURT:  Okay.  Thank you, Ms. Cohen.

12          Ladies and gentlemen, I think we'll take a break

13   now.  And then, I'm told that Mr. Ruhnke is going to --

14          MR. RUHNKE:  Yes, sir.

15          THE COURT:  -- sum up for the Defense.

16          So, let's take a few minutes for Mr. Ruhnke to get

17   himself situated for that.  Give you a chance to stretch.  We

18   will take 15 minutes.  Keep an open mind.  Don't discuss the

19   case.  The case has not been submitted to you yet, so it's

20   too soon to start talking about the case.

21          All right.  We'll see you in 15.

22          (Jury not present in the courtroom)

23          MR. RUHNKE:  Your Honor.

24          THE COURT:  Yes, sir.

25          Sit down, everybody.

Sue Ghorayeb,  Official Court Reporter

Cohen-Summation

 1          MR. RUHNKE:  Your Honor, I'm sorry to have stopped
 2   you leaving the bench, but I'm somewhat frustrated by the fact
 3   that the Court's technical staff cannot get my laptop hooked
 4   into this display system beyond the projector.  This is the
 5   first experience I've ever had where the defense doesn't have
 6   access to display something, and I'm wondering if someone can
 7   make one last try to get me --
 8          THE COURT:  How much time have you had to deal with
 9   this?  Couple of weeks?  That's enough.
10          MR. RUHNKE:  I was dealing with it yesterday and the
11   day before yesterday.
12          THE COURT:  Look, I don't know anything about it.
13   You can do whatever you want to get ready for your summation.
14   We are going to go ahead with the summation in 15 minutes.
15          MR. RUHNKE:  Okay.
16          THE COURT:  What do you want me to do?  You want me
17   to do it?
18          MR. RUHNKE:  I just -- no, no, no.  I just want the
19   technical staff to come up.  If I'm limited to using the
20   projector, I may want to move the podium a little bit so I'm
21   not blocking --
22          THE COURT:  You can move the podium anywhere you
23   want.  What do you want me to do, Mr. Ruhnke, exactly?  Tell
24   me exactly what you want me to do, okay?
25          MR. RUHNKE:  I'd like somebody to --

Cohen-Summation

1              THE COURT:  Then I will decide whether I'll do it.

2              MR. RUHNKE:  Yeah.  I would like somebody in the

3    15 minutes to come up and try again to hook me into this

4    system.  Thank you.

5              THE COURT:  Good luck.

6              (Recess)

7              (Jury not present in the courtroom)

8              THE COURT:  Have a seat, everybody.

9              Ready to proceed, Mr. Ruhnke?

10             MR. RUHNKE:  Yes.  And with the assistance --

11             THE COURT:  Are you ready for -- to proceed?  That's

12   a yes or no.

13             MR. RUHNKE:  Yes.

14             THE COURT:  Okay.  Great.  Let's get the jury.

15             MR. RUHNKE:  And, Your Honor, I just want to thank

16   the Government for helping this happen when they did.  I

17   wanted that to be on the record, but it doesn't matter.

18             THE COURT:  Okay.  That, that can be on the record

19   as well.

20             (Jury present in the courtroom)

21             THE COURT:  Okay.  Welcome back, everybody.

22             Please have a seat.

23             You may proceed.

24             MR. RUHNKE:  Thank you.  May it please the Court,

25   and good morning, ladies and gentlemen of the jury.

Sue Ghorayeb,  Official Court Reporter

1           This is the first chance I've had to speak with you

2   all directly.  You see me in court, but I'll remind you that

3   I'm David Ruhnke, and I am one of the three attorneys who

4   represent Tyrone Felder.  And I am here this morning to tell

5   you in a relatively brief period of time, I hope, that the

6   evidence in this case has not established that Tyrone Felder

7   is guilty of any of the crimes beyond a reasonable doubt with

8   which he is -- of which he is accused.

9           So, we've used that phrase "beyond a reasonable

10  doubt," and you've heard it time and again.  So, the question

11  naturally is going to arise:  Well, what do we mean by

12  "beyond a reasonable doubt"?  How sure do you have to be is

13  another way of -- of asking that question.

14          Well, the answer to that will not come from me, but

15  it will come from Judge Briccetti who will define for you

16  what it means to have a reasonable doubt about the truth of

17  anything.  Suffice it to say, you have to be very sure.  You

18  have to be so sure that if this was something that was

19  important to you, in your own life, you would not hesitate to

20  go ahead and say, "Yeah, I'm satisfied."

21          And this morning or this afternoon or tomorrow or

22  whenever you conclude your deliberations, you are going to be

23  asked to make an important decision in the life of another

24  person, in the life of another fellow human being.  And I ask

25  you to bring to that process the same level of certainty that

1    you would bring in your own lives if you had to make an

2    important decision that had a drastic impact on you for being

3    wrong.  So thank you for doing that.

4            And thank you for being here.  We can't do this

5    without you.  I know jury service can't be easy.  I've been

6    called for jury service and I understand that.  And in some

7    sense, it is -- if it was easy, maybe more countries around

8    the world would do it.  But the United States has chosen this

9    system even though it may be hard at times.

10           So let's talk about things that fall short of proof

11   beyond a reasonable doubt.  And you will hear from the judge

12   about this issue of mere presence.  You have seen all kinds

13   of evidence that various witnesses say that that

14   African-American man in the blurry photograph happens to be

15   Tyrone Felder because he's wearing clothes that distinguish

16   him, a hoody and -- and black-and-white sneakers, and that

17   there were text messages and cell phone calls among these

18   men.  But you also know that they've known each other from

19   Riverside Park Towers virtually their entire lives.  They

20   talk to one another.  They hang out with one another.  They

21   exchange Instagram photographs of them all together, as

22   friends are want to do.

23           So the fact that somebody is merely present or

24   merely associates with other people are not crimes.  The

25   Judge will explain this to you further, but I suspect and

1    think that he will tell you that the fact that somebody

2    associates with other people, even if those other people

3    happen to be engaged in criminal activity, does not make that

4    person guilty of a crime unless he is part of it and joins in

5    with it and shares the intent.  The fact that somebody

6    happens to be there, present, when a crime is being

7    committed, even knowing that a crime is underway is not proof

8    beyond a reasonable doubt of criminal liability unless that

9    person has the same level of intent as the other people he

10   happens to be associated with.

11          So, here are what I suggest, respectfully, are key

12   questions you ought to ask yourselves, each other.  You don't

13   have to follow what I'm saying here, but I suggest these are

14   reasonable and logical questions you might ask as you sit

15   down in the jury room and review the evidences:  What did he

16   actually do that was criminal, if anything?

17          What did you see on the videos?  What did you

18   hear -- see on the phone records that was criminal?  And with

19   what intent did he act, if he acted at all in a criminal way?

20          And as you explore that question, it logically

21   becomes, "How do we know that?  You know, what's our source

22   of the information?  Where does that come from?"

23          And the fact that people are calling each other on

24   the cell phones and walking around town together doesn't make

25   Tyrone Felder guilty of a crime.  And when you check out the

Ruhnke-Summation

1   source of the information, you are well to ask yourself:

2   What do we know about the source of the information?

3            One thing for sure we know is the source is not

4   scientific evidence.  One thing we know for sure, it is not

5   in DNA or fingerprints.

6            You heard from these Crime Scene Unit officers,

7   veteran members of the New York Police Department who do

8   important careful work.  They gather, they catalog, they keep

9   safe evidence so that four years later they're able to come

10  into court and say, "Yeah, on that date in August, I picked

11  this thing up, I put it in an envelope, I wrote the date on

12  an envelope, number on it, and, yeah, it's the same thing."

13  They don't overlook evidence.  That's their job.

14           So don't take it from me, but here's what the

15  testimony was from the Government's DNA expert.  Basically,

16  this, that we sweat on hot days and we contribute DNA.

17  Basically, that the expert had samples of Tyrone Felder's

18  DNA, a reference sample of DNA, and the evidence was compared

19  to everything that had been gathered, all the swabs, and

20  there were no matches to Tyrone Felder's DNA.  That's what

21  she told you.  So, it's not the DNA that's going to help you

22  reach a conclusion in this case with regards to Tyrone

23  Felder's guilt or non-guilt of these crimes.  Being not

24  guilty simply means the charges haven't been proved and --

25  and they haven't been proved beyond a reasonable doubt.

1          The law sets up, as Judge Briccetti will tell you

2     later today, a presumption that we are all entitled to claim

3     that we're not guilty, and that never changes unless a jury

4     of 12 people is convinced beyond a reasonable doubt, that

5     that presumption no longer applies and the case has been

6     proven beyond a reasonable doubt.

7          So, what do we know and how do we know?  And this

8     brings us to the Government's witness, Tommy Smalls.  This is

9     from one of the video surveillances of the robberies, and

10    that is Mr. Smalls in the hoody with the mask on, with the

11    handgun in his right hand, in action.  The Government tells

12    you this is a person you should rely on and his testimony you

13    should accept.  And I -- I ask respectfully, in your own

14    lives, if Tommy Smalls told you something and it was

15    important for you to know whether it was true or not, would

16    you take his word?  And if the answer to that is no, then you

17    should not take his word here.

18         Here's, again, Mr. Smalls jumping over the counter

19    on his way to terrorizing the owners, innocent owners of a

20    store.

21         And a witness like Smalls is in a special place as

22    far as the law is concerned.  And, again, this is what I

23    expect Judge Briccetti to tell you, but he is the source of

24    the law and not I.  But I expect him to tell you that

25    witnesses in his position who have made a deal with the

1    Government has a motive to lie, has a motive to fabricate

2    evidence, and that the testimony of these kind of witnesses

3    should be considered by you with special care and caution.

4    In other words, be careful before you buy the testimony.

5            And there's more here.  You know from the evidence

6    that Tommy Smalls is not only a liar, but a convicted liar.

7    A liar who committed a felony-level lie.  And it was a

8    monstrous lie, if you stop to -- to analyze it.  He met,

9    you'll recall, with representatives of the Government.

10   Nobody was here at this counsel table now, but in early

11   January -- I'm sorry, early 2017, January 25, he met with a

12   group of agents, federal prosecutors, in a small conference

13   room.  We described the scene.  And what did he do?  He

14   promised to tell the truth.

15           What did he do when he took his oath here?  He

16   promised to tell the truth.  And here's what he told the

17   Government:  That Felder wasn't even there on August 5, 2014,

18   because this was a break -- and later on he explains, this

19   was a break he was giving Felder and he would just tell them

20   that he committed one murder instead of two as some kind

21   of -- of break.  If that makes any sense to you, ladies and

22   gentlemen, I leave that to you.

23           He also told them this:  He said the cab driver was

24   killed directly by Kareem Martin.  Now, he tells you that's a

25   lie.  And what happens when a liar tells you something is the

1   truth?  It's up to you to decide what you wanna do with that.

2          I would suggest with regard to Tommy Smalls that

3   you could go back to the jury room and say, look, when it

4   comes to Smalls, he gave up his right to be believed as a

5   witness when he deliberately lied to representatives of the

6   Government who now call him as a witness despite being lied

7   to, when he implicated someone he now says is innocent.  And

8   you don't know that.  I mean, you know that's what he says.

9   He says, "When I said Martin killed the driver, that was a

10  lie."  So his version of truth is "I'm the kind of person who

11  could implicate an innocent person in -- in murder."

12         And it went beyond that, didn't it?  Remember his

13  testimony that he got together with his other co-defendant,

14  Takiem Ewing, together in the jail, and they decided that

15  they would tell that same story if Ewing decided to speak

16  with the Government.  In other words, they would get together

17  and conspire to tell a lie implicating an innocent person.

18         He also told you the reason he named Martin was

19  that Martin had come to him in the jail and told him, "You

20  know, Tommy, you have to plead guilty to one of these

21  murders," and that upset him and that was a reason that he

22  lied.

23         So he first told that lie, if it is a lie, on

24  January 25.  And that's part of the problem is you don't know

25  when a liar is lying.  And then on July 13, 2007, now says,

Ruhnke—Summation

1    "I lied."

2              You know, one thing that's consistent, however,

3    about his two versions of what happens is he keeps himself

4    out of either of direct hands-on responsibility for the

5    murders.

6              And so what about that previous promise?  This is

7    from the trial transcript.  The question is referring to that

8    first proffer session, meeting with the Government and the

9    agents in January of 2017.

10             "You were encouraged by everyone there.  If there

11   was one thing you were supposed to do was absolutely tell the

12   truth, correct?"

13             He says, "Correct.

14             And you agreed that you would do that, correct?

15             "Correct.

16             " And you broke that promise, didn't you?"

17             And the answer to that is a yes.

18             And I, again, reiterate that when he took the

19   witness stand -- when any witness takes the witness stand,

20   they promise you, they promise everybody in the courtroom

21   that what they are about to say is the truth.

22             So what do you do with Tommy Smalls, who's a liar,

23   who says he's telling the truth on September 4, 2018, when he

24   says, "I'm not lying," and you kinda put in parentheses

25   afterwards, at least not this time?  And what do you do with

1    that when you evaluate credibility?  Because you don't know

2    and you can't tell.

3            And then he's a liar, a convicted liar who comes

4    with a deal with the Government.  He faces -- and he told you

5    this -- a mandatory minimum 132 years in prison unless

6    something else happens.  And here's what he had to say about

7    that, what this deal means to him.

8            "First, if you were sentenced to this 132 years,

9    you would die in prison, right?"

10           So he knows without some action on the part of the

11   Government, he will die in prison.  He doesn't like prison.

12   Nobody likes prison, but he does -- he faces death in prison.

13           And the next question was:  "And you also

14   understand, by mandatory minimum, the law means that the

15   judge can't change that on his own or her own, it takes

16   something else before that mandatory minimum can go away,

17   correct?"

18           And he answers, "Correct."

19           Question:  "All right.  And the only thing -- is

20   this your understanding, the only thing that can make it go

21   away is if the Government presents a letter to the judge

22   asking that you be treated leniently, correct?"

23           And he says, "Correct."

24           And the question is:  "That's your understanding,

25   correct?"  And I -- I asked him to speak up, and he says,

1    "Yes."

2           And just skipping a couple lines because he didn't

3    often speak as clearly as I think we would want witnesses

4    to -- to speak, final question was:  "And if the Government

5    is unhappy with your cooperation and doesn't write that

6    letter, it's also your understanding that the judge has no

7    choice but to sentence you to 132 years in prison, up to

8    life, correct?"

9           And he says that's his understanding, "Correct."

10   And he knows that that sentence means he will -- he will die

11   in prison.

12          It is not a crime to associate with other people.

13   It is not a crime to be present when other people commit a

14   crime, if you do not join in and want it to succeed and take

15   actions to succeed.  If the Government establishes nothing

16   more than presence, nothing more than association, that's the

17   end of the case, because neither of those things are a crime.

18          The crimes in this case are horrible.  And no one

19   in -- in their right mind would stand in front of you and say

20   anything different.  They are not going to be made better by

21   convicting someone where there's reasonable doubt about their

22   guilt.  You promised us you could do that.  Right from the

23   start you promised us that if the evidence fell short,

24   nothing in your background, nothing in your world view,

25   nothing in your own personal opinions about people would stop

1    you from returning that verdict.  And that's what I'm going

2    to ask you to do, find Tyrone Felder not guilty of all

3    charges.  Thank you.

4              THE COURT:  Great.  Thank you, Mr. Ruhnke.

5              Is the Government going to make a rebuttal

6    summation?

7              MR. SCOTTEN:  We will, Your Honor.  Thank you.

8              THE COURT:  Okay.  You ready to go?

9              MR. SCOTTEN:  Sure, Your Honor.

10             THE COURT:  Okay.

11             MR. SCOTTEN:  Good morning.  What you heard so far

12   this morning is an excellent illustration of the difference

13   between evidence and argument.  What Ms. Cohen gave you was

14   evidence.  When she wanted to prove something, she would tell

15   you what it was and she would point to the exhibits or the

16   testimony or both that proved it.

17             What Mr. Ruhnke gave you was argument, no reference

18   to the evidence, and as you can see, because you sat through

19   this trial, what he said just doesn't match up with the

20   evidence.  You cannot come to a podium and say, "Well, the

21   video is blurry," and make it so.  I think that was the

22   entirety of his discussion of the two and a half days of

23   video showing his client in the middle of crimes.  That

24   doesn't make it go away.  I mean, I could stare here and say,

25   "I don't see Judge Briccetti on the bench."  I just said it.

Scotten-Rebuttal

1    Does that make it go away?  Of course not.  And when you look
2    at the evidence, it is so clear that this man participated in
3    a murder of two innocent men, and participated in two
4    robberies.

5           So let me briefly go through some of the things
6    Mr. Ruhnke said.  He said -- I think this was his main --
7    maybe his only reference to the evidence, DNA.  It's kind of
8    a weird thing to say because his two main arguments were
9    there was no DNA and mere presence doesn't prove somebody
10   guilty.  What does DNA tell you?  Mere presence.  That's all
11   DNA would -- tells you is if somebody was there.  And at no
12   point did he give you any reason to believe his client was
13   not there.  His client was on video.  You saw him the whole
14   time.  How would DNA add to what you already know when he
15   can't even give you an argument against that Mr. Felder was
16   obviously there.

17          Now, you also know why there was no DNA.  Because
18   the defendant wore gloves.  Because they bleached the first
19   car.  They wiped down the second.  They threw out their
20   clothes.  They threw them down the trash chute.  That defense
21   amounts to, Hey, my client is really good at destroying
22   evidence.  That is not a defense.  It's not a defense in any
23   case, but it's definitely not a defense when you are caught
24   on camera.

25          So let me take a second to discuss this idea of

Sue Ghorayeb,  Official Court Reporter

1    mere presence.  You know he's on camera.  Let's talk about

2    what happens on camera.  I'll start with August 5th because

3    that's where you only see his face after he's done committing

4    all the crimes.

5            Mr. Ruhnke wants you to believe that it's a

6    coincidence, that it's mere presence, that he just happens to

7    be there at 6:00 a.m. with the three guys who came back from

8    committing those heinous crimes.  Think about what you would

9    have to believe for that to be a coincidence.

10           So first, Felder is talking to the other guys, as

11   the phone records show, just hours before the crime.  Just a

12   coincidence.

13           Second, when those three guys go off and prepare to

14   commit these horrible crimes, they're talking to Felder,

15   literally while they're getting their stuff together, and

16   only to Felder.  Just a coincidence.

17           Third, when they go to commit these crimes, where

18   do they go?  They drive straight to Felder's neighborhood.

19   Just a coincidence.  They call him there two more times.

20   Those are the last phone calls while Maodo Kane is still

21   alive.  Just a coincidence.

22           Then, a fourth man happens to show up during the

23   robberies with Mr. Kane's car.  Just a coincidence.  The

24   fourth man also seems to be in charge.  He's telling people

25   when to end the robbery.  He's the one driving.  You've heard

Scotten-Rebuttal

1  that Felder's kind of in charge of this group, but it's just

2  a coincidence that this fourth guy is there.  We follow him

3  all the way through the robberies, you see him walking away

4  down those empty streets by Yankee Stadium, and then boom, by

5  coincidence, that fourth guy, that terrible criminal is gone

6  and all of the sudden Felder gets there in 11 minutes, the

7  exact time it takes to catch a cab ride from near Yankee

8  Stadium to Ewing's apartment.

9          It gets worse.  Here's another coincidence.  Felder

10  just happens to be wearing the same jeans, the same sneakers,

11  to have the same build as that fourth guy.  Terrible

12  coincidence.  The robbers invite Felder upstairs to split the

13  loot.  You saw Ewing with the backpack full of loot, even

14  though he didn't take part in those crimes.

15          Another coincidence.  When the robbers go to throw

16  out all their clothes, Ewing has to throw out to too -- or

17  sorry, Felder has something to throw out too.  And it just

18  happens to look like the gloves you saw that fourth guy

19  wearing the whole time.

20          Ladies and gentlemen, to believe in all of those

21  coincidences, you would have to believe that Felder is the

22  unluckiest man in the world, and you know he's not.  You know

23  the unluckiest man in the world on August 5th was Maodo Kane,

24  because he got into a car with Felder and Felder killed him.

25          Now, let me talk much more briefly about this idea

Sue Ghorayeb,  Official Court Reporter

1  of mere presence on August 12th.  I'm not going to show you

2  the video again.

3        Well, how easy would it be to get up 342-C?

4        That is not mere presence.  Running down the street

5  from a dead man's car with a gun in your hand is not mere

6  presence.  I could give you a ton of reasons, but Ms. Cohen

7  already did, so I won't do it again, that you know he's

8  involved in that plan from start to finish.  Leading the

9  charge to recover the dead man's cab as it runs down the

10  street is not mere presence.  Destroying evidence, throwing

11  it in the dumpster, is not mere presence.  Having a gun in

12  your hand is not mere presence.  Shooting Mr. Bah in the head

13  is not mere presence.  That was nothing but argument, ladies

14  and gentlemen.  It was entirely empty.  And I'm not blaming

15  Mr. Ruhnke for that.  He has an impossible job.  His

16  client --

17        MR. RUHNKE:  Objection to that, Your Honor.

18        THE COURT:  Well, defense has no obligation to do

19  anything, as I've told you.  He's presumed innocent, currently

20  presumed innocent unless and until you decide that the

21  Government has proven each and every element of the crimes

22  charged beyond a reasonable doubt, and that's what you need to

23  keep in mind.

24        MR. SCOTTEN:  Absolutely.  And so look at all the

25  evidence that you have seen.  Do any of those arguments sway

1   you?  Of course not.  They didn't even engage with the

2   evidence.  And when the defense chooses to make arguments, you

3   can look at them the same as any other argument.  Those didn't

4   make any sense.  Mere presence?  That bears no relation to

5   what you saw in this case.

6          Now, I do wanna talk briefly about Tommy Smalls

7   because, as you notice, Mr. Ruhnke spent almost all of his

8   time talking about Tommy Smalls.  There's a reason he did

9   that.  If you believe Tommy Smalls, that alone would be

10  enough to convict his client.  But here's the thing.  You

11  also knew Felder was guilty before you ever heard from

12  Smalls.  You saw the video.  You saw the phone records.  You

13  saw the DNA that confirms, yes, Martin is there standing

14  right next to Felder.  You heard from the other witnesses.

15  You saw the ballistics.  So there is literally no fact in

16  this case that depends in any way on Smalls.

17         Of course, there's another way to look at that,

18  precisely because at every single important point, Smalls is

19  corroborated.  That is, the other evidence backs him up.  It

20  tells you the same thing he told you.  You know that he

21  testified credibly.  Look at it this way.  If you read a book

22  and then after you read the book somebody comes to you and

23  tells you what the book was about, it doesn't matter whether

24  you want to trust them or not.  You know what the book's

25  about.  That's true even if he points out one or two things

Scotten-Rebuttal

1     you didn't see in the book.  You can go back and look at the

2     book and it's right there.  Just like in this case, you can

3     go back and look at the video, the ballistics, the call

4     records and see that it's right there.

5             Now, I suppose there is one thing that I agree with

6     in Mr. Ruhnke's statement.  He said it was a monstrous lie

7     when Tommy Smalls first spoke to the Government.  So what do

8     we agree is monstrous lie -- or what was that lie?  Saying

9     that Tyrone Felder didn't kill Mr. Kane.  We're all agreed,

10    yeah, that's true, he killed him.  And I want to talk a

11    little bit about that, even though, as you know, it's not a

12    question you're going to have to decide as to who exactly

13    killed these two poor men.  It is just another good example

14    of how the evidence backs up what Smalls testified to.

15            First, let's think about August 5th.  Notice

16    something about August 5th.  Nobody died except when

17    Mr. Felder was there.  You saw those other three men doing

18    terrible things, running amuck in stores with guns terrifying

19    people, but Felder was outside in the car and everybody

20    lived.  It's only when Felder is there that someone is

21    killed.  And you might say, "Well, everyone had a motive to

22    kill Mr. Kane because presumably Mr. Kane had seen their

23    faces.  You don't get into a cab wearing a mask."

24            But think about who had the most motive to kill

25    Mr. Kane.  The other three men were picked up on the street.

Sue Ghorayeb,  Official Court Reporter

1    What kind of lead, if they leave Mr. Kane alive, are Martin,

2    Ewing, and Smalls going to give the police?  I saw three

3    young men.  I picked them up on the street.  But what about

4    Felder?  They picked Felder up at his home.  If Mr. Kane

5    leaves -- lives, he can tell the police exactly where the man

6    who carjacked him lives.  And you saw during the evidence

7    Felder's cell phone, Felder's home phone, and his wife's

8    phone all come back to that address, leaves Kane living, it

9    presents the greatest threat to Mr. Felder.

10           And now, let's think about what happened on the

11   12th.  Tommy Smalls told you that Felder shot Mr. Bah as he

12   was exiting the rear right passenger seat and starting to

13   fall down because Mr. Bah hit the gas.  Think about what the

14   ballistics evidence told you or, really, the medical evidence

15   of how the bullet traveled.  Dr. Prial testified the bullet

16   fired by the person who killed Mr. Bah left no stippling.

17   That's the -- that's what's left on a person when a bullet is

18   fired within 2 feet.  Well, here, you know it was fired

19   within the car because no windows were broken.  The bullet

20   didn't come from outside.  And the shooter had to be far

21   enough away not to leave stippling.  There's almost no way in

22   the car you could do that except as you're falling backwards

23   outside with a open door.

24           But here's what else:  When Felder fires that shot,

25   where's he firing from?  To the victim's right and lower than

Scotten-Rebuttal

1    him because he's falling down.  And remember what Dr. Prial

2    told you about how the bullet traveled?  Entered on a slight

3    right side of Mr. Bah's head, it exited on the left behind

4    his ear, traveling upwards.  Now, Tommy Smalls doesn't know

5    any of that.  He just told you an account.  And then a

6    doctor, a medical expert who never met Tommy Smalls came in

7    here and told you facts that matches that exactly.  I'm not

8    going to spend any more time on that, because, again, you're

9    actually not going to get a chance to say who shot these two

10   men.  And you certainly know Felder participated, but it is

11   yet another example of how the evidence corroborates what

12   Smalls told you.

13             Now, I just want to hit a couple more point before

14   I sit down.  One is reasonable doubt.  Mr. Felder's lawyer

15   said a lot about reasonable doubt.  Judge Briccetti and not

16   Mr. Felder's lawyers will tell you what that means.  When you

17   listen to Judge Briccetti's instructions, I just ask you to

18   remember this.  Reasonable doubt is not some magical or

19   mystical term.  It's the same burden of proof in every

20   criminal case everywhere in the country for the last 200

21   years.  It's applied every single day and every day juries

22   return verdicts.

23             Before I sit down, I just want to remind you of

24   what this case is about.  Yes, it's about two terrifying

25   armed robberies in Yonkers, but most importantly, two

Scotten-Rebuttal

1    innocent cab drivers executed with a single shot to the back

2    of the head exactly one week a part, their bodies dumped in

3    the street, their cabs scrubbed of forensic evidence.  So

4    clear the same crew did both of these, and the defendant

5    caught on video working with all of them again and again.

6    All the witnesses, giving you information that builds towards

7    his role, whether it's because he's a leader, because they

8    saw him, because he's on videotape, and all the other

9    evidence in this case consistent with what you heard,

10   everything showing you that Mr. Felder was part of the crew

11   that committed these horrible crimes.

12           You know who killed those two men.  He is sitting

13   right there.  But you don't even need to decide that.  All

14   you need to know is what the evidence so clearly tells you,

15   that he was part of the crew that cost Aboubacar Bah and

16   Maodo Kane their lives.  You've known that was true since

17   last week.

18           Ladies and gentlemen, this may be an easy case in

19   the sense that there's so much evidence that tells you what

20   happened, that tells you the defendant is so guilty, but it

21   is an incredibly important case.  Return the only verdict

22   consistent with the law, the facts, and your good judgment.

23   The defendant is guilty.

24           Thank you, Your Honor.

25           THE COURT:  Thank you, Mr. Scotten.

Judge-Jury Charge

1          Okay.  Members of the jury, now that you have heard

2     all of the evidence and the arguments of the lawyers, it is

3     my duty to give you final instructions on the law.  And all

4     the instructions I give you — those given at the beginning of

5     the trial, now at the end of the trial — must guide and

6     govern your deliberations.  It is your sworn duty as jurors

7     to follow the law as stated in my instructions, and to apply

8     these rules of law to the facts as you find them from the

9     evidence received during the trial.  The lawyers have

10    referred to some of the applicable rules of law in their

11    closing arguments.  However, if anything the lawyers said

12    about the law differs from what I say about the law, what I

13    say controls.  You are to follow my instructions.  You are

14    not to single out any one instruction alone, but you must

15    consider these instructions as a whole in reaching your

16    decisions.  Also, you are not to be concerned with the wisdom

17    of any rule of law stated by the Court.  Regardless of any

18    opinion you may have as to what the law ought to be, it would

19    be a violation of your sworn duty to base any part of your

20    verdict upon any view or opinion of the law other than that

21    given in these instructions, just as it would be a violation

22    of your sworn duty to base your verdict upon anything but the

23    evidence received in the case.

24          And, again, remember, I'm going to give you copies

25    of these instructions to take with you into the jury room,

1  but very important that you pay close attention, just like
2  you've been doing throughout the trial, to the instructions
3  as I give them to you now.

4          As I told you at the beginning of the trial, an
5  indictment is not evidence.  An indictment is the formal
6  method by which a case is brought into court for trial and
7  determination by a jury.  It creates no presumption that a
8  crime was committed, and no inference of any kind may be
9  drawn from the indictment.  Under our law, a person who has
10  been accused of a crime is presumed to be innocent.
11  Therefore, you may not consider the fact that the Defendant
12  was indicted as evidence of his guilt.

13          The fact that the prosecution was brought in the
14  name of the United States entitles the Government to no
15  greater or lesser consideration than that accorded to any
16  other party.  In your deliberations, you are to perform your
17  duty without bias or prejudice to either the Government or
18  the Defendant.  All parties, the Government and individuals
19  alike, stand as equals before this Court.

20          Now, in a criminal case, the burden is on the
21  Government to prove each and every element of the crime
22  charged.  This burden never shifts to the Defendant.  This
23  means the Defendant has no obligation to prove anything, or
24  to call or cross-examine any witnesses, or to offer any
25  evidence.  As judges of the facts, you are presuming the

1  Defendant to be innocent, so he has nothing to prove.  The

2  Government must convince you that this presumption of

3  innocence is wrong before you can find otherwise.  And the

4  Government can only convince you that this presumption is

5  wrong if it proves beyond a reasonable doubt all of the

6  elements of the crimes charged in the indictment — nothing

7  more and nothing less.  There is no legal requirement that

8  the Government prove its case through any particular means.

9  Your job is to determine whether, on the evidence or lack of

10  evidence, the Defendant's guilt has been proven beyond  a

11  reasonable doubt.  So, the question that naturally arises is

12  what is a "reasonable doubt"?  It is a doubt, based upon

13  reason and common sense, that would cause a reasonable person

14  to hesitate to act in a matter of importance in his or her

15  personal life.  Proof beyond reasonable doubt is proof of

16  such a convincing character that a reasonable person would

17  not hesitate to rely and act upon it in the most important of

18  his or her own affairs.  A doubt is reasonable if it is based

19  on the evidence, or the lack of evidence.  A doubt is not

20  reasonable if it is based on caprice, whim, speculation, or

21  suspicion.  A reasonable doubt is not something you dream up

22  as an excuse to avoid the performance of an unpleasant duty.

23  And it is not the product of sympathy.

24         Now, you will find the facts from one thing only —

25  the evidence presented in this courtroom.  The evidence in

1    this case consists of the sworn testimony of the witnesses;

2    all exhibits received in evidence, regardless of who may have

3    produced them; and all facts that may have been agreed to or

4    stipulated, which you are to regard as proved.  Nothing I say

5    is evidence.  Nothing any of the lawyers say is evidence.

6    Questions by themselves are not evidence.  Objections are not

7    evidence.  You must disregard any testimony to which an

8    objection was sustained by the Court, and any testimony that

9    I ordered stricken.  Please understand that I am neutral in

10   this matter.  I do not decide the factual issues of this

11   case.  That is not my job; it is yours, and I leave it

12   entirely to you.  My function is to get the trial concluded

13   as fairly and efficiently as possible, and to explain the law

14   to you.  The decision in the case is yours, so please do not

15   get any notion that I have a certain view or opinion about

16   the case.  I do not.  In making your findings based on the

17   evidence received, you are permitted to draw reasonable

18   inferences from the facts that you find have been proved from

19   the testimony and the exhibits.  Inferences are simply

20   deductions or conclusions that reason and common sense lead

21   you to draw from the evidence received in the case.

22            You should consider the evidence in a trial in the

23   same way that any reasonable and careful person would treat

24   any important question involving facts, opinions, and

25   evidence.  You are expected to use your common sense --

1  excuse me.  You are expected to use your good sense in

2  considering and evaluating the evidence in the case for only

3  those purposes for which it has been received, and to give

4  such evidence a reasonable and fair construction in light of

5  your common knowledge of the natural tendencies and

6  inclinations of human beings.

7            There are two types of evidence that you may

8  properly consider in deciding the case.  One type of evidence

9  is called direct evidence.  Direct evidence is evidence given

10  by a witness who testifies to what he or she saw, heard, or

11  observed, of his or her own knowledge acquired by virtue of

12  his or her own senses.  The other type of evidence is

13  circumstantial evidence.  Circumstantial evidence is evidence

14  that tends to prove a disputed fact by proof of other facts.

15  And I'll give you a simple example of circumstantial evidence

16  that is often used in this courthouse.  Let's assume that

17  when you came into the courthouse today the sun was shining

18  and it was a nice day.  Assume also that the courtroom blinds

19  were drawn and you could not look outside.  And as you sat

20  here, someone walked in with an umbrella that was wet.

21  Somebody else walks in with a raincoat that was also wet.

22  Now, you could not look outside of the courtroom to see

23  whether or not it was raining, so you would have no direct

24  evidence of that fact.  But, on the combination of facts that

25  I just asked you to assume, it would be reasonable and

1   logical for you to conclude that it was raining.  And that's
2   all there is to circumstantial evidence.  You infer from an
3   established fact the existence or the nonexistence of some
4   other fact on the basis of your reason, experience, and
5   common sense.  Circumstantial evidence is of no less value
6   than direct evidence.  The law makes no distinction between
7   direct and circumstantial evidence, but simply requires that,
8   before returning a verdict of guilty, the jury must be
9   satisfied of the Defendant's guilt beyond a reasonable doubt
10  from all of the evidence in the case.

11          You are the sole judges of the credibility of the
12  witnesses and the weight their testimony deserves.  You may
13  be guided by the appearance and conduct of the witness, or by
14  the manner in which the witness testifies, or by the
15  character of the testimony given, or by evidence you find
16  credible that is contrary to the testimony given.  You should
17  carefully scrutinize all the testimony you have heard, the
18  circumstances under which each witness testified, and every
19  matter in evidence that tends to show whether a witness is
20  worthy of belief.  Consider also each witness's intelligence,
21  motive, state of mind, and demeanor or manner while on the
22  stand.  In addition, you may consider any evidence of bias,
23  hostility, or anger a witness might have against either party
24  in the case.  Consider the witness's ability to observe the
25  matters as to which he or she has testified, and whether he

1   or she impresses you as having an accurate recollection of

2   these matters.  Consider any relation each witness may bear

3   to either side of the case; the manner in which each witness

4   might be affected by the verdict; and the extent to which, if

5   at all, each witness's testimony is supported by or

6   contradicted by other evidence in the case.  Inconsistencies

7   or discrepancies in the testimony of a witness, or between

8   the testimonies of different witnesses, may cause you to

9   discredit someone's testimony, or it may not.  Two or more

10  persons witnessing an event may see or hear it differently;

11  an innocent mis-recollection, like a failure of recollection,

12  is not uncommon.  In weighing the effect of a discrepancy,

13  consider whether it pertains to a matter of importance or to

14  an unimportant detail, and whether you believe it results

15  from innocent error or intentional falsehood.  After making

16  your judgment, you should give the testimony of each witness

17  such weight, if any, you think it deserves.

18          Now, you have heard evidence that, before

19  testifying at this trial, a witness or witnesses made a

20  statement or statements concerning the same subject matter as

21  the witness's testimony in the trial.  You may consider the

22  earlier statement or statements to help you decide how much

23  of that witness's testimony to believe.  If you find that the

24  prior statement was not consistent with the testimony of that

25  witness at this trial, then you should decide whether that

1   affects the believability of his testimony at the trial.  I

2   also instruct you that a prior statement, if you find that in

3   fact it was made, is not evidence that the statement is true.

4   You may consider the prior consistency or inconsistency only

5   as bearing on the weight or credibility that you wish to give

6   the testimony that the witness presented in this trial.

7            Now, you have heard from one witness, Tommy Smalls,

8   who has entered into an agreement to cooperate with the

9   Government.  There is nothing improper about the Government's

10  use of such a witness.  Whether or not you approve of the use

11  of such a witness in an effort to detect or prosecute

12  criminal activity is not to enter into your deliberations.

13  Your sole concern is to decide whether the witness gave

14  truthful testimony in this courtroom.  Although the law

15  allows the use of such testimony, the nature of such

16  testimony is such that it must be scrutinized with great care

17  and viewed with special caution.  As always, it is for you to

18  decide what weight, if any, to give to this witness's

19  testimony, in light of all the facts and circumstances.

20  Also, the fact that a witness claims to have been involved in

21  the charged offense should be considered by you as bearing on

22  his credibility.  However, that does not mean that he is

23  incapable of giving a truthful version of what happened.  You

24  should also bear in mind that a cooperating witness has an

25  interest different from that of an ordinary witness.  A

1  witness who believes that he may be able to obtain a reduced

2  sentence or to avoid criminal prosecution by testifying in a

3  manner favorable to the prosecution may have a motive to

4  testify falsely.  At the same time, you should consider

5  whether the witness would benefit more by lying or by telling

6  the truth.  If you believe a witness was motivated by

7  personal gain, was the motivation one that would cause him to

8  lie, or was it one that would cause him to tell the truth?

9  And did this motivation color his testimony?  Obviously, you

10  should reject the testimony if you find it was false.

11  However, if after a cautious and careful examination of the

12  testimony and the witness's demeanor, you are satisfied that

13  the testimony is true, you should accept it as credible and

14  act on it accordingly.  As with any witness, you may accept

15  parts and reject parts of the witness's testimony, or you

16  may, in your discretion, disregard all of it.  In addition,

17  you heard Mr. Smalls testify that he pleaded guilty in

18  relation to the same charges against Mr. Felder in this case.

19  The fact that he pleaded guilty to the same charges in this

20  case goes only to the guilt of Smalls, and may not be used as

21  proof that Felder is guilty.  You may not infer that the

22  Defendant is guilty of participating in any criminal conduct

23  merely from the fact that he associated with other people who

24  were guilty of wrongdoing.  However, as I have said, you may

25  consider the testimony of Mr. Smalls in determining whether

1    or not the Government has proven the charges against the

2    Defendant beyond a reasonable doubt.  In sum, you should look

3    to all the evidence in deciding what credence and what

4    weight, if any, you will give to the testimony of Mr. Smalls.

5            Now, you have heard the testimony of a witness who

6    has testified under a grant of immunity from this Court.

7    What this means is that the testimony of the witness may not

8    be used against her in any criminal case, except a

9    prosecution for perjury, giving a false statement, or

10   otherwise failing to comply with the immunity order of this

11   court.  You are instructed that the Government is entitled to

12   call, as a witness, a person who has been granted immunity by

13   order of this court.  You have also heard testimony from law

14   enforcement witnesses.  The fact that a witness is employed

15   by a government agency as a law enforcement official does not

16   mean that his or her testimony is necessarily deserving of

17   more or less consideration or greater or lesser weight than

18   that of an ordinary witness.  It is your decision, after

19   reviewing all the evidence, whether to accept the testimony

20   of such witnesses and to give that testimony whatever weight,

21   if any, you find it deserves.

22           Now, you have heard evidence during the trial that

23   certain witnesses have discussed the facts of the case and

24   their testimony with the lawyers before the witnesses

25   appeared in court.  Although you may consider that fact when

Judge-Jury Charge

1    you are evaluating a witness's credibility, I instruct you

2    that there is nothing improper about a witness meeting with

3    lawyers before testifying so that the witness can be aware of

4    the subjects he or she will be questioned about, focus on

5    those subjects, and have the opportunity to review relevant

6    exhibits before being questioned about them here.  In fact,

7    it would be unusual for a lawyer to call a witness without

8    such a meeting.  Again, the weight you give to the fact or

9    the nature of the witness's preparation for his or her

10    testimony and what inferences you draw from such preparation

11    are matters entirely within your discretion.

12          Mr. Felder did not testify in this case.  A

13    defendant has no obligation to testify or present any

14    evidence, because it is the Government's burden to prove the

15    defendant's guilt beyond a reasonable doubt.  A defendant is

16    never required to prove that he is innocent.  You may not

17    attach any significance to the fact that Mr. Felder did not

18    testify.  No adverse or unfavorable inference against him may

19    be drawn by you because he did not take the witness stand.

20    You may not consider this against him in any way.

21          The Government has presented exhibits in the form

22    of charts and summaries, which I will characterize as

23    demonstrative charts.  These demonstrative charts were shown

24    to you in order to make the other evidence more meaningful

25    and to aid you in considering the evidence.  The information

1    on each of these demonstrative charts is based on other

2    exhibits in evidence and on testimony presented during the

3    trial.  The sources of information for these demonstrative

4    charts are noted on each chart.  The underlying exhibits for

5    these charts will be provided to you.  These demonstrative

6    charts are not better than the testimony and documents on

7    which they are based, and are not themselves independent

8    evidence.  Therefore, you are to give no greater

9    consideration to these demonstrative charts than you would

10   give to the evidence on which they are based.  It is for you

11   to decide whether the demonstrative charts correctly present

12   the information contained in the testimony and the exhibits

13   on which they are based.  You are entitled to consider the

14   demonstrative charts if you find that they help you in

15   analyzing and understanding the evidence.

16          Now, in this case you have heard evidence in the

17   form of stipulations of fact.  A stipulation of fact is an

18   agreement between the parties that a certain fact is true.

19   You must regard such agreed-upon facts as true.  You have

20   also heard evidence in the form of stipulations of testimony.

21   A stipulation of testimony is an agreement between the

22   parties that, if called as a witness, a person would have

23   given certain testimony.  You must accept as true the fact

24   that the witness would have given that testimony.  However,

25   it is for you to determine the effect to be given to that

Judge—Jury Charge

1    testimony.

2            Okay.  Now let me turn to the charges in the

3    Indictment.  Before I describe the specific elements of the

4    charged offenses, I should draw your attention to the fact

5    that it does not matter if the indictment charges that a

6    specific act occurred on or about a certain date, and the

7    evidence indicates that, in fact, it was on another date.

8    The law only requires a substantial similarity between the

9    date alleged in the indictment and the date established by

10   testimony or exhibits.

11           Now, the Defendant, Tyrone Felder, a/k/a "Man Man,"

12   is formally charged in an indictment.  As I instructed you at

13   the outset of the case, the indictment is a charge or

14   accusation.  It is not evidence.  The indictment in this case

15   contains nine charges or "counts."  Each count charges a

16   separate offense or crime.  Each count must therefore be

17   considered separately by you, and you must return a separate

18   verdict on each count.  Here is a summary of the nine counts:

19   Count One charges that on or about August 5, 2014, the

20   Defendant committed a carjacking, or aided and abetted the

21   same, of a vehicle driven by Maodo Kane, during the course of

22   which Mr. Kane was shot and killed.  Count Two charges that

23   the Defendant possessed, carried or used a firearm, or aided

24   and abetted the same, in connection with the carjacking of

25   Mr. Kane charged in Count One, which firearm was discharged.

Judge-Jury Charge

1    Count Three charges that on or about August 5, 2014, the
2    Defendant committed a robbery, or aided and abetted the same,
3    of a convenience store in the vicinity of 821 McLean Avenue
4    in Yonkers, New York.  Count Four charges that the Defendant
5    possessed, carried or used a firearm, or aided and abetted
6    the same, in connection with the robbery of a convenience
7    store charged in Count Three, which firearm was brandished.
8    Count Five charges that on or about August 5, 2014, the
9    Defendant committed a robbery, or aided and abetted the same,
10   of a restaurant in the vicinity of 680 Central Park Avenue in
11   Yonkers, New York.  Count Six charges that the Defendant
12   possessed, carried or used a firearm, or aided and abetted
13   the same, in connection with the robbery of a restaurant
14   charged in Count Five, which firearm was brandished.  Count
15   Seven charges that on or about August 12, 2014, the Defendant
16   committed a carjacking, or aided and abetted the same, of a
17   vehicle driven by Aboubacar Bah, during the course of which
18   Mr. Bah was shot and killed.  Count Eight charges that the
19   Defendant possessed, carried or used a firearm, or aided and
20   abetted the same, in connection with the carjacking of
21   Mr. Bah charged in Count Seven, which firearm was discharged.
22   And Count Nine charges that in or about the summer of 2014,
23   the Defendant conspired - in other words, agreed - with
24   others to commit robberies of businesses and individuals in
25   Westchester County and the Bronx.

Sue Ghorayeb,  Official Court Reporter

Judge-Jury Charge

1           And as I just mentioned, the indictment contains
2    nine counts.  Each count constitutes a separate alleged
3    offense.  You must consider each count of the indictment
4    separately, and you must return a separate, unanimous verdict
5    as to each count.  You may only find the Defendant guilty of
6    a particular count if the Government has proven each element
7    of the offense charged with respect to that count beyond a
8    reasonable doubt.  Your verdict as to one count should not
9    influence your decision as to any other count.

10          Okay.  I will start with Counts One and Seven of
11   the indictment, which each charge the Defendant with
12   committing the crime of carjacking.  Count One reads as
13   follows - now I'm reading and quoting now from the
14   indictment:  "On or about August 5, 2014, in the Southern
15   District of New York, Tyrone Felder, a/k/a "Man Man," the
16   Defendant, with the intent to cause death and serious bodily
17   harm, knowingly took a motor vehicle that had been
18   transported, shipped, and received in interstate and foreign
19   commerce from the person and presence of another by force and
20   violence and by intimidation, and did aid and abet the same,
21   and death resulted, to wit in the course of the carjacking by
22   the Defendant, the driver of the car, Maodo Kane, was shot
23   and killed." Count Seven reads as follows:  "On or about
24   August 12, 2014, in the Southern District of New York, Tyrone
25   Felder, a/k/a "Man Man," - a/k/a means also known as - but

1    a/k/a "Man Man," the Defendant, with the intent to cause

2    death and serious bodily harm, knowingly took a motor vehicle

3    that had been transported, shipped, and received in

4    interstate and foreign commerce from the person and presence

5    of another by force and violence and by intimidation, and did

6    aid and abet the same, and death resulted, to wit in the

7    course of the carjacking by the Defendant, the driver of the

8    car, Aboubacar Bah, was shot and killed."  Now, the elements

9    are the same for both Count One and Count Seven.  And here

10   they are.  To find the Defendant guilty, the Government must

11   prove each of the following elements beyond a reasonable

12   doubt:  First, the Defendant took a motor vehicle from the

13   person or presence of another, or aided and abetted the same;

14   Second, the Defendant took the vehicle by using force and

15   violence or by acting in an intimidating manner, or aided and

16   abetted the same; Third, the Defendant acted with intent to

17   cause death or serious bodily harm, or aided and abetted the

18   same; and Fourth, the motor vehicle had previously been

19   transported, shipped, or received in interstate or foreign

20   commerce.  And I will now explain these four elements to you

21   in greater detail.

22            First Element:  The first element the Government

23   must establish beyond a reasonable doubt is that the

24   Defendant took a motor vehicle from the person or presence of

25   another, or aided and abetted the same.  To take a motor

1    vehicle means to acquire possession or control of the vehicle

2    for a period of time.  The Government does not have to prove

3    that the Defendant, or those he is alleged to have aided and

4    abetted, intended to permanently deprive the owner of

5    possession of the vehicle.  Also, the Government does not

6    have to prove that the victim was forced to leave the vehicle

7    as long as it proves that the Defendant, or those he is

8    alleged to have aided and abetted, had control of the

9    situation.

10            Second Element:  The second element the Government

11   must prove beyond a reasonable doubt is that the Defendant

12   took the vehicle from the victim by using force and violence

13   or by acting in an intimidating manner, or aided and abetted

14   the same.  The Government can meet its burden on this element

15   either by proving that the Defendant, or those he is alleged

16   to have aided and abetted, used force and violence or that

17   the Defendant acted in an intimidating manner. The Government

18   does not have to prove that the Defendant, or those he is

19   alleged to have aided and abetted, used force and violence if

20   it proves that the Defendant, or those he is alleged to have

21   aided and abetted, acted in an intimidating manner.  The

22   phrase "intimidating manner" means that the Defendant did or

23   said something that would make an ordinary reasonable person

24   fear bodily harm.  Your focus should be on the Defendant's

25   behavior.  The Government does not have to prove that the

1    behavior of the Defendant or those he is alleged to have

2    aided and abetted caused or could have caused great terror or

3    panic, but it must show that an ordinary person would have

4    feared bodily harm because of the behavior.  The Government

5    also does not have to prove that the Defendant, or those he

6    is alleged to have aided and abetted, made explicit threats

7    of bodily harm.  If you find the Defendant, or those he is

8    alleged to have aided and abetted, confronted the victim in

9    such a way that it would reasonably create a fear of bodily

10   harm, that is sufficient.

11          Third Element:  The third element the Government

12   must prove beyond a reasonable doubt is that the Defendant

13   acted with intent to cause death or serious bodily harm.  To

14   establish this element, the Government must prove that at the

15   moment the Defendant, or those he is alleged to have aided

16   and abetted, demanded or took control of the vehicle, the

17   Defendant possessed the intent to seriously harm or kill the

18   driver if necessary to steal the car or for any other reason.

19   A Defendant may intend to engage in certain conduct only if a

20   certain event occurs.  In this case, the Government contends

21   that the Defendant intended to cause death or serious bodily

22   harm if the victim refused to turn over his car.  If you find

23   beyond a reasonable doubt that the Defendant had such an

24   intent, the Government has satisfied this element of the

25   offense.

Judge-Jury Charge

1          Fourth Element:  The fourth element the Government

2     must prove beyond a reasonable doubt is that the motor

3     vehicle had previously been transported, shipped, or received

4     in interstate or foreign commerce.  And this requires the

5     Government to prove that at some point in the past -- some

6     time in the past the vehicle had been shipped, driven or

7     transported between one state and another.  It is not

8     necessary that the Government prove that the Defendant had

9     any involvement in the interstate shipping, driving or

10    transportation, or that the Defendant knew that the vehicle

11    had previously been shipped, driven or transported in

12    interstate commerce.  In this case, you have heard a

13    stipulation between the parties that if called as a witness,

14    a representative of the Ford Motor Company would testify that

15    the vehicle driven by Mr. Kane on August 5, 2014, was

16    manufactured in Michigan.  You have also heard a stipulation

17    that if called as a witness, a representative of Toyota would

18    testify that the vehicle driven by Mr. Bah on August 12,

19    2014, was manufactured in Kentucky.

20          Now, if, and only if, you find the Defendant guilty

21    of Counts One or Seven as I just explained to you, then you

22    must make a special finding on each of those Counts, Counts

23    One and Seven, for which you found the Defendant guilty.

24    Specifically, you must determine whether or not death

25    resulted from the actions of the Defendant, or the actions of

1    people the Defendant is alleged to have aided and abetted.

2    In order to establish that the conduct of the Defendant, or

3    those he is alleged to have aided and abetted, resulted in

4    the death of the victim, the Government must prove beyond a

5    reasonable doubt that but for the actions of the Defendant,

6    or those he is alleged to have aided and abetted, the victim

7    would not have died.  The Government is not required to prove

8    that the Defendant, or those he is alleged to have aided and

9    abetted, intended to cause the death of the victim.  Your

10   finding that death resulted must be beyond a reasonable

11   doubt.  In addition, it must be unanimous, in that all of you

12   must agree that death resulted.  You will be provided with a

13   verdict form that will include a space for you to indicate

14   your determination with respect to this issue on those two

15   Counts, and I'll discuss that with you at the end of my

16   instructions.

17            Okay.  Moving on to Counts Three and Five, which

18   are the robbery counts.  Count Three reads as follows:  "On

19   or about August 5, 2014, in the Southern District of New

20   York, Tyrone Felder, a/k/a "Man Man," the Defendant,

21   unlawfully and knowingly did commit robbery, as that term is

22   defined in Title 18, United States Code, Section 1951(b)(1),

23   and did thereby obstruct, delay, and affect commerce and the

24   movement of articles and commodities in commerce, as that

25   term is defined in Title 18, United States Code, Section

1     1951(b)(3), and did aid and abet the same, to wit, Felder

2     robbed a convenience store in the vicinity of 821 McLean

3     Avenue in Yonkers, New York, that sold goods which had

4     traveled in interstate commerce."  Count Five reads as

5     follows:  "On or about August 5, 2014, in the Southern

6     District of New York, Tyrone Felder, a/k/a "Man Man," the

7     Defendant, unlawfully and knowingly did commit robbery, as

8     that term is defined in Title 18, United States Code, Section

9     1951(b)(1), and did thereby obstruct, delay, and affect

10    commerce and the movement of articles and commodities in

11    commerce, as that term is defined in Title 18, United States

12    Code, Section 1951(b)(3), and did aid and abet the same, to

13    wit, Felder robbed a restaurant in the vicinity of

14    680 Central Park Avenue in Yonkers, New York, that sold goods

15    which had traveled in interstate commerce."  The elements are

16    the same for both Count Three and Count Five.  To find the

17    Defendant guilty, the Government must prove each of the

18    following elements beyond a reasonable doubt:  First, the

19    Defendant obtained or took the personal property of another,

20    or from the presence of another, or attempted to do so, or

21    aided and abetted the same; Second, the Defendant did so

22    against the intended victim's will by actual or threatened

23    force, violence or fear of injury, whether immediate or in

24    the future, or aided and abetted the same; Third, the

25    Defendant's actions in any way or degree obstructed, delayed,

1    or affected interstate commerce; and Fourth, the Defendant

2    acted knowingly and unlawfully.  And I will now explain these

3    four elements to you in greater detail.

4            First Element:  The first element the Government

5    must prove beyond a reasonable doubt is that the Defendant

6    knowingly obtained the personal property of another or from

7    the presence of another, or aided and abetted the same.  The

8    term "property" includes tangible and intangible things of

9    value.  Money is considered "property."

10           Second Element:  The second element the Government

11   must prove beyond a reasonable doubt is that the Defendant

12   took the personal property of another against the victim's

13   will, by actual or threatened force, violence, or fear of

14   injury, whether immediate or in the future, or aided and

15   abetted the same.  It is not necessary that the force,

16   violence, and fear were all used or threatened.  It is

17   sufficient that any of these methods was employed.  In

18   considering whether the Defendant, or those he was allegedly

19   aiding and abetting, used, or threatened to use, force,

20   violence, or fear, you should give those words their common

21   and ordinary meaning, and understand them as you normally

22   would.  The violence does not have to be directed at the

23   person whose property was taken.  The use of a threat of

24   force or violence might be aimed at a third person.  A threat

25   may be made verbally or by a physical gesture.  Whether a

Judge-Jury Charge

1    statement or physical gesture by the Defendant actually was a
2    threat depends upon the surrounding facts.

3           Third Element:  The third element that the
4    Government must prove beyond a reasonable doubt is that the
5    robbery affected interstate or foreign commerce.  The
6    requirement of showing an effect on commerce involves only a
7    minimal burden of proving a connection to interstate
8    commerce, and is satisfied by conduct that affects commerce
9    in any way or degree.  The requirement may be satisfied by a
10   showing of a very slight effect on interstate commerce.  Even
11   a potential or subtle effect on commerce will suffice.  The
12   requirement may be satisfied by a showing that the target of
13   the robbery or attempted robbery was a business engaged in
14   interstate commerce.  With regard to this element, it is not
15   necessary for the Government to prove that commerce actually
16   was affected by the Defendant's conduct.  It is sufficient if
17   the charged robbery or attempted robbery possibly or
18   potentially would have affected interstate or foreign
19   commerce.  It is not necessary for you to find that the
20   Defendant intended or anticipated that the effect of his acts
21   would be to affect interstate commerce, or that the Defendant
22   had a purpose to affect commerce.  All that is necessary is
23   that the natural effect of the acts he committed would affect
24   interstate or foreign commerce.  Now, in this case, you have
25   heard a stipulation between the parties that the convenience

1   store located in the vicinity of 821 McLean Avenue in

2   Yonkers, New York, alleged to have been the target of the

3   robbery in Count Three, and the restaurant located in the

4   vicinity of 680 Central Park Avenue in Yonkers, New York,

5   alleged to have been the target of the robbery charged in

6   Count Five, were businesses engaged in interstate commerce.

7   Again, you should accept a stipulated fact as true.

8   Accordingly, with respect to Counts Three and Five, this

9   element has been satisfied, and there is nothing else for you

10  to consider with respect to this element for those Counts.

11          Fourth Element:  The fourth element the Government

12  must prove beyond a reasonable doubt is that the Defendant

13  acted unlawfully and knowingly, that is, with a conscious

14  purpose to violate the law.  The terms "unlawfully" and

15  "knowingly" are used because, if you find that the Defendant

16  committed the robbery, or aided and abetted the same, you

17  must also consider whether the prosecution has proven beyond

18  a reasonable doubt that, in doing so, the Defendant knew what

19  he was doing.  In other words, the Defendant -- strike that.

20  In other words, the Government must prove beyond a reasonable

21  doubt that the Defendant committed a robbery deliberately and

22  voluntarily.  "Unlawfully" means obviously contrary to law,

23  but in terms of its application to the Defendant's state of

24  mind, the Government is not required to show that the

25  Defendant knew he was breaking any particular law.  The

1    Government must prove, however, that the Defendant was aware

2    of the generally unlawful nature of his acts.  And

3    "knowingly" means to act consciously and voluntarily rather

4    than by mistake, or accident or mere inadvertence.

5            Now, let me talk to you about aiding and abetting,

6    which you've heard me mention several times.  With respect to

7    Counts One, Three, Five, and Seven, the indictment also

8    charges the Defendant with what is called "aiding and

9    abetting."  Aiding and abetting liability is its own theory

10   of criminal liability.  In effect, it is a theory of

11   liability that permits a Defendant to be convicted of a

12   specified crime if the Defendant, while not himself

13   committing the crime, assisted another person or persons in

14   committing the crime.  Under the aiding and abetting statute,

15   it is not necessary for the Government to show that the

16   Defendant himself physically committed the crime with which

17   he is charged in order for you to find the Defendant guilty.

18   You may find the Defendant guilty of the substantive crime if

19   you find beyond a reasonable doubt that the Government has

20   proved that another person physically committed the crime,

21   and that the Defendant aided and abetted that person in the

22   commission of the crime.  As you can see, the first

23   requirement is that another person has committed the crime

24   charged.  Obviously, no one can be convicted of aiding and

25   abetting the criminal acts of another if no other crime was

1    committed by the other person —— or no crime was committed by

2    the other person in the first place.  But if you do find that

3    a crime was committed, then you must consider whether the

4    Defendant aided or abetted the commission of the crime.  To

5    aid or abet another to commit a crime, it is necessary that

6    the Defendant willfully and knowingly associate himself in

7    some way with the crime, and that he willfully and knowingly

8    participate in the crime by doing some act to help make the

9    crime succeed.  To establish that the Defendant participated

10   in the commission of the crime, the Government must prove

11   that the Defendant engaged in some affirmative conduct or

12   overt act for the specific purpose of bringing about that

13   crime.  So, the mere presence of a Defendant where a crime is

14   being committed, even coupled with knowledge by the Defendant

15   that a crime is being committed, or merely associating with

16   others who were committing a crime is not sufficient to

17   establish aiding and abetting.  One who has no knowledge that

18   a crime is being committed or is about to be committed but

19   inadvertently does something that aids the commission of the

20   crime is not an aider and abettor.  An aider and abettor must

21   know that the crime is being committed and act in a way which

22   is intended to bring about the success of the criminal

23   venture.  To determine whether a Defendant aided or abetted

24   the commission of the crime with which he is charged, ask

25   yourself these questions:

Judge-Jury Charge

1           Did he participate in the crime charged as

2    something he wished to bring about?

3           Did he associate himself with the criminal venture

4    knowingly and willfully?

5           Did he seek by his actions to make the criminal

6    venture succeed?

7           If he did, then the Defendant is an aider and

8    abettor, and therefore guilty of the offense.  If he did not,

9    then the Defendant is not an aider and abettor, and is not

10   guilty of aiding and abetting that offense.

11          Here's what I want to do right now.  I want to take

12   a one-minute break, just for everybody to stretch.  Stand up

13   and stretch.  I know that this is long, and you've paid

14   attention, and that's terrific, but let's just stretch.  By

15   the way, that applies to me too.

16          All right.  Have a seat.

17          Okay.  I will now turn to the firearms offenses

18   charged in Counts Two, Four, Six, and Eight of the

19   indictment.  These counts charge a violation of the law

20   making it a crime for any person, "during and in relation to

21   any crime of violence... [to] use[] or carr[y] a firearm,"

22   or, "in furtherance of any such crime, [to] possess[] a

23   firearm."  Count Two reads as follows:  "On or about

24   August 5, 2014, in the Southern District of New York, Tyrone

25   Felder, a/k/a "Man Man," the Defendant, during and in

Judge-Jury Charge

1   relation to a crime of violence for which he may be

2   prosecuted in a court of the United States, namely, the

3   carjacking charged in Count One of this indictment, knowingly

4   did use and carry a firearm, and, in furtherance of such

5   crime, did possess a firearm, which was discharged, and did

6   aid and abet the same."  Count Two is a firearms count

7   connected to the carjacking offense charged in Count One.

8   What this means is that you cannot consider Count Two unless

9   you first determine that the Defendant is guilty of the

10  carjacking charged in Count One.  Now, Count Four reads as

11  follows:  "On or about August 5, 2014, in the Southern

12  District of New York, Tyrone Felder, a/k/a "Man Man," the

13  Defendant, during and in relation to a crime of violence for

14  which he may be prosecuted in a court of the United States,

15  namely, the robbery charged in Count Three of this

16  indictment, knowingly did use and carry a firearm, and, in

17  furtherance of such crime, did possess a firearm, which was

18  brandished, and did aid and abet the same."  Count Four is a

19  firearms count connected to the robbery offense charged in

20  Count Three.  This means that you cannot consider Count Four

21  unless you determine that the Defendant is guilty of the

22  robbery charged in Count Three.  Count Six reads as follows:

23  "On or about August 5, 2014, in the Southern District of New

24  York, Tyrone Felder, a/k/a "Man Man," the Defendant, during

25  and in relation to a crime of violence for which he may be

1    prosecuted in a court of the United States, namely, the

2    robbery charged in Count Five of the indictment, knowingly

3    did use and carry a firearm, and, in furtherance of such

4    crime, did possess a firearm, which was brandished, and did

5    aid and abet the same."  Count Six is a firearms count

6    connected to the robbery offense charged in Count Five.  This

7    means that you cannot consider Count Six unless you determine

8    the Defendant is guilty of the robbery charged in Count Five.

9    Count Eight reads as follows:  "On or about August 12, 2014,

10   in the Southern District of New York, Tyrone Felder, a/k/a

11   "Man Man," the Defendant, during and in relation to a crime

12   of violence for which he may be prosecuted in a court of the

13   United States, namely, the carjacking charged in Count Seven

14   of this indictment, knowingly did use and carry a firearm,

15   and, in furtherance of such crime, did possess a firearm,

16   which was discharged, and did aid and abet the same."  Count

17   Eight is a firearms offense connected to the carjacking

18   offense charged in Count Seven.  So, again, this means that

19   you cannot consider Count Eight unless you first determine

20   the Defendant is guilty of the carjacking charged in Count

21   Seven.  And the elements for these four counts are the same,

22   Counts Two, Four, Six, and Eight, as follows.

23            To find the Defendant guilty of the firearms

24   offenses charged in Counts Two, Four, Six, and Eight, the

25   Government must prove each of the following elements beyond a

Judge—Jury Charge

1    reasonable doubt:

2         First, on or about the dates alleged in the

3    indictment, the Defendant used or carried or possessed a

4    firearm, or any combination of those acts, or aided and

5    abetted the same -- or strike that.  Or aided and abetted the

6    use, carrying or possession of a firearm by another.  Second,

7    the Defendant used or carried the firearm, or aided and

8    abetted the use and carrying of the firearm, during and in

9    relation to the specified crimes of violence, or that the

10   Defendant possessed the firearm, or aided and abetted the

11   possession of the firearm, in furtherance of the specified

12   crimes of violence.  And, third, the Defendant acted

13   unlawfully and knowingly.

14        First Element:  The first element that the

15   Government must prove beyond a reasonable doubt is that on or

16   about the dates set forth in the indictment, the Defendant

17   used, carried, or possessed a firearm, or aided and abetted

18   the same.

19        A firearm under the statute means "any weapon...

20   which will or is designed to or may readily be converted to

21   expel a projectile by the action of an explosive."  In

22   considering the specific element of whether the Defendant you

23   are considering used or carried or possessed a firearm, it

24   does not matter whether the firearm was loaded or operable at

25   the time of the crime.  Operability is not relevant to your

1  determination of whether a weapon qualifies as a firearm.  And

2  I instruct you that a gun is a firearm.

3       "Use:"  In order to prove that the Defendant used

4  the firearm, the Government must prove beyond a reasonable

5  doubt that an active employment of the firearm by the

6  Defendant during and in relation to the commission of a crime

7  of violence.  Let me read that again.  In order to prove that

8  the Defendant used the firearm, the Government must prove

9  beyond a reasonable doubt an active employment of the firearm

10  by the Defendant during and in relation to the commission of a

11  crime of violence.  This does not mean that the Defendant must

12  actually fire or attempt to fire the weapon, although those

13  would obviously constitute use of the weapon.  Brandishing,

14  displaying, or even referring to the weapon so that others

15  present knew that the Defendant had the firearm available if

16  needed all constitute use of the firearm.  The mere possession

17  of a firearm at or near the site of the crime without active

18  employment as I just described it is not, however, sufficient

19  to constitute use of the firearm.

20       "Carry:"  In order to prove that the Defendant

21  carried the firearm, the Government must prove beyond a

22  reasonable doubt that the Defendant had the weapon within his

23  control so that it was available in such a way that it

24  furthered the commission of the crime.  The Defendant need not

25  have held the firearm physically, that is have had actual

1    possession of it on his person.  If you find that the

2    Defendant had dominion and control over the place where the

3    firearm was located, and had the power and intention to

4    exercise control over the firearm, and that the firearm was

5    immediately available to him in such a way that it furthered

6    the commission of the crime of violence, you may find that the

7    Government has proven that the Defendant carried the weapon.

8            "Possess:"  The legal concept of possession may

9    differ from everyday use of the term, so let me explain that

10   to you in some detail.  Actual possession is what most of us

11   think of as possession — that is, having physical custody or

12   control of an object, as I possess this pen.  If you find the

13   Defendant had the firearm on his person, therefore, you may

14   find the Defendant had possession of it.  However, a person

15   need not have actual, physical possession — that is, physical

16   custody of an object — in order to be in legal possession of

17   it.  If a person has the ability to exercise substantial

18   control over an object, even if he does not have the object in

19   his physical custody, and that person has the intent to

20   exercise control, then the person is in possession of that

21   article.  This is called "constructive possession."  Control

22   over an object may be demonstrated by the existence of a

23   working relationship between one person having the power or

24   ability to control the item and another person who has actual

25   physical custody.  The person having control "possesses" the

1  firearm, because he has an effective working relationship with

2  the person who has actual physical custody of the firearm, and

3  because he can direct the movement or transfer or disposition

4  of the firearm.  In addition, an individual may have

5  possession of an item that is not found on his person, because

6  that individual has a relationship to the location where the

7  item is maintained.  In this manner, for example, a

8  businessperson may possess things that are scattered

9  throughout a number of stores or offices or installations

10 around the country.  More than one person can have control

11 over the same firearm.  The law recognizes that possession may

12 be sole or joint.  If one person alone has actual or

13 constructive possession of a thing, possession is sole.  If

14 more than one person has possession of it, as I have defined

15 possession for you, then possession is joint.  That is what is

16 meant by "possession."  If you find that the Defendant had

17 such power and intention, then he possessed the firearm under

18 this element even if he possessed it jointly with another.

19 Proof of ownership of the firearm is not required.  Finally,

20 possession and ownership are not the same.  A person can

21 possess an object and not be the owner of the object.

22         Now, the Defendant is also charged with aiding and

23 abetting the crimes charged in Counts Two, Four, Six, and

24 Eight, the firearms offenses.  I previously instructed you on

25 aiding and abetting law, and you should apply those

1   instructions in determining whether the Defendant is guilty of

2   these Counts as an aider and abettor.  I also want to give you

3   an additional instruction that applies specifically to these

4   Counts, the firearms counts.  To convict the Defendant of

5   aiding and abetting the crime charged in these Counts, you

6   must find that the Defendant either facilitated the use,

7   carrying, or possession of the firearm or the commission of

8   the charged crimes of violence.  It is not necessary that the

9   Defendant facilitate both the possession, use, or carrying of

10  the firearm and the crimes of violence.  To convict the

11  Defendant of a firearms offense on an aiding and abetting

12  theory, you must find that the Defendant had the advance

13  knowledge that a participant in the crime of violence would

14  use, carry, or possess a firearm in furtherance of the crime

15  of violence.  Advance knowledge means knowledge at a time the

16  Defendant can attempt to alter the plan or withdraw from it.

17  Knowledge of the gun may, but does not have to, exist before

18  the underlying crime has begun.  It is sufficient if the

19  knowledge is gained in the middle of the underlying crime, so

20  long as the Defendant continues to participate in the crime

21  and has a realistic opportunity to withdraw from it.  You may,

22  but need not, infer that the Defendant has sufficient

23  foreknowledge if you find that the Defendant continued his

24  participation in the crime after learning about the use,

25  carrying, or possession of a gun by a co-participant in the

Judge-Jury Charge

1    crime of violence.  In other words, as to aiding and abetting

2    the offenses charged in Counts Two, Four, Six, and Eight, the

3    Government must prove beyond a reasonable doubt that the

4    Defendant either facilitated the use, carrying, or possession

5    of the firearm or the commission of the charged crime of

6    violence, and had knowledge of the firearm when he still had a

7    realistic opportunity to withdraw from the crime of violence.

8    That's all the first element.

9            Moving on to the second element.  The second element

10   of the firearms offenses is that the Defendant used or carried

11   a firearm during and in relation to a crime of violence, or,

12   in the alternative, that he possessed a firearm in furtherance

13   of such a crime.  "In relation to" means that the firearm must

14   have had some purpose, role, or effect with respect to the

15   crime of violence.  This requirement is satisfied if the

16   firearm facilitated, or had the potential to facilitate, the

17   specified crimes of violence.  To possess a firearm "in

18   furtherance of a crime of violence" requires that the

19   Defendant possessed a firearm and that the possession advanced

20   or moved forward the crime.  The mere presence of a firearm is

21   not enough.  The firearm must have played some part in

22   furthering the crime in order for this element to be

23   satisfied.  Now, you are instructed that the carjackings

24   charged in Counts One and Seven of the indictment and the

25   robberies charged in Counts Three and Five all qualify under

Judge–Jury Charge

1  the law as crimes of violence.

2      Third Element:  The third element the Government

3  must prove beyond a reasonable doubt is that the Defendant

4  knew that he was carrying or using a firearm during and in

5  relation to a crime of violence, or knew that he was

6  possessing a firearm in furtherance of such a crime, and that

7  the Defendant acted unlawfully and knowingly in doing so.  And

8  I have already defined for you "unlawfully" and "knowingly."

9      Okay.  Now, as to Counts Four and Six, if, and only

10 if -- which relate to Counts Three and Five.  If, and only if,

11 you find the Defendant guilty of Counts Four or Six as I've

12 just explained it to you, then you must make a special finding

13 on each Count for which you found the Defendant guilty.

14 Specifically, you must determine whether or not, during the

15 Defendant's use, carrying, or possession of a firearm, he

16 brandished the firearm, or aided and abetted another's

17 brandish of the firearm.  To "brandish" a firearm means to

18 display all or part of the firearm, or otherwise make the

19 presence of the firearm known to another person, in order to

20 intimidate that person, regardless of whether the firearm is

21 directly visible to that person.  Your finding as to brandish

22 must be beyond a reasonable doubt.  In addition, it must be

23 unanimous, in that all of you must agree that a firearm was

24 brandished.  And, again, as I told you earlier, you are going

25 to be provided with a verdict form that will include a space

Judge—Jury Charge

1    for you to indicate your determination with respect to this

2    issue.

3              Now, Counts Two and Eight, which relate,

4    respectively, to Counts One and Seven.  If, and only if, you

5    find the Defendant guilty of Counts Two or Eight as I just

6    explained to you, then you must make a special finding on each

7    of those Counts for which you found the Defendant guilty.

8    Specifically, you must determine whether or not, during the

9    Defendant's use, carrying, or possession of a firearm, or his

10   aiding and abetting of the use, carrying, or possession of a

11   firearm, the firearm was discharged.  "Discharge" means to

12   fire or shoot.  The Defendant need not be the person who

13   personally discharged the firearm and, indeed, the discharge

14   may even be accidental.  Your finding that a discharge

15   occurred must be beyond a reasonable doubt.  In addition, it

16   must be unanimous, in that all of you must agree that a

17   firearm was discharged.  Beyond a reasonable doubt and

18   unanimous.  That's required, as it is with respect to every

19   other aspect of your verdict.  You will be provided with a

20   verdict form that will include a space for you to indicate

21   your determination with respect to this issue.

22             Okay.  Moving on to Count Nine, which is the robbery

23   conspiracy count.  And Count Nine of the indictment charges

24   the Defendant with participating in a robbery conspiracy.  A

25   conspiracy is a kind of criminal partnership – an agreement,

Judge—Jury Charge

1   or an understanding, of two or more persons to join together

2   to accomplish some unlawful purpose.  The crime of conspiracy

3   to violate a federal law is an independent offense.  It is

4   separate and distinct from the actual violation of any

5   specific federal law or laws, which the law refers to as

6   "substantive crimes."  Indeed, you may find a Defendant guilty

7   of the crime of conspiracy to commit an offense against the

8   United States even though the substantive crime, which was the

9   object of the conspiracy, was not actually committed.  Count

10  Nine reads as follows:  "In or about Summer 2014, in the

11  Southern District of New York and elsewhere, Tyrone Felder,

12  a/k/a "Man Man," the Defendant, and others known and unknown,

13  willfully and knowingly did combine, conspire, confederate,

14  and agree together and with each other to commit robbery, as

15  that term is defined in Title 18, United States Code,

16  Section 1951(b)(1), and would and did thereby obstruct, delay,

17  and affect commerce and the movement of articles and

18  commodities in commerce, as that term is defined in Title 18,

19  United States Code, Section 1951(b)(3), to wit, Felder, and

20  others known and unknown, agreed to rob businesses and

21  individuals in Westchester County and Bronx County that

22  transacted business in interstate commerce."  I'm continuing

23  to quote from the Indictment here.  "In furtherance of the

24  conspiracy and to effect the illegal object thereof, the

25  following overt acts, among others, were committed in the

Judge—Jury Charge

1    Southern District of New York:  a.  On or about August 5,
2    2014, Tyrone Felder, a/k/a "Man Man," the Defendant, robbed
3    and carjacked a livery cab driver in the Bronx, New York.
4    b.  On or about August 5, 2014, Tyrone Felder, a/k/a "Man
5    Man," the Defendant, robbed employees of a convenience store
6    in Yonkers, New York.  c.  On or about August 5, 2014, Tyrone
7    Felder, a/k/a "Man Man," the Defendant, robbed employees of a
8    restaurant in Yonkers, New York.  d.  On or about August 12,
9    2014, Tyrone Felder, a/k/a "Man Man," the Defendant, robbed
10   and carjacked a livery cab driver in the Bronx, New York."
11           Now, to sustain its burden of proof with respect to
12   the conspiracy charge, the Government must establish the
13   following elements:  First -- and there are two elements.
14   First, the Government must prove that the conspiracy charged
15   in the indictment existed.  That is, that there was an
16   agreement or understanding among at least two people to
17   violate the laws of the United States that make it a crime to
18   commit a robbery that affects interstate or foreign commerce.
19   Then, second, the Government must prove that the Defendant
20   knowingly became a member of the conspiracy to commit robbery.
21   Again, both of these elements must be satisfied beyond a
22   reasonable doubt.
23           First Element:  Starting with the first element, a
24   conspiracy is an agreement or understanding, explicit or
25   implicit, of two or more people to accomplish a criminal or

Judge-Jury Charge

1   unlawful purpose.  In this instance, the unlawful purpose

2   alleged to have been the object of the conspiracy was the

3   robberies of businesses and individuals in Westchester County

4   and the Bronx.  In other words, the Government alleges that

5   there was an agreement or understanding and that its objective

6   was to commit robberies which affected interstate or foreign

7   commerce.  As for the time frame of the alleged conspiracy,

8   although it is charged that the conspiracy took place in or

9   about the summer of 2014, it is not essential that the

10  Government prove that the conspiracy started and ended on

11  specific dates or that it existed throughout that period.

12  Rather, it is sufficient to satisfy the first element, that

13  you find that in fact a conspiracy was formed, and that it

14  existed for any time within the charged period.

15          Second Element:  If you conclude that the Government

16  has proven beyond a reasonable doubt that the charged

17  conspiracy existed, you must then consider the second

18  essential element, which is that the Defendant was a member of

19  the conspiracy.  To prove this second element, the Government

20  must prove beyond a reasonable doubt that the Defendant

21  participated in the charged conspiracy and that he did so

22  unlawfully, intentionally and knowingly.  I have already

23  defined the terms "unlawfully" and "knowingly."  You should

24  apply the definitions that I have already given to you.

25  "Intentionally" means to act deliberately and with a bad

Judge-Jury Charge

1    purpose rather than innocently.  If you find beyond a

2    reasonable doubt that the Defendant participated in the

3    charged conspiracy and did so unlawfully, intentionally, and

4    knowingly, then the second element is satisfied.  In this

5    regard, it is not necessary that the Defendant be fully

6    informed of all the details of the conspiracy in order to

7    justify an inference of membership on his part.  Nor does the

8    Defendant need to know the full extent of the conspiracy or

9    all of its participants.  Indeed, it is not necessary that the

10   Defendant know more than one other member of the conspiracy.

11   Nor is it necessary that the Defendant receive any monetary

12   benefit from participating in the conspiracy.  All that is

13   necessary is proof beyond a reasonable doubt that the

14   Defendant intentionally joined in the conspiracy for the

15   purpose of furthering its unlawful objective.  The Defendant

16   also need not have joined the conspiracy at the outset.  The

17   Defendant may have joined it at any time in its progress, and

18   he will still be held responsible for all that was done before

19   he joined, as well as all that was done during the

20   conspiracy's existence while the Defendant was a member.  The

21   law does not require that each conspirator have an equal role

22   in the conspiracy.  Even a single act may be sufficient to

23   draw the Defendant within the ambit of a conspiracy if it

24   meets the essential requirements I have just described.

25   However, I want to caution you that the mere association by

1    the Defendant with a conspirator does not make the Defendant a

2    member of the conspiracy even when coupled with knowledge that

3    a conspiracy is taking place.  In other words, knowledge

4    without participation is not sufficient.  What is necessary is

5    that the Defendant has participated in the conspiracy with

6    knowledge of its unlawful purpose and with intent to aid in

7    the accomplishment of its unlawful objective.  In short, to

8    satisfy the second essential element of the charged

9    conspiracy, you must find beyond a reasonable doubt that the

10   Defendant, with an understanding of the unlawful character of

11   the conspiracy charged in Count Nine, intentionally joined the

12   conspiracy for the purpose of furthering the unlawful object

13   of committing robbery.  I have previously instructed you on

14   the law concerning robbery, and you should apply those same

15   instructions here to the object of the unlawful conspiracy

16   charged in Count Nine.

17           Now, let me just say something about what we call

18   venue.  In addition to all of the elements of the charged

19   crime that I have described for you, you must decide whether

20   any act in furtherance -- when I say -- I'm sorry.  Let me

21   start over.  In addition to all the elements of the charged

22   crimes that I have just described for you, you must decide

23   whether any act in furtherance of the charged crime you are

24   considering occurred within the Southern District of New York.

25   The Southern District of New York encompasses the following

Judge—Jury Charge

1  counties:  New York County (which is Manhattan), the Bronx,

2  Westchester, Sullivan, Orange, Rockland, Putnam, and Dutchess.

3  Thus, you must decide whether the crime charged, and this

4  applies to each of the crimes charged – or any act committed

5  to further or promote the crime – occurred within the Southern

6  District of New York.  For the venue requirement only, the

7  Government need not prove venue beyond a reasonable doubt.

8  Instead, the Government need only prove venue by a

9  preponderance of the evidence.  "Preponderance of the

10  evidence" means more likely than not.  Thus, the Government

11  has satisfied its venue obligations if you conclude that it is

12  more likely than not that the charged crime you are

13  considering, or any act in furtherance of that crime, occurred

14  in the Southern District of New York.

15        Now, there's a few other things I need to tell you,

16  which I've now completed describing the elements of the

17  offenses, but there's a number of relevant and important

18  matters that I need to describe, but they are miscellaneous.

19        First, regarding expert testimony:  In this case, I

20  permitted witnesses to express their opinions as an expert

21  about matters that are in issue.  An expert is someone who by

22  education or experience has acquired learning or experience in

23  a specialized area of knowledge.  Such witnesses are permitted

24  to give their opinions as to relevant matters in which they

25  profess to be an expert and give their reasons for their

1    opinions.  Expert testimony is presented to you on the theory

2    that someone who is experienced in the field can assist you in

3    understanding the evidence or in reaching an independent

4    decision on the facts.  Now, your role in judging credibility

5    applies to experts as well as to all other witnesses.  You

6    should consider the expert opinions that were received in

7    evidence in this case and give them as much or as little

8    weight as you think they deserve.  If you should decide that

9    the opinion of an expert was not based on sufficient education

10   or experience or on sufficient data, or if you should conclude

11   that the trustworthiness or credibility of an expert is

12   questionable for any reason, or if the opinion of the expert

13   was outweighed, in your judgment, by other evidence in the

14   case, then you might disregard the opinion of the expert

15   entirely or in part.

16          On the other hand, if you find the opinion of an

17   expert is based on sufficient data, education and experience,

18   and the other evidence does not give you reason to doubt his

19   conclusions, his or her conclusions, you would be justified in

20   placing reliance on his or her testimony.

21          Now, you have heard testimony about evidence seized

22   in connection with certain searches conducted by law

23   enforcement officers.  Evidence obtained from these searches

24   was properly admitted in the case, and may be properly

25   considered by you.  Such searches are entirely appropriate law

1    enforcement actions.  Whether you approve or disapprove of how

2    the evidence was obtained should not enter into your

3    deliberations, because I instruct you that the Government's

4    use of the evidence was entirely lawful.  You must, therefore,

5    regardless of your personal opinions, give this evidence full

6    consideration along with all the other evidence in the case in

7    determining whether the Government has proven the Defendant's

8    guilt beyond a reasonable doubt.

9             Also, you have heard testimony about cellphone

10   location information obtained from cellphone service

11   providers, such as AT&T, Verizon Wireless, or Sprint, pursuant

12   to a court order.  This evidence was properly admitted in this

13   case, and may be properly considered by you.  The acquisition

14   of this evidence was an entirely appropriate law enforcement

15   action.  Whether you approve or disapprove of how the evidence

16   was obtained should not enter into your deliberations, because

17   I instruct you that the Government's use of the evidence is

18   entirely lawful.  You must, therefore, regardless of your

19   personal opinions, give this evidence the full -- its -- try

20   that sentence again.  You must, therefore, regardless of your

21   personal opinions, give this evidence full consideration along

22   with all the other evidence in the case in determining whether

23   the Government has proven the Defendant's guilt beyond a

24   reasonable doubt.

25             We have, among the exhibits received in evidence,

1   some documents that are redacted.  "Redacted" simply means

2   that part of the document or recording was taken out.  You

3   are -- and there were no recordings that were redacted.  But

4   "redacted" means that part of the document was taken out.  You

5   are to concern yourself only with the part of the item that

6   has been admitted into evidence.  You should consider -- you

7   should not consider -- you should not consider any possible

8   reason why the other part of it has been deleted.

9           Now, regarding persons not on trial, you may not

10  draw any inference, favorable or unfavorable, towards the

11  Government or the Defendant from the fact that any person

12  other than the Defendant is not on trial here.  You also may

13  not speculate as to the reasons why other persons are not on

14  trial.  Those matters are wholly outside your concern and have

15  no bearing on your function as jurors.

16          Now, in reaching your decision as to whether the

17  Government has sustained its burden of proof, it would be

18  improper for you to consider any personal feelings you have

19  about the Defendant's race, religion, national origin, sex, or

20  age.  It would be equally improper for you to allow any

21  feelings you might have about the nature of the crimes charged

22  to interfere with your decision-making process.  Also, any

23  sort of bias, sympathy, or prejudice for or against either

24  side has no relevance to the matter before you.  Under your

25  oath as jurors, you are not to be swayed by bias, sympathy or

Judge-Jury Charge

1    prejudice.  You are to determine the guilt or innocence of the

2    Defendant based solely on the evidence and subject to the law

3    as I have charged you.

4          In addition, the question of possible punishment of

5    the Defendant, if any, is of no concern to the jury, and so it

6    may not enter into or influence your deliberations in any way.

7    The duty of imposing a sentence rests exclusively with the

8    court.  Your function is to weigh the evidence in the case and

9    determine whether the Defendant has been proven guilty beyond

10   a reasonable doubt, based solely on the evidence presented in

11   this courtroom.

12         Now, the verdict must represent the considered

13   judgment of each juror.  In order to return a verdict, it is

14   necessary that each juror agree.  Your verdict, and your

15   answers to all of the questions on the verdict sheet, must be

16   unanimous — all twelve of you must agree.  It is your duty, as

17   jurors, to consult with one another, and to deliberate with a

18   view to reaching an agreement, if you can do so without

19   violence to your individual judgment.  You must each decide

20   the case for yourself, but only after an impartial

21   consideration of the evidence in the case with your fellow

22   jurors.  In the course of your deliberations, do not hesitate

23   to reexamine your own views, and change your opinion, if you

24   are convinced it is erroneous.  But do not surrender your

25   honest conviction as to the weight or effect of evidence,

Judge—Jury Charge

1   solely because of the opinion of your fellow jurors, or for

2   the mere purpose of returning a verdict.  Remember at all

3   times that you are not partisans.  You are judges – judges of

4   the facts.

5           Now, when you retire to deliberate, you should elect

6   one member of the jury as your foreperson.  It could be any

7   one of you.  That person will preside over the deliberations

8   and speak for you here in open court.  The foreperson's vote

9   is not entitled to any greater weight than any other

10  individual juror.

11          You are not to discuss the case until all jurors are

12  present.  Only when all twelve jurors are present do you

13  constitute a jury, and only then may you deliberate.  So, you

14  can only deliberate when all twelve of you are present in the

15  room.

16          If it becomes necessary during your deliberations to

17  communicate with the Court, you may send a note to me, signed

18  by your foreperson or by one or more members of the jury.  No

19  member of the jury should ever attempt to communicate with the

20  Court by any means other than a signed writing, and the Court

21  will never communicate with any member of the jury on any

22  subject touching on the merits of the case otherwise than in

23  writing, or orally here in open court.  And you will note from

24  the oath about to be taken by the marshal, in a couple of

25  minutes, that he too, like all other persons, is forbidden to

Judge-Jury Charge

1  communicate in any way or manner with any member of the jury

2  on any subject touching on the merits of the case.  Bear in

3  mind also that you are never to reveal to any person - not

4  even to the Court - how the jury stands, numerically or

5  otherwise, on the questions before you, until after you have

6  reached a unanimous verdict.  In other words, do not tell me

7  in any note what your vote is on any count.

8              Now, if during your deliberations you want to review

9  the testimony of a particular witness, please send out a note

10  telling the Court precisely what you want to hear.  And please

11  be very specific, as specific as you can.  I urge you not to

12  ask for testimony unless you first speak amongst yourselves

13  and exhaust your total memory, since the collective memory of

14  the twelve people of the jury is better than that of any one

15  jury -- juror, I should say.  But, if after discussion, you

16  are still in doubt or vague as to a particular point in the

17  testimony and you want to review certain testimony, I will

18  have the court reporter gather that testimony for your review.

19  The lawyers and I, if that happens, may decide to have you

20  come out to hear the read-back of testimony, or we may send

21  you back a portion of the transcript.

22             I know that some or all of you have been taking

23  notes during the trial.  Let me remind you that your notes are

24  for your own personal use - they are not to be given or read

25  to another juror.  You may use them to refresh your

Judge—Jury Charge

1  recollection during deliberations, but it's important to

2  remember that the official record of what has occurred during

3  the trial is the official transcript prepared by the court

4  reporter.  Therefore, you must rely on the transcript to

5  resolve any question about what was actually said during the

6  trial.

7       Now, in reaching a decision, you are to rely solely

8  on the testimony of the witnesses, and the exhibits and

9  stipulations admitted into evidence at trial.  You are not to

10  do any investigation on your own.  This means that, among

11  other things, you must not conduct research via the Internet,

12  Google, or Wikipedia via your computer, laptop, tablet,

13  smartphone, cellphone, or any other media.  As I've said many

14  times before, your verdict must be based solely on the

15  evidence you see and hear in this courtroom, and nothing else.

16       You will have all of the exhibits that I admitted

17  into evidence with you in the jury room.  Some of the exhibits

18  may require the use of computers to play videos, but if you

19  need to see those, of course you can ask to see them, and we

20  will gladly play them for you.  But, basically, I'm going to

21  send all the exhibits back into the jury room with you.

22       I will also send in three copies of my instructions

23  in case you want to review them during your deliberations.

24  Now, if you find that you do not understand any of my

25  instructions, or you want me to go over them again to clarify

Sue Ghorayeb,  Official Court Reporter

1    some matters for you or just to reinforce what I had to say,

2    send me a note asking for re-instruction and I will be happy

3    to go over them.

4            Now, as you retire to commence your -- to begin your

5    deliberations, you will be provided with a verdict sheet,

6    which I will now explain.  We try to keep the verdict sheets

7    as simple as possible, and when you see it, you'll see that

8    you need to indicate your verdict with checkmarks.  So, for

9    example, it will say Count One, and there's a box for not

10   guilty or guilty.  And it says, "If you find the Defendant not

11   guilty of Count One, please proceed to Count Three."  Why is

12   that?  Because Count Two is the firearms offense related to

13   Count One.  So, if it's not guilty, then obviously you don't

14   have to worry about Number Two.  You just go on to Number

15   Three.  "If you find the Defendant guilty of Count One, do you

16   also find that death resulted?  Yes or no."  And then proceed

17   to Count Two.

18           And, remember, on all of these -- not only the

19   verdicts, guilty or not guilty, but all these other questions

20   that I've just instructed you about, your verdict needs to be

21   unanimous, all of you have to agree in order to render a

22   verdict, and the Government has the burden of proof beyond a

23   reasonable doubt.

24           Now, the verdict sheet is not the jury charge.  I

25   just gave you the jury charge, and I'm going to give you a

Judge-Jury Charge

1  copy of the jury charge.  So, I make it my practice not to

2  repeat any details about the jury charge on the verdict sheet.

3  The verdict sheet is just for the purpose of reporting your

4  verdict.  So, you have to apply all of the instructions I've

5  just given you to the determinations you need to make on the

6  verdict sheet, including beyond a reasonable doubt, unanimity.

7          And then it goes on to Count Two, which, as I said,

8  if it's not guilty on Count One, you don't even consider Count

9  Two.  But if it's guilty on Count One, you consider Count Two.

10  And there is a question on Count Two, "If you find the

11  Defendant guilty of Count Two, do you also find that the

12  firearm was discharged?  Yes, no -- yes or no."  Two different

13  boxes.  Again, the Government has the burden of proof beyond a

14  reasonable doubt.  Your verdict has to be unanimous.

15          Then it moves on to Count Three, which is the

16  alleged robbery of the Mini Mart.  The same thing, not guilty

17  or guilty.  If you find the Defendant not guilty, you go to

18  Count Five because you don't need to discuss Count Four.  If

19  you find the Defendant guilty of Count Three, you then proceed

20  to Count Four, which is the firearms charge, similar to Count

21  Two, except that on Count Four, which relates to the first of

22  the two alleged robbery, you know, the Mini Mart robbery, on

23  Count Four, if you find the Defendant guilty, then you also

24  have -- the next question is, "Do you also find that the

25  firearm was brandished?"  Remember, the previous one was

1    discharged, but this one is brandished.  Again, unanimous,

2    beyond a reasonable doubt.

3            And then Count Five relates to the alleged robbery

4    of the Dunkin' Donuts.  And so forth.  I'm not going to go

5    over every one because it's written in plain English.

6            And when you get to the very end, there's a space

7    for the date and for the foreperson to sign.  Actually, I once

8    had a jury report a verdict which wasn't signed, the form

9    wasn't signed.  Please don't do that.  You have got to sign

10   it.  Whoever the foreperson is has to sign it and date it when

11   you're ready to report your verdict.

12           Okay.  I need to spend a few moments with the

13   lawyers and the court reporter over at the side bar.  Just

14   stay in the jury box.  I'll be right back.  Keep an open mind.

15   Don't discuss the case, because I have more to say -- I may

16   have more to say after I've spoken with the lawyers.

17           (At side bar)

18           THE COURT:  Does the Government have any objections,

19   comments or suggestions?

20           MR. SCOTTEN:  No, Your Honor.

21           MS. COHEN:  No, Your Honor.

22           THE COURT:  Okay.  Does the defense have any

23   objections, comments or suggestions?

24           MR. RUHNKE:  Your Honor, just as you suggested

25   yesterday, we adopt our objections that we made in writing and

Judge—Jury Charge

1   all of the objections we made yesterday during the charge

2   conference, and we believe that is sufficient to preserve

3   those issues.  We wonder if the Government has a different

4   view?

5              MR. SCOTTEN:  No.

6              THE COURT:  I'm sure they don't and I don't care

7   what their view is.  It is sufficient.

8              MR. RUHNKE:  Thank you, Your Honor.

9              THE COURT:  Anything else?

10              MR. RUHNKE:  No, sir.

11              THE COURT:  Wait one second.  As I was thinking

12   about telling the jury about sending the evidence into the

13   jury room, there's some evidence —— maybe a lot of evidence ——

14   that in order for them to view, they would need the use of

15   your technology.

16              MS. COHEN:  We have actually prepared a scrubbed

17   laptop for them with all of the video exhibits.  So that will

18   be available to them to play the video without having to come

19   back out here.

20              THE COURT:  Okay.  Is that acceptable to you,

21   sending that laptop in?

22              MR. RUHNKE:  Yes.

23              MR. PATEL:  Yes.

24              THE COURT:  And it will be easy for someone to use?

25              MS. COHEN:  Yes.  It's —— my understanding is they

Judge—Jury Charge

1    will be playing the video off the desktop.

2           THE COURT:  That includes everything they would

3    need?

4           MS. COHEN:  Yes.

5           THE COURT:  How about an exhibit list.  Is there an

6    exhibit list?

7           MS. COHEN:  I can talk to Mr. McLaughlin about

8    whether he can do that.

9           MR. PATEL:  And the laptop has no Internet excess?

10          MS. COHEN:  That's correct.  It's all disconnected.

11          THE COURT:  I don't require an exhibit list but

12   sometimes it's helpful.  I will leave that up to you.  I'm not

13   ordering it.  I'm just throwing it out there, just curious.

14          MR. SCOTTEN:  We will consult and see if we have a

15   list ready.

16          THE COURT:  Oh, alternate jurors.  It's my practice

17   to discharge the alternate jurors, period, not to make them

18   stay around or continue to be available, unless someone has an

19   objection.

20          MR. SCOTTEN:  You don't tell them not to talk about

21   the case in case you need to call them?

22          THE COURT:  I don't usually do that when I've got --

23   I don't usually do that.  I'm willing to do that if you ask me

24   to do it.  It's certainly not incorrect, the law permits it.

25   It's Rule 24 or something like that.

1          MR. SCOTTEN:  Obviously, it's an exceptional case.

2    We usually ask for that because we hate to have a weird

3    situation.

4          THE COURT:  If that's what you want me to do, I'll

5    do it.

6          MR. SCOTTEN:  Yes.

7          THE COURT:  Do you have any problem with it?

8          MR. PATEL:  No.

9          THE COURT:  Okay.  I will do that as well, which

10   means I'm just going to tell them they can't talk to anyone

11   about the case because there might be a possibility -- we

12   don't think so, but there might be a possibility of having to

13   come back.

14         MR. SCOTTEN:  Yes, sir.

15         THE COURT:  All right.

16         MR. PATEL:  Yes.

17         THE COURT:  All set.  Thank you.

18         (In open court)

19         THE COURT:  Okay.  Thank you, counsel.

20         All right.  So, ladies and gentlemen, I've just

21   been informed by the Government that -- not just by the

22   Government, by the parties that there is a laptop, a

23   so-called scrubbed laptop.  Means it has nothing else on it.

24   But a laptop with the digital evidence on it which will allow

25   you to play any of that evidence, if that's what you want to

Judge-Jury Charge

1   do.   In other words, you don't have to come in and ask us to

2   do it for you.   You can ask us to do it for you if you're

3   having a problem or if you think that's a better way to do

4   it, but we're going to send in a laptop.   It doesn't have

5   access to the Internet, that should probably not surprise

6   you.   It's just, it's just a -- it's just a digital device

7   that will allow you to view the digital evidence.   So, you'll

8   have all that with you in the jury room.

9            Okay.   Now, we've come to the point at which the

10   regular jurors will commence their deliberations in the case.

11   What that means is that the time has also come for me to

12   discharge the alternate jurors, the three alternate jurors.

13   And I so appreciate your attention and your appearance and

14   your hard work, I really do, but -- and I'm sorry that you're

15   going to miss the experience of deliberating with your fellow

16   jurors, but the law provides for a jury of twelve persons in

17   the case and no more.

18            So, when you go, when you go back to the jury room,

19   the alternates should promptly retrieve their belongings.

20   And there should be lunch back there.   You should retrieve

21   that too.   But at that point, I'm going to have to ask you to

22   leave.   And after the alternates have left, then the rest of

23   you, the twelve of you, can begin your deliberations.   But,

24   again, only after the alternates have left.   You can exchange

25   handshakes, do whatever you want to do, but the point is that

1    the jury is the twelve, the first twelve, not the alternates.

2          I am going to ask the alternates to do one thing.

3    This is important.  This rarely happens, but it sometimes

4    happens that during the course of deliberations one of the

5    twelve jurors has to be excused for some reason or another.

6    And so, what I want to do, and the law permits me to do

7    this -- what I want to do is retain the alternate jurors in

8    this sense only.  I'm not making you stay in the courthouse.

9    You can leave.  You can go home or to work, whatever you want

10   to do.  But I need to ask you, the alternates now, the three

11   alternates, I need to ask, and, in fact, order you, to not

12   discuss the case with any other person among the three of you

13   or the others or friends or family or anyone.  Unless you get

14   called back in to replace a regular juror, which I think is

15   unlikely, but I just want to preserve that possibility.

16         We know how to reach you.  After the case is over,

17   we'll reach out to you and tell you that the case is over.

18   Or, if for some reason we need to call you back, we'll reach

19   out to you in order to -- you know, Alternate Number 1, 2,

20   and 3, in that order, to bring you back in, if that's

21   absolutely necessary.

22         So, Donna, we do have their contact information?

23         THE CLERK:  Yes.

24         THE COURT:  So, that's the way it has to work.  You

25   are excused, with the proviso that until -- it will be

Judge—Jury Charge

1  Ms. Hilbert probably reaches out to you and tells you that the

2  case is at an end —— that you're not allowed to discuss the

3  case with any other person.  Unless, of course, you come back

4  in, in which case we'll start deliberations from the

5  beginning.  I know that sounds tricky, but that's the way it

6  works.  If that happens, we'd start all over again with

7  deliberations and, of course, you would be a fully engaged

8  juror at that time.

9          If we don't see each other again, please know that

10  you've done your duty and you've done it well.  On behalf of

11  everyone in the case, thank you for your service.

12          At this point, you may commence your deliberations.

13  I believe lunch is here?

14          THE CLERK:  Yes.

15          THE COURT:  And, as I say, we'll get the evidence in

16  to you as soon as possible.  Thank you.  Oh, sorry.  I forgot

17  one thing.  The marshal needs to be sworn.

18          (Marshal sworn in to watch the jury)

19          THE COURT:  You may commence your deliberations, and

20  now you can discuss the case.  All right?  Good luck.

21          (Jury not present in the courtroom at 1:25 p.m.)

22          THE CLERK:  Counsel, Court Exhibit 2 will be marked

23  as the copy of the jury charge, just for the record.

24          THE COURT:  The three copies going in to the jury.

25          (Pause.  Attorneys looking over the marked exhibits)

Sue Ghorayeb,  Official Court Reporter

Judge—Jury Charge

1                THE CLERK:  Could you sign the exhibit list and

2       could you initial it for me.

3                Have all the parties gone over the exhibits and you

4       are all in agreement on what we're sending in to the jury

5       momentarily?

6                MR. SCOTTEN:  Yes.  For the Government, yes.

7                THE CLERK:  So, we are all in agreement?

8                MR. PATEL:  We are all in agreement.

9                (Recess.  Jury deliberating)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Judge-Jury Charge

1                (Jury not present in the courtroom at 4:10 p.m.)

2                THE COURT:  Okay.  Have a seat everybody.

3                The jury has reached a verdict, which was delivered

4     to us at 3:55 p.m. today, and I've reviewed the verdict sheet

5     for regularity.  So, let's get the -- let's get the jury in.

6                (Jury present in the courtroom)

7                THE COURT:  Okay.  Welcome back everybody.

8                Have a seat.

9                First of all, who is the foreperson?

10               Juror Number one.  And it's Ms. Oriani; is that

11    right?

12               THE FORELADY:  Yes.

13               THE COURT:  And, Ms. Oriani, has the jury

14    unanimously agreed upon a verdict?

15               THE FORELADY:  Yes.

16               THE COURT:  Okay.

17               THE CLERK:  Would you rise.

18               How does the jury find with respect to Count One;

19    not guilty or guilty?

20               THE FORELADY:  Guilty.

21               THE CLERK:  "If you find the defendant guilty of

22    Count One, do you also find that death resulted?"

23               Answer:  Yes or no?

24               THE FORELADY:  Yes.

25               THE CLERK:  With respect to Count Two:  "Firearms

Judge—Jury Charge

1    Offense during Carjacking on August 5th, 2014;" not guilty or

2    guilty?

3              THE FORELADY:  Guilty.

4              THE CLERK:  With respect to the question:  "Do you

5    also find that the firearm was discharged?"  Answer:  Yes or

6    no?

7              THE FORELADY:  Yes.

8              THE CLERK:  With respect to Count Three:  "Robbery

9    of the Mini-Mart;" not guilty or guilty?

10             THE FORELADY:  Guilty.

11             THE CLERK:  With respect to the question —-

12             THE COURT:  Count Four.

13             THE CLERK:  Count Four.  I apologize.

14             With respect to Count Four:  "Firearms Offense

15   during Robbery of the Mini-Mart;" not guilty or guilty?

16             THE FORELADY:  Guilty.

17             THE CLERK:  "Do you also find that the firearm was

18   brandished?"  Answer:  Yes or no?

19             THE FORELADY:  Yes.

20             THE CLERK:  With respect to Count Five:  "Robbery of

21   the Dunkin' Donuts;" not guilty or guilty?

22             THE FORELADY:  Guilty.

23             THE CLERK:  "Count Six:  Firearms during Robbery of

24   the Dunkin' Donuts."  Excuse me.

25             "Firearms Offense during Robbery of the Dunkin'

Judge-Jury Charge

1    Donuts;" not guilty or guilty?

2              THE FORELADY:  Guilty.

3              THE CLERK:  "Do you also find that the firearm was

4    brandished?"  Answer:  Yes or no?

5              THE FORELADY:  Yes.

6              THE CLERK:  With respect to Count 7:  "Carjacking on

7    August 12, 2014;" not guilty or guilty?

8              THE FORELADY:  Guilty.

9              THE CLERK:  "Do you also find that death resulted?"

10             Answer:  Yes or no?

11             THE FORELADY:  Yes.

12             THE CLERK:  With respect to Count Eight:  "Firearms

13   Offense during Carjacking on August 12, 2014;" not guilty or

14   guilty?

15             THE FORELADY:  Guilty.

16             THE CLERK:  "Do you also find that the firearm was

17   discharged?"  Answer:  Yes or no?

18             THE FORELADY:  Yes.

19             THE CLERK:  With respect to Count Nine:  "Robbery

20   Conspiracy;" not guilty or guilty?

21             THE FORELADY:  Guilty.

22             THE COURT:  Thank you, ma'am.  You may have a seat.

23             Would either party like the jury polled?

24             MR. PATEL:  Yes, please, Your Honor.

25             THE COURT:  Okay.

Sue Ghorayeb,  Official Court Reporter

Judge-Jury Charge

1           THE CLERK:  Juror Number 1, is that your verdict?

2           JUROR #1:  Yes, ma'am.

3           THE CLERK:  Juror Number 2, is that your verdict?

4           JUROR #2:  Yes.

5           THE CLERK:  Juror Number 3, is that your verdict?

6           JUROR #3:  Yes.

7           THE CLERK:  Juror Number 4, is that your verdict?

8           JUROR #4:  Yes.

9           THE CLERK:  Juror Number 5, is that your verdict?

10          JUROR #5:  Yes.

11          THE CLERK:  Juror Number 6, is that your verdict?

12          JUROR #6:  Yes.

13          THE CLERK:  Juror Number 7, is that your verdict?

14          JUROR #7:  Yes.

15          THE CLERK:  Juror Number 8, is that your verdict?

16          JUROR #8:  Yes.

17          THE CLERK:  Juror Number 9, is that your verdict?

18          JUROR #9:  Yes.

19          THE CLERK:  Juror Number 10, is that your verdict?

20          JUROR #10:  Yes.

21          THE CLERK:  Juror Number 11, is that your verdict?

22          JUROR #11:  Yes.

23          THE CLERK:  And, Juror Number 12, is that your

24  verdict?

25          JUROR #12:  Yes.

Sue Ghorayeb,  Official Court Reporter

Judge—Jury Charge

1              THE CLERK:  The jury has been polled.

2              THE COURT:  Okay.  I'm going to direct the Clerk to

3     file and record the verdict.

4              Ladies and gentlemen, I'm now going to discharge

5     you from your duties.  You've done them extremely well.  I

6     have said that to you before, I mean it, and now I'll say it

7     to you again.  I hope that —— I know that jury service is

8     difficult, but I hope it's been rewarding.  You certainly

9     have done everything that's been expected of you.

10             Now, when you're —— when you leave, you are no

11    longer under the order that you can't talk about the case

12    with anybody.  You can talk about the case with anybody you

13    want.  You're not required to, but you certainly can if you

14    want to.

15             It's my practice to meet with the jurors very

16    briefly after I deal with some issues with the lawyers, which

17    will take a few minutes.  So, if any or all of you want to

18    stick around for a few minutes, I'm just going to come back

19    and shake your hand and, you know, thank you personally,

20    that's all.  We are not going to talk about the case, but I

21    think what you've done is so important, you deserve to be

22    thanked by me personally.  I intend to do that.

23             By the way, you don't have to wait around for me,

24    you don't.  You are free to go.  If you want to stick around,

25    you can, and it will just be a few minutes.  With that, you

Judge—Jury Charge

1    are discharged with the thanks of the Court.

2              (Jury not present in the courtroom)

3              THE COURT:  Have a seat, please.

4              Are there any applications?

5              I will set a sentencing date in a minute, but is

6    there anything else that we need to address?

7              MR. PATEL:  Your Honor, thank you.  If we could have

8    until October 9th to file any posttrial motions.

9              THE COURT:  Yes, you can have that.  You're

10   certainly not required to file posttrial motions, but you have

11   the right to do so.  Basically, you're asking for -- I think

12   the rule is two weeks; is that right?

13             MR. PATEL:  Yes.

14             THE COURT:  So, whatever it is you are asking for is

15   basically two extra weeks?

16             MR. PATEL:  That's correct, Your Honor.

17             THE COURT:  Okay.  Any motions -- any defense

18   motions shall be filed by October 9th.  And if there are

19   defense motions and the Government -- then the Government

20   should respond to them by no later than October 23rd.  All

21   right?

22             MR. SCOTTEN:  Yes, Your Honor.  Yes, Your Honor.

23             THE COURT:  I'll direct that the Probation

24   Department conduct a presentence investigation and prepare a

25   Presentence Report.

Judge—Jury Charge

1            And, Mr. Felder, as part of that presentence

2    investigation, you're going to be interviewed by the

3    Probation Department, and your lawyer or lawyers, however you

4    would like to proceed, will be with you when that happens.

5            If you do speak to the Probation Officer, please

6    make sure that anything you say is truthful and accurate,

7    because whatever you do say is going to be reported to me,

8    and if it's not truthful and accurate, that will also be

9    reported to me, which will —— which will probably be

10   unfavorable to you.  And when the Presentence Report is

11   prepared, you will have an opportunity to review it before

12   sentencing, and I urge you to review it carefully and let

13   your lawyers know if there are any objections or comments or

14   anything you want to say about them —— about the report, so

15   that your lawyers can tell me about those objections or

16   comments of any kind prior to sentencing.  If you wait until

17   after sentencing, it's too late, so you need to do it before

18   sentencing.  And, also, you should know that at sentencing

19   both you and your attorney will have an opportunity to be

20   heard before I impose sentence.

21           So, Donna, can we give them a date?

22           THE CLERK:  Yes.

23           THE COURT:  Normally, it's three months, but we have

24   a trial during December, and, of course, there's the holidays

25   in December.  So we would like to put the sentencing over

1   until January.  Is that okay with the Government?

2                  MR. SCOTTEN:  Yes, Your Honor.

3                  MR. PATEL:  Yes, Your Honor.  Thank you.

4                  THE COURT:  Okay.

5                  THE CLERK:  How about Thursday, January 3rd, at

6   11:00 o'clock?

7                  THE COURT:  You know what, let's make it -- let's

8   put it the following week, if you don't mind, Donna, because

9   then they can submit -- let's pick a date the following week,

10  towards the end of the next week.

11                 THE CLERK:  We have a trial again.

12                 THE COURT:  Of course.  Plus, I'm going to be out a

13  couple of days that week too, right.  So, we have to go to the

14  third week.  Sorry.

15                 THE CLERK:  How about Friday, January 18th, 2019,

16  10:30.

17                 THE COURT:  Does that work for everybody?

18                 January 18th, at 10:30 did you say?

19                 THE CLERK:  Yes, Judge.

20                 MR. PATEL:  I believe it should be fine, Your Honor.

21                 MR. SCOTTEN:  Yes, Your Honor.

22                 THE COURT:  Okay.  Any defense submission or any,

23  you know, any sentencing memorandum from the defense will be

24  due on -- well, let's make it January 4th, 2019, that's plenty

25  of time, and any response from the Government or any

1   submission from the Government will be due January 11th, 2019.

2   Okay.  So, do you have all those dates?

3               The sentencing date is 1/18/19 at 10:30.  Defense

4   submission January 4th and Government submission January

5   11th.  And, of course, if the Defendant wishes to make

6   posttrial motions, they're due by October 9th, and the

7   Government's response will be due October 23rd.  Okay.

8               Anything else that we need to do before we adjourn?

9               MR. SCOTTEN:  Not from the Government, Your Honor.

10  Thank you.

11              MR. PATEL:  Not -- no.  Thank you, Your Honor.

12              THE COURT:  Okay.  Let me again tell you how much I

13  appreciate your hard work and professionalism, and it's really

14  a pleasure to preside over a trial in which the lawyers are so

15  excellent, universally excellent, as they have been in this

16  case.

17              MR. PATEL:  Thank you, Your Honor.

18              THE COURT:  Anyway, have a nice day everybody.

19              We are adjourned.

20              (Case adjourned)

21                              INDEX

22  Ms. Cohen Summation                              1245

23  Mr. Ruhnke Summation                             1284

24  Mr. Scotten Rebuttal                             1295

25  Judge Jury Charge                                1304